UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

SYLVIA PANETTA (pro se),                              :     Civil No. **20cv2255**
                                                      :
                          Plaintiff,                  :
                                                      :     COMPLAINT
                    vs.                               :     AND
                                                      :     JURY DEMAND
Joseph Cassel – Individual Capacity                   :
Town of Wallkill (TOW) - Municipal Corporation        :
Daniel Depew - Individual & Official Capacity as Town :
   of Wallkill (TOW) Supervisor                       :
Richard Guertin - Individual & Official Capacity as TOW :
   Municipal Attorney and City of Middletown Attorney :
Patrick S. Owen - Individual & Official Capacity as TOW :
   Judge                                              :
Joseph A. Owen - Individual & Official Capacity as TOW :
   Judge                                              :
David Hoovler – Individual and Official Capacity as   :
   Orange County District Attorney                    :
Andrew Kass – Individual and Official Capacity as Orange :
   County Assistant District Attorney                 :
Michael Purcell – Individual and Official Capacity as :
   Orange County Assistant District Attorney          :
Orange County Government Center                       :
Steven Brockett – Individual & Official Capacity as City :
   of Middletown Judge                                :
Robert Hertman - Individual & Official Capacity as TOW :
   Chief of Police                                    :
M. Donaldson – Individual & Official Capacity as TOW  :
   Detective police officer                           :
Antonino Spano - Individual & Official Capacity as TOW :
   Police Officer                                     :
Jason Farningham, Individual & Official Capacity as TOW :
   Police Officer                                     :
Anthony Grosso, Individual & Official Capacity as TOW :
   Police Officer                                     :
Kelly Ann Boss, Individual & Official Capacity as TOW :
   Police Officer                                     :
Kate Monahan, Individual & Official Capacity as TOW  :
   Police Officer and photographer                    :
Barry Weissman, Individual & Official Capacity as TOW :
   Police Officer                                     :
Julia Ashworth, Individual & Official Capacity as TOW :
   Police Officer                                     :

1

A Solano, Individual & Official Capacity as TOW Police
  Officer                              :

Christopher DiNapoli - Individual & Official Capacity as
  TOW Police Officer                 :

John Snellinger - Individual & Official Capacity as TOW
  Police Officer               :

Jessica Kenney – Individual & Official Capacity as TOW
  Police Officer               :

Joseph Steuber - Individual & Official Capacity as TOW
  Police Officer and photographer     :

Jessica Steuber - Individual & Official Capacity as TOW
  Police Officer and photographer     :

David Ayers – Individual & Official Capacity as Orange
  County Sheriff Department Investigator :

Orange County Office for the Aging

Alison Johannesson, Individual & Official Capacity
  employee of Office for the Aging

Joshua Furman DVM, Individual & Official Capacity of
  Monhagan Veterinary Hospital veterinarian

Paul Johnson DVM, Individual & Official Capacity Animal :
  Health Center, Inc. veterinarian

Catherine Etherington DVM, Individual & Official Capacity:
  East Greenbush Animal Hospital, Inc. veterinarian

East Greenbush Animal Hospital, LLC. – Limited Liability
  Corp.

Emanouil Petkov – Individual & Official Capacity Orange
  County Animal Emergency Service veterinarian

Elizabeth Susen DVM – Individual & Official Capacity
  Middletown Veterinary Hospital veterinarian

Mountain Rottie Rescue of New York, Inc.  501(c)3 non-
  profit corporation

Krissie Downey - Individual & Official Capacity
  Mountain Rottie Rescue of New York, Inc.

Jamie Gaebel – Individual and Official Capacity member
  volunteer Mountain Rottie Rescue of New York, Inc.

Pay Eyerman – Individual Capacity as owner of KK dog

Suzanne Taurone – Individual & Official Capacity of  owner:
  Suzanne's Dog Training

Lisa Carder – Individual and Official Capacity of co-owner
  Suzanne's Dog Training

George McClure – Individual & Official Capacity volunteer :
  Mountain Rottie Rescue of New York, Inc.

Kelly Lambert Ambrose – Individual & Official Capacity
  Volunteer/treasurer Mountain Rottie Rescue of New York, :
  Inc.

Christine Larocca Mann Uveges - Individual & Official

Capacity Mountain Rottie Rescue of New York, Inc.       :
Hudson Valley Rottie Rescue, Inc.       :
Hudson Valley Rottie Rescue, Inc.501(c)3 non-profit       :
  corporation       :
JeanYoungman - Individual & Official Capacity       :
  Mountain Rottie Rescue of New York, Inc. & Hudson       :
  Valley Rottie Rescue, Inc.       :
Lynn Herring - Individual & Official Capacity       :
  Mountain Rottie Rescue of New York, Inc.       :
Pets Alive, Inc., 501(c)3 Corporation       :
Kerry Clair – Individual & Official Capacity Director of       :
  Pets Alive, Inc.       :
Tina Hudson – Individual & Official Capacity of A       :
  Rottweiler Empire Rescue, Inc.       :
Eric Bellows – Individual & Official Capacity Pack       :
  Ethics Rescue       :
Karma K-9 Rescue, Inc., 501(c)3 Corporation       :
Stephanie Palmer, Individual & Official Capacity as Board    :
  Of Director Karma K-9 Rescue, Inc.       :
Shari Bach, Individual & Official Capacity as Director       :
  Paws Unlimited       :
Susan Bossley – Individual & Official Capacity President of :
  Goshen Humane Society       :
Goshen Humane Society, Inc. 501(c)3 Corporation       :
April Wood, Individual and Official Capacity Director       :
  Middletown Humane Society       :
Warwick Valley Humane Society, Inc. 501(c)3 non-profit       :
  corporation       :
Susan Barron, Individual & Official Capacity Director       :
  Warwick Valley Humane Society       :
Times Herald-Record newspaper       :
Nathan Brown, Individual and Official Capacity as       :
  Journalist Times Herald-Record newspaper       :
Joseph Vanderhoof, Individual and Official Capacity as       :
  Publisher Times Herald-Record       :
John and Jane Does 1-20       :

Defendants.

**PARTIES**

Plaintiff Information
Sylvia Panetta, P.O.B. 55, Howells, NY 10932  Orange County, New York (845) 341-8786

Defendant Information

1. Joseph Cassel - 495 County Rd. 50, New Hampton, NY 10958 Orange County (845) 374-4809
2. Town of Wallkill - Municipal Corporation, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10941 Orange County
3. Daniel Depew – was TOW Supervisor, currently c/o Middletown Medical, 1 Edgewater Drive, Middletown, NY 10940  845 342-4774 Orange County
4. Richard Guertin – TOW attorney & City of Middletown attorney, Now Mdtn Court Judge, 2 James St., Middletown 10940  845 476-3630
5. Patrick S. Owen, Judge, c/o Town of Wallkill, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-7822
6. Joseph A Owen, Judge, c/o Town of Wallkill, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-7822
7. David Hoovler – District Attorney, Orange County Government Center, 255 Main Street, Goshen, NY 10924  Orange County 845 291-2050
8. Andrew Kass – Assistant District Attorney, Orange County Government Center, 255 Main Street, Goshen, NY 10924  Orange County 845 291-2050
9. Michael Purcell – Assistant District Attorney, Orange County Government Center, 255 Main Street, Goshen, NY 10924  Orange County 845 291-2050
10. Steven Brockett, Judge Middletown City Court, 3 James St., Middletown, NY  Orange County 845 346-4050
11. Robert Hertman, Police Chief, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-6757
12. M. Donaldson, detective police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-6757
13. Antonino Spano, police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940   Orange County 845 692-6757
14. Daniel Covey, police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-6757
15. Jason Farningham, police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  (now working for Monroe PD, 104 Stage Rd., Monroe, NY 10950) Orange County (845) 782-8644
16. Anthony Grosso, police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940 (now working for Monroe PD, 104 Stage Rd., Monroe, NY 10950) Orange County (845) 782-8644
17. Kelly Ann Boss, police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940 Orange County Orange County  845 692-6757
18. Kate Monahan, police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940 Orange County 845 692-6757
19. Barry Weissman, police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940   Orange County 845 692-6757
20. Julia Ashworth, police officer, Town of Wallkill PD, 99 Tower Drive, Middletown, (Town of Wallkill) NY 10940 Orange County  845 692-6757
21. A. Solano, police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940 Orange County  845 692-6757
22. Christopher DiNapoli - police officer, Town of Wallkill PD, 99 Tower Drive, (Town of

Wallkill) Middletown, NY 10940  Orange County 845 692-6757

23. John Snellinger - police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-6757

24. Jessica Kenney - police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-6757

25. Joseph Steuber -  police officer, Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-6757

26. Jessica Steuber - police officer,  Town of Wallkill PD, 99 Tower Drive, (Town of Wallkill) Middletown, NY 10940  Orange County 845 692-6757

27. David Ayers, Orange County, New York

28. County of Orange, Orange County Government Center, 255 Main Street, Goshen, NY 10924 Orange County 845 291-4000

29. Orange County Office for the Aging, 40 Matthews Street #305, Goshen, NY 10924   Orange County 845 615-3700

30. Alison Johannesson – clerk, Office for the Aging, 40 Matthews Street #305, Goshen, NY 10924  Orange County 845 615-3700

31. Joshua Furman DVM – Monhagen Veterinary Hospital 208 Monhagen Ave., Middletown, NY 10940  or 91 Review Crest Drive, Pt. Jervs, NY 12771 Orange County 845 342-1091

32. Paul Johnson DVM, 488 E. Main Street, Middletown, NY  Orange County 845 343-9888

33. Catherine Etherington DVM – c/o East Greenbush Animal Hospital, 2 Springhurst Drive, East Greenbush, NY  12061  Rensselaer County (518) 477-7400

34. East Greenbush Animal Hospital LLC –2 Springhurst Drive, East Greenbush, NY 12061, Rensselaer County  The Defendant is incorporated under the laws of the State of New York and has its principal place of business in the State of New York.

35. Emanouil Petkov DVM – c/o Orange County Emergency Service, 517 Rt. 211, Middletown, NY 10941  Orange County 845 692-0260

36. Elizabeth Susen DVM, Middletown Veterinary Hospital, 189 Waywayanda Ave., Middletown, NY  Orange County 10940  845 343-7012

37. Mountain Rottie Rescue of New York, Inc., 501(c)3 non-profit corporation, POB 109, 159 Cold  Spring Rd., Monticello, NY 12701 Sullivan County www.MountainRottieRescue.org, Mountainappl@yahoo.com, The Defendant is incorporated under the laws of the State of New York and has its principal place of business in the State of New York

38. Krissie Downey – 159 Cold Spring Rd., Monticello, NY 12701, POB 350, Clifton Park, NY 12065  Sullivan County

39. Jamie Gaebel - Jeffersonville, N.Y., Sullivan County (845) 482-2210

40. Pay Eyerman –as owner of Karousel Kennel dog,  Sparrowbush, Orange County, NY

41. Suzanne Taurone – 99 Purdys Lane, New Windsor, NY 12553 Orange County, 845 629-4789  suze4094@g-mail.com

42. Lisa Carder - 99 Purdys Lane, New Windsor, NY 12553 Orange County, 845 629-4789

43. George McClure - 45 Penstock Rd., Lake Katrine, NY 12449 845 336-8044, 914 388-0344 & 914 388-0498 cells Ulster County

44. Kelly Lambert Ambrose – 276 Round Lake Road, Ballston Lake, NY 12019 Saratoga County

45. Christine Larocca-Mann-Uveges – aka Maritza Espenberg  381 Oakland Ave., Cuddebackville, NY 12729  Orange County 845 672-3625, 845 536-7193, 845 672-3647, 845 659-9875, 845 616-9619, 914 357-7193, 845 368-4464, 845 368-4464, 9727-865-2806, (646) 209-3851

46. Hudson Valley Rottie Rescue, Inc. 501(c)3 non-profit corporation 4/1/13. 66 Guymark Tpk., Middletown, NY 10940 (Youngman residence) The Defendant is incorporated under the laws of the State of New York and has its principal place of business in the State of New York

47. Jean Youngman – 66 Guymard Tpke., Middletown, NY 10940 Orange County 845 386-1943, 845 820-4533 cell, 727 861-0375; 845 386-1966 myrottietoo@netscape.net

48. Lynn Herring –17 Hunts Road, Newburgh, NY 12550 Works for social services welfare examiner OC Gov't Orange County

49. Pets Alive, Inc., 363 Derby Rd., (TOW) Middletown, NY 10940 845 386-5408 The Defendant is incorporated under the laws of the State of New York and has its principal place of business in the State of New York

50. Kerry Clair –88A Mill Pond Rd., Mount Hope, NY. Orange County 845 386-8001

51. Tina Hudson – 16 Woodside Dr., Clifton Park, NY 12065 Saratoga County www.rottieempirerescue.com 518 373-9622.

52. Eric Bellows – Karma K-9 Rescue, 613 Lynk St., Sprakers, NY 12166 Montgomery County (646) 209-385, 518 258-6845 23 Marlborough St., Albany, NY 12209

53. Karma K-9 Rescue, Inc. – c/o Stephanie Palmer, 23 Marlborough St., Albany, NY 12209 The Defendant is incorporated under the laws of the State of New York and has its principal place of business in the State of New York. 518 461-3954stephanie@karmak9.org

54. Stephanie Palmer, (Karma K-9 Rescue Bd. of Directors) 21 Black Lake Rd., Catskill, NY 12414 Greene County 518 461-3954 cell; 518 426-8379 or 23 Marlborough St., Albany, NY 12209 or c/o Eric Bellows address Sprakers, NY 12166

55. Shari Bach – Paws Unlimited. 637 Murray Rd., Kingston, NY 12401 Ulster County 845 336-7297

56. Susan Bossley – c/o Goshen Humane Society, 44 Police Drive., Goshen, NY 10924 Ulster County 845 294-3984

57. Goshen Humane Society, Inc. – 44 Police Dr., Goshen, NY 10924 845 294-3984

58. April Wood c/o Middletown Humane Society, 142 Bloomingburg Rd., Town of Wallkill, NY 10940

59. Warwick Humane Society, Inc. – 48 Public Works Drive, Warwick, NY 10940 845 986-2473

60. Susan Barron, c/o Warwick Humane Society, 48 Public Works Drive, Warwick, NY 10990 845 986-2473

61. Times Herald-Record (THR) newspaper, owned by public corporation Gannett Co., Inc. 40 Mulberry St., Middletown, NY 845 341-1100

62. Nathan Brown, call his cell (THR) newspaper, 40 Mulberry St., Middletown, NY 845 341-1100 (THR) newspaper, 40 Mulberry St., Middletown, NY 845 341-1100

63. Joseph Vanderhoof, (THR) newspaper, 40 Mulberry St., Middletown, NY Orange County 845 341-1100

64. Jane Doe Orange County Jail Nurse 1

65. Jane Doe Orange County Jail Nurse 2

66. John and Jane Does 3-20


## JURISDICTION AND VENUE

67. Sylvia Panetta (Plaintiff), Plaintiff in this action, is a 72-year old woman, citizen and resident of Orange County, New York.

68. In the years preceding March 6, 2012, Plaintiff bred, raised and sold dogs internationally for 43 years, 27 years at her home and property in the Town of Wallkill, Orange County, New York, the property zoned appropriately for the purpose for which it was purchased in May, 1985.

69. This Honorable Court has jurisdiction over the federal claims set forth below.

70. Events giving rise to Plaintiff's claim occurred at 237 Derby Road, Town of Wallkill, Town of Wallkill Court, Middletown City Court, Orange County Jail in Goshen, all in Orange County, New York.

71. Plaintiff sustained injuries including multiple neurological damages, blunt force injuries to the knees, rubs and shoulders, a Traumatic Brain Injury, and claustrophobia.

72. Plaintiff has expectations that law enforcement and judicial civil servant employees honor their Oaths to uphold, support and defend the Constitution from enemies from within and without, said Constitution enacted to secure and safeguard all American nationals' unalienable rights and protect our form of government, a free and independent republic for a free, sovereign and educated people.

73. Plaintiff's reputation and character was discredited, defamed, humiliated, damaged, slandered, libeled and caused great personal injury, including severe mental anguish, emotional distress and resulted in physical injuries, loss of real and chattel property and business interests.

74. Plaintiff contends that this Court has jurisdiction over this action based on the grounds that Plaintiff was wrongfully, unlawfully and through acts under color of state law, consisting of

racketeering and corruption, robbed of her dogs, property, assets and rights. Plaintiffs contend that the defendants, and each of them, acted knowingly, intentionally, deliberately, maliciously and, without limitation, in continuous violation of Plaintiffs' due process rights as afforded in the 1st, 4th 5th 6th 7th and 8th and, inter alia, 14th Amendments to the United States Constitution, Title 42 U.S.C. § 1981, 1983, 1985(3), 1986, Title 18 U.S.C. racketeering, and that defendants' knowing, willful and despicable conduct constitutes conspiracy against rights, deprivation of rights under color, racketeering, extortion, theft, interference with commerce, illegal restraint of trade, sabotage, treason, false claims against the United States, and campaign of hate against Plaintiff as stated below.

75.  Plaintiff is an individual previously domiciled at 237 Derby Rd., in the Town of Wallkill, New York, Orange County, since 1985, when she purchased her 99.2 acre farm ("the Property") from its previous owner. Incident to acquiring this real property consisting of land and structures, Plaintiff acquired the bundle of rights derived from state, federal and common law, such as privacy, lifestyle, due process, and other unalienable rights which also comprise the requisite property interests. Plaintiff's occupation was as an animal enterprise owner in the production of Rottweiler dogs.

76.  Venue is proper because Defendants' complained-of conduct occurred in Orange County in the state of New York. Plaintiff is domiciled in the state of New York. Venue lies in this district pursuant to 28 U.S.C. §1391(b)

77.  Plaintiff spent money on food, including that imported from Canada, preventive and treatment medications, vaccines, veterinarian services, shipping crates, airline shipping of puppies and dogs to all U.S. states (including Hawaii and Alaska), and Canada, Mexico, Central America, Bahamas, United Arab Emirates, etc.), advertising in U.S., Canadian and European magazines, dog houses, chain link fencing, fencing repair supplies, many tons of stone for dog runs' floors,

8

repair materials, etc..

78.    Plaintiff's enterprise thus benefits the local community and economy, benefits the state, and benefits the United States for generating income and wealth circulating in the community, as Plaintiff engaged in the purchase, production and sale of commodities in intra and interstate trade defined as domestic animals (dogs), food, fuel for vehicles (another big-ticket item in interstate trade) used to pick up food, transport and pick up dogs at various airports in New York City, New York State and New Jersey, fencing supplies, dog products, etc.

79.    Plaintiff has been directly, indirectly, adversely, and irreparably harmed by Defendants' arbitrary and capricious imposition of local and state codes, violations and orders without jurisdiction, theft of her dogs/property, loss of irreplaceable genetic pools, bloodlines developed over 43 years, deprivation of rights under color, breach of the peace, and violation of state and federal law at issue here and identified below.

80.    Plaintiff's injuries are ongoing and continuous until the Court Orders post-deprivation and other relief prayed for in these claims. The real properties consisting of land, home and all chattels property, dogs, etc., which are the subject of this claim, were located within the County of Orange, New York, and the majority of wrongdoing was committed by Defendants under color of that authority.

81.    Verified claims for damages against all defendants for violation of New York Constitution and its Bill of Rights and U.S. Constitution and its Amendments.

82.    The U.S. District Court, Southern District has jurisdiction over these defendants for violating state and federal laws governing property ownership, commerce and trade, illegal restraint of trade, public corruption, state and federal programs directly or indirectly receiving federal funds and for violating Plaintiff's civil and unalienable rights secured by

New York State and U.S. Constitutions and by Treaties and Acts of Congress including but not limited to:

83. Title 7 U.S.C. § 2 agricultural commodities (anything of value which can be bought, traded or sold): "The word 'person' ... shall include individuals, associations, partnerships, corporations, and trusts. ... and all other goods and articles..."

84. §2131(b)(3) provides federal jurisdiction and protection to all animal owners: "The Congress finds that animals and activities which are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce or the free flow thereof, and that regulation of animals and activities as provided in this chapter is necessary to prevent and eliminate burdens upon such commerce and to effectively regulate such commerce, in order...... (3) to protect the owners of animals from theft of their animals by preventing the sale or use of animals which have been stolen."

85. § 601 and § 2159 clarifies that the only persons who have jurisdiction to inspect any animal enterprise are USDA Inspectors at the direction of a federal judge.

86. Title 15 U.S.C. § 1 forbid municipalities or their agents to restrict the raising of any commodity (domestic animals) for personal use or profit or overthrow the Constitution. Each civil servant swore an oath to protect, defend and uphold the Constitution from invasion from within and without. The New York and U.S. Constitutions forbid the very conduct which Plaintiffs claim against all Defendants. Our form of government, which Plaintiffs have understood it to be, has the Constitution, Treaties and other safeguards in place to secure the Peoples' unalienable rights to life, liberty and pursuit of happiness. Plaintiff hereby admits the New York and United States Constitutions into Evidence to eliminate hearsay, opinion and controversy, see Title 28 U.S.C. Rules 612 (writing used to

refresh memory), 701 (opinion testimony of lay witnesses) 702 (testimony by experts) 703 (basis of opinion testimony by expert witnesses) 705 (disclosure of facts or data underlying expert opinion) and 806 (attacking and supporting credibility of declarant).

87. Title 15 U.S.C. § 1-2, Violation of Intangible right to honest services;

88. Title 15 U.S.C. § 1-7, commerce and Trade, Sherman Act

89. Title 18 §43 Animal Enterprise Terrorism Act "Whoever ... intentionally damages or causes the loss of and property including animals or records ... shall be fined.., or imprisoned..."

90. Title 18 U.S.C. § 2, 3, 4, ,201, §§241 and 242 conspiracy against rights, deprivation of rights under color of law. Allows to sue police officers, judges, DA's.

91. Title 286, 287, 645, 666 "Whoever... being an agent of... a state, local.., government, or any agency thereof-... obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner... shall be fined under this title, imprisoned not more than 10 years, or both."

92. Title 18 § 667 Theft of livestock; any domestic animal raised for home use, consumption or profit.

93. Title 18 §891-896 Extortionate Credit Transactions. § 891 quotes: ... (7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property,

94. Title 18 §§1001, 1343, 1346 Sherman Anti-Trust Act,

95. Title 18 §§1621, 1622, 1623, §§1951-1964. §§ 1951-1964 Violation of RICO

96. Title 18 § 1961 definitions of racketeering activity including property and rights by acts or threats involving robbery, bribery, or extortion which are chargeable under State law and

punishable by imprisonment for more than one year if the act indictable under such section of such Act was committed for the purpose of financial gain.

97.    § 1962(d) prohibited racketeering activities

98.    Title 18 U.S.C. § 1951 "Interference with Commerce (b) As used in this section (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." This law applies to whoever affects the movement of articles or commodities in commerce defined as domestic animals/cattle, fuel, vehicles, feed, pens, fencing, feed hoppers, supplies etc. by physical violence (theft at gunpoint, shooting cattle) by wrongful use of fear under color of official right.

99.    Title 2311, 2331(5) and 3112 repealed warrants to seize animals, birds or eggs since 1981. Plaintiff requests that this Court take judicial notice of U.S. Supreme Court and other decisions governing trespass, illegal search and seizure, deprivation of life, liberty and the pursuit of happiness, public corruption, racketeering, interference with commerce, and due process:

100.   Title 28 U.S.C. §§ 1331, § 1341 Frauds and Swindles, any scheme or artifice to defraud, denial of intangible right to honest services by means of fraudulent pretenses and fraudulent papers delivered by means of criminal trespass and sent through the U.S. Mail.

101.   Title 1343 (3) and (4)

102.   Title 28 U.S.C. §§ 1331, 1343 (3) and (4), and civil rights violations under

103.   Title 28 U.S.C. § 1331, 1332, 1343(a) (1, 2, 3 and 4), 1391(b), 1746, and for an injunction and restraining order against all defendants pursuant to

104.   Title 28 U.S.C. § 1651 against all defendants relating to Plaintiff's real property

105. Title 28 U.S.C. § 1367 for Plaintiff's state law claims, and civil rights violations under

106. Title 42 U.S.C. §§1981, 1983, 1985(3), 1986 and 1988, which provide civil remedies authorized by law to redress the deprivation of rights under color of law, statute, regulation, custom and usage of action proper under:

107. Title 28 U.S.C. § 1331, 1332, 1343(a) (1, 2, 3 and 4), 1391(b), 1746, and for an injunction and restraining order against all defendants pursuant to

108. Title 28 U.S.C. § 1651 against all defendants relating to Plaintiff's real property, described commonly as 92.2 acres at 237 Derby Road, Town of Wallkill, NY, and 78 dogs, aged dogs, teenagers and puppies comprised of unique bloodlines developed by Plaintiff over the last 43 years.

109. For claims brought under the United States Constitution,

110. Title 28 U.S.C. § 1367 for Plaintiff's state law claims, and

111. Title 42 U.S.C. § 1981, 1983, 1985(3), 1986, Title 18 U.S.C. racketeering

112. Title 42 U.S.C. §§1981, 1983, 1985(3), 1986 and 1988, which provide civil remedies authorized by law to redress the deprivation of rights under color of law, statute, regulation, custom and usage of action

113. Title 18 U.S.C. § 43, Title 18 U.S.C. §§ 241 & 242 Violation of Conspiracy against and Deprivation of Rights under color, Violation of RICO Title U.S.C. §§ 1951-1964, Violation of Fraud and Swindle Title 18 U.S.C. § 1341, Violation of Intangible right to honest services Title 18 U.S.C. § 1346, Sherman Anti-Trust

114. Title 15, U.S.C. § 1-2, and First, Third, Fourth, Fifth, Sixth, Eighth and 14th Amendment, violation of 1st Amendment right of access to justice,

115. Plaintiff's real property and property interests, commonly and legally described below, and

defendants' claims thereto or interest therein, are under exclusive jurisdiction of the United States pursuant to provisions set under Title 28 U.S.C.

116. All parties to this dispute are domiciled in New York State.

117. The following defendants listed below are hereby sued in their individual and official capacities actively participating in conspiracy with the other defendants in racketeering, extortion, interference with commerce and trade, illegal restraint of trade.

118. That the Defendant Joseph Cassel (Cassel) is a resident of New Hampton, Orange County, New York.

119. That the Defendant Town of Wallkill (hereinafter TOW) is a municipal corporation in Orange County, New York doing business in New York State.

120. That the Defendant Daniel Depew (Depew) is a resident of Orange County, New York.

121. That the Defendant Richard Guertin (Guertin)is a resident of Orange County, New York.

122. That the Defendant Patrick S. Owen (P. Owen) is a resident of Orange County, New York.

123. That the Defendant Joseph A. Owen (J. Owen) is a resident of Orange County, New York.

124. That the Defendant David Hoovler (Hoovler) is a resident of Orange County, New York.

125. That the Defendant Andrew Kass (Kass) is a resident of Orange County, New York.

126. That the Defendant Michael Purcell (Purcell) is a resident of Orange County, New York.

127. That the Defendant County of Orange (County) corporation doing business in New York State.

128. That the Defendant Steven Brockett (Brockett) is a resident of Orange County, New York.

129. That the Defendant Robert Hertman (Hertman) is a resident of Orange County, New York.

130. That the Defendant M. Donaldson (Donaldson) is a resident of Orange County, New

York.

131. That the Defendant Antonino Spano (Spano) is a resident of Orange County, New York.

132. That the Defendant Jason Farningham (Farningham) is a resident of Orange County, New York.

133. That the Defendant Anthony Grosso (Grosso) is a resident of Orange County, New York.

134. That the Defendant Kelly Ann Boss (Boss) is a resident of Orange County, New York.

135. That the Defendant Kate Monahan (Monahan) is a resident of Orange County, New York.

136. That the Defendant Barry Weissman (Weissman) is a resident of Orange County, New York.

137. That the Defendant Julia Ashworth (Ashworth) is a resident of Orange County, New York.

138. That the Defendant A. Solano (Solano) is a resident of Orange County, New York.

139. That the Defendant Christopher DiNapoli (DiNapoli) is a resident of Orange County, New York.

140. That the Defendant John Snellinger (Snellinger) is a resident of Orange County, New York.

141. That the Defendant Jessica Kenney (Kenny) is a resident of Orange County, New York.

142. That the Defendant Joseph Steuber (Joe Steuber) is a resident of Orange County, New York.

143. That the Defendant Jessica Steuber (Jess Steuber) is a resident of Orange County, New York.

144. That the Defendant David Ayers (Ayers) is a resident **of** Orange County, New York.

145. That the Defendant Orange County Office for the Aging is an Orange County agency providing services in Orange County, New York.

146. That the Defendant Alison Johannesson (Johannesson) is a resident of Orange County, New York.

147. That the Defendant Joshua Furman (Furman) is a resident of Orange County, New York.

148. That the Defendant Paul Johnson (Johnson) is a resident of Orange County, New York.

15

149. That the Defendant Catherine Etherington (Etherington) is a resident of Rensselaer County, New York.

150. That the Defendant East Greenbush Animal Hospital, LLC. (East Greenbush) is a Limited Liability Corporation located in Rensselaer County, New York.

151. That the Defendant Emanouil Petkov (Petkov) is a resident of Orange County, New York.

152. That the Defendant Orange County Animal Emergency Service, (OC Emergency Service) located in the Town of Wallkill, Orange County, New York.

153. That the Defendant Elizabeth Susen (Susen) is a resident of Orange County, New York.

154. That the Defendant Mountain Rottie Rescue of New York, Inc. (MRR) 501(c)3 non-profit corporation, located in Sullivan County, New York.

155. That the Defendant Krissie Downey (Downey) is a resident of Monticello, Orange County, New York.

156. That the Defendant Janie Gaebel (Gaebel) is a resident of Jeffersonville, Sullivan County, New York.

157. That the Defendant Pay Eyerman is a resident of Sparrowbush, Orange County, New York.

158. That the Defendant Suzanne Taurone is a resident of New Windsor, Orange County, New York.

159. That the Defendant Lisa Carder is a resident of New Windsor, Orange County, New York.

160. That the Defendant George McClure (McClure) is a resident of Ulster County, New York.

161. That the Defendant Kelly Ambrose (Ambrose) Sullivan County, New York.

162. That the Defendant Christine LaRocca-Mann-Uveges (LaRocca) is a resident of Cuddebackville, Orange County, New York.

163. That the Defendant Hudson Valley Rottie Recue, Inc., 501(c)3 non-profit corporation, located in Middletown/Cuddebackville, Orange County, New York.

164. That the Defendant Jean M. Youngman (JYoungman) is a resident of Middletown, Orange County, New York.

165. That the Defendant Ronald W. Youngman (RYoungman) is a resident of Middletown,

Orange County, New York.

166. That the Defendant Lynn Herring (Herring) is a resident of Newburgh, Orange County, New York.

167. That the Defendant Pets Alive, Inc., (PA) is a NYS 501(c)3 corporation located in the Town of Wallkill, Orange County, New York. doing business in New York State, other USA states and foreign countries.

168. That the Defendant Kerry Clair (Kerry) is a resident of Mount Hope, Orange County, New York.

169. That the Defendant Tina Hudson (Hudson) is a resident of Saratoga County, New York.

170. That the Defendant Eric Bellows (Bellows) (Pack Ethic) is a resident of Montgomery County, New York.

171. That the Defendant Karma K-9 Rescue, Inc., (Karma) is a non-profit corporation located in Albany, Montgomery County, New York.

172. That the Defendant Stephanie Palmer (Palmer) is a resident of Catskill, Greene County, New York.

173. That the Defendant Shari Bach (Bach) is a resident of Kingston, Ulster County, New York.

174. That the Defendant Mary Margaret MacCollum (MacCollum) is a resident of Stillwater, Saratoga County, New York.

175. That the Defendant Susan Bossley (Bossley) is a resident of Orange County, New York

176. That the Defendant Goshen Humane Society, Inc., (Goshen HS) is a non-profit corporation located in Goshen, Orange County, New York.

177. That the Defendant April Wood (Wood) is a resident of Orange County, New York

178. That the Defendant Warwick Humane Society, Inc., a non-profit corporation is located in Warwick, Orange County, New York.

179. That the Defendant Susan Barron is a resident of Orange County, New York

180. That the Defendant Times Herald-Record, Inc., corporation is located in Middletown, Orange County, New York

181. That the Defendant Nathan Brown (Brown) is an out-of-state resident

182. That the Defendant Joseph Vanderhoof (Vanderhoof) is a resident of Orange County, New York.

York.

183. John & Jane Doe 1-20 are unknown at this time.

## FACTUAL ALLEGATIONS

184. At all times relevant to this action, Plaintiff Sylvia Panetta owned and operated an internationally known Rottweiler breeding kennel, Karousel Kennels, for 43 years, 27 years at the 237 Derby Rd., Town of Wallkill, Orange County, New York location.

185. The third week of February, 2012, Plaintiff had started her outside yearly "Spring cleaning" by removing broken pallets that the doghouses sat on, as well as wooden houses that could no longer be repaired. They were placed outside in front of the dog runs waiting to be bagged and brought to the house for recycling as firewood.

186. The pallets raise the houses above the ground so they can remain dry when there is snow accumulation. Additionally, it allows any water to flow out through the water holes.

187. On Sunday, March 4, 2012, **Joseph Cassel of J. Cassel Construction,** a non-corporate entity, arrived at the Plaintiff's home for an appointment to view damages from Hurricane Irene for the purpose of preparing repair estimates to be submitted to FEMA, and additionally, separate estimates for some interior renovations. **Mr. Cassel** was on the front deck, inside the house, and in an enclosed porch.

188. At no time was he in the private, bio-security area in the back acreage where the dogs are located in oversized dog runs surrounded by and concealed by woods.

189. Prior to his arrival, the house dogs had been placed in their dens (crates) with crates covered on all sides including front and top, to prevent the dogs from having visual contact with this "intruder". This facilitated with no barking responses (distraction and annoyance) that

18

would have ordinarily occurred and to prevent any mishaps of physical contact.

190. **Mr. Cassel** did not at any time approach the two dog runs in the side area by the front of the house.

191. **Mr. Cassel** engaged in bizarre behavior and unusual comments, such as when measuring the length of the deck, stopped suddenly and stated, "I don't take bribes" and he would "have to figure out how to keep his men 'safe'", and other unusual and bizarre conversation. As he was leaving, he said he was past-President of the **Goshen Humane Society**. He described that when he first joined them, they operated out of a barn and dogs were kept in horse stalls. He described how the "dog shit was two feet high" (his words) and how it took him weeks to shovel out each stall.

192. The Plaintiff accompanied **Mr. Cassel** from the moment he arrived and exited his vehicle until the time he left the property.

193. **Mr. Cassel** said he would email the estimates to the Plaintiff on Tuesday, March 6, 2012.

68. On the morning of March 6, 2012, **Mr. Cassel** called **the Orange County Office for the Aging** and spoke with **Alison Johannesson**, telling her the Plaintiff had 50 to 100

69. On **March 6, 2012**, initially, without statutory authority, two TOW police officers illegally entered and illegally remained on Plaintiff's property prior to obtaining a search warrant.

194. dogs in cages in the woods.

195. **Cassel** asked her to call the police as he wanted to remain anonymous.

196. A recording of that call proved that **PO Farningham** and **PO Grosso** had lied (later followed with written and oral testimony of the two officers describing the perjury); that this, in fact, was <u>not</u> a welfare check, but in fact, an unfounded zoning allegation. (Emphasis added)

197.

198. **PO Farningham** and **PO Grosso** had no statutory authority to enter the property, but did so under false pretenses, committing an illegal search and later, perjury.

199. This initial search was preceded by their literally breaking into the property by cutting a heavy logging chain that prevented unwanted entries, removing the wooden gate door from its post and then knocking down that "4x4" post that was cemented into the ground.

200. Therefore, the search was illegal, later confirmed by the Appellate Term Court, Brooklyn, New York in their Decisions dated December 13, 2018 and February 6, 2020. The recording that proved the perjury and illegality and was beneficial for the Plaintiff's defense was withheld from the Plaintiff. This was one of three Brady violations.

201. On the morning of **March 6, 2012, Mr. Cassel** sent an email to the Plaintiff stating, in part, " … that I have decided that I cannot accept these jobs at this time."

202. Simultaneously, the outside dogs were barking. The Plaintiff presumed dogs were playing and other dogs were barking at them.

203. Plaintiff waited until her companion, **Gilbert Brandt** (Gil), finished letting the housedogs out to relieve themselves so she could go out and clean the deck and hose out a crate with spilled food.

204. While on the deck hosing out the crate, the outside dogs continued barking. A while after that, two uniformed **Town of Wallkill (TOW) police officers** (PO) –**Farningham** and **Grosso** - suddenly came from the back of the property and startled the Plaintiff.

205. The Plaintiff was terrified and shocked to see them as she lives in the woods in the middle of 92 <u>very secluded acres.</u> (Emphasis added)

206. Plaintiff was on the deck for quite a while. During that time, they hadn't come down the

1,000 foot-long driveway that approaches the front of the house, so they were on the property for a long time.

207. The driveway entering the property is secured by a wooden gate as well as a heavy, padlocked tow chain going across the driveway with a No Trespassing sign and a second No Trespassing sign about 100 feet further down the driveway tacked on a tree. The house is not visible from the road.

208. The Plaintiff asked the officers what they were doing there. P.O. **Farningham** (TOW):

> TOW: We're here for a well-care check. Someone called – was concerned about you. (*sarcastically*) *Are …you … OK?*
>
> Plaintiff: Of course, I'm all right.
>
> TOW: Oh, and by the way, did you know you had two dogs with broken legs?
>
> Plaintiff: I don't have any dogs with broken legs. You were in the back in the woods with my dogs? You broke bio-security? Do you have a search warrant?
>
> TOW: No.
>
> Plaintiff: So --- you came here under the guise of a well-care check and went in the back in the woods, broke bio-security, and did an illegal search of the dogs? You violated my Constitutional rights. You did a search without a search warrant!
>
> TOW: We want the two dogs. We want to take them to the vet.
>
> Plaintiff: You're not getting any dogs. You have no search warrant so I'm going to ask you to leave.
>
> TOW: We want the dogs.
>
> Plaintiff: You have no search warrant, so I am again asking you to leave.

209. Ignoring the fact this was an illegal search, PO **Farningham** kept trying to engage the

Plaintiff in conversation. Plaintiff went back and forth many times, with the officers refusing to leave … and they finally left.

210. The **two TOW police officers** were ingratiating themselves to be powerful persons. It is impossible to exaggerate the physical and emotional damage that followed that was done by this false and reckless action.

211. As soon as they left, Plaintiff took pictures of the dogs she thought they were referring to. They were two five year-old dogs that were born deformed that were in no pain or suffering from anything. They were very active, healthy, happy and affectionate dogs – they just looked different.

212. PO **Farningham** and PO **Grosso** were asked by Plaintiff if they had a SW. They did not. They were told to leave.

213. Yet contrary to law, they (and other officers and civilians) came back six more times. PO **Grosso** remained on the property outside the kitchen's large double window for about eight hours. He refused to leave.

214. During that time, Plaintiff told Grosso several times he had no right to remain on her property – there was no search warrant. He wouldn't leave.

215. Plaintiff told him his being here was illegal. Further, having been advised that what he's doing is illegal, he should withdraw himself from the situation. He said he was ordered to do so.

216. Plaintiff reminded **PO Grosso** he took an oath when he became a police officer and he was to uphold the Constitution and protect people's rights. At a later time, Plaintiff overheard PO **Grosso** on his radio repeatedly saying, "But you're mandating me to do this. You're mandating me to do this, right?" He said it a few times.

217. The Plaintiff called an attorney, handed the phone to **PO Grosso** who was told he was trespassing and had to leave. He refused to leave.

218. Plaintiff **called 911** and told them there was a police officer on the property that refuses to leave. They connected the Plaintiff with the TOW police department where dispatcher **"DeStefano"** incorrectly stated they do have a right to be there.

219. **PO Grosso** was later joined by **PO Weissman.**

220. **Many officers**, including **PO Ashworth, Spano, Farningham, Boss, Monahan, Solano, DiNapoli, Snellinger, Kenney, Joe Steuber, Jessica Steuber** and building inspector came back to view all the outside dogs <u>several more times</u> prior to obtaining a search warrant. They repeatedly broke bio-security. (Emphasis added)

221. The TOW police officers were ingratiating themselves to be powerful persons. It is impossible to exaggerate the damage that followed that was done by this false and reckless action.

222. A group of **six other officers** returned again and were illegally searching the dog runs near the front of the house prior to obtaining a search warrant. They broke bio-security.

223. Plaintiff called an attorney who spoke to **PO Spano** who informed them they had no right to be there, the searches were illegal and they should leave. They refused to leave.

224. Six further illegal searches were executed by **PO's Spano, Covey, Farningham, Grosso, Boss, Monahan, Weissman, Ashworth, Solano, DiNapoli, Snellenger, Kenney, Joseph Steuber, Jessica Steuber,** prior to obtaining a search warrant.

225. **PO's Spano, Farningham**, and other officers arrived. Plaintiff was told by PO Spano and Farningham to sign all the dogs over to them. She was threatened that if she did not do so, she would go to jail. Plaintiff refused to sign the dogs over to them. He further intimidated

the Plaintiff by saying she would additionally have to pay heavy fines if they weren't signed over. Plaintiff again refused to sign the dogs over.

226. **The TOW police officers** ingratiated themselves to be powerful persons. It is impossible to exaggerate the damage that followed that was done by this continuing false and reckless action.

227. Between March 6, 2012 and April 30, 2012, there were multiple illegal searches executed by various police officers, veterinarians and civilians.

228. Other times, other days, **PO Ashworth** trespassed whenever she felt like it without a search warrant. She had no statutory authority to do so. She refused to leave when repeatedly told to do so.

229. The peace and tranquility the dogs enjoyed were now suddenly, viciously, intentionally and forcefully interrupted by an illegal invasion, commencing with two police officers who had no veterinary experience, and ending with people who had no knowledge or experience in animal husbandry or management of a large breeding kennel.

230. Plaintiff was outside in her pajamas and jacket and was ordered by **PO Spano** to remain outside against her will, even after telling the group of officers she was freezing cold. Plaintiff was eventually allowed inside at a later time and they left the property.

231. Plaintiff got in the car to drive up to the road (had no purse or anything else with her) to retrieve the newspaper from the newspaper box on the road. **PO Grosso** jumped in front of the car like a "superhero". Plaintiff told him she was going to the road to get the newspaper. She reiterated that there was no search warrant, that he was violating her rights by trespassing and remaining on her property and refusing to leave when repeatedly asked, and that she had every right to move around on her property or leave her property. He was

getting very nervous about the situation. He asked the Plaintiff if she had a law degree. He told her at least three times, "Don't forget" --- that Plaintiff has to remember that the entire time, whenever he's talked to her, he has always been very polite. Plaintiff later learned that **PO Grosso** was a new rookie to the TOW police department.

232. TOW police officer **Grosso** ingratiated himself to be a powerful person. It is impossible to exaggerate the damage that followed that was done by this false and reckless action.

233. While exiting the property, Plaintiff observed the barriers of entry, a padlocked logging chain extended across the driveway from post to post preventing unwanted entry was cut, and they removed a wooden gate with a No Trespassing sign from its 4 x 4 post that was cemented into the ground, and that post was knocked over at ground level.

234. The Plaintiff concluded this was without a search warrant and done because they were too lazy to walk the 1,000 foot driveway.

235. **PO Farningham** and **PO Grosso** were ingratiating themselves to be powerful persons. It is impossible to exaggerate the physical damage to property and emotional damage to Plaintiff that followed that was done by this false and reckless action.

236. Plaintiff called **911** and told them there was a police officer on her property that refuses to leave. They connected her with the TOW police department. Plaintiff spoke to Dispatcher **"DeStefano"** who incorrectly said they <u>do</u> have a right to be there. (Emphasis added)

237. TOW police officer/dispatcher **DeStafano** ingratiated himself to be a powerful person. It is impossible to exaggerate the damage that followed that was done by this false and reckless action.

238. Plaintiff, realizing she could be arrested at any time and having to go to the pharmacy to pick up lung/breathing medication for her elderly friend that lives with her, called the

attorney, handed the phone to **PO Grosso,** who was told by the attorney Plaintiff had to pick up medication and that she had every right to leave the property. **PO Grosso** told the attorney he never said she couldn't leave.

239. It is to be noted the Plaintiff does not know if, or how many additional illegal searches were executed while she was away from the property.

240. **PO Farningham and PO Grosso** entered the posted and locked property under false pretenses and perjured themselves when breaking into the property under the guise of a fabricated "well-care check", with no probable cause or search warrant. (NOTE: The Appellate Term Court deemed the search to be illegal in their December 18, 2018 and February 6, 2020 decisions.)

241. They broke into the property followed by multiple illegal trespasses under an unfounded zoning allegation of "a large amount of dogs", not a criminal offense. (Emphasis added)

242. The complaint should have been directed to the TOW zoning department, who would have generated a letter ... and subsequently would have realized the Plaintiff's property was grandfathered for 27 years for an unlimited amount of dogs with no restrictions on Plaintiff breeding and selling dogs.

243. Defendant **Alison Johannesson,** an employee of the Orange County Office for the Aging, and is an animal rights extremist, phoned the TOW police with the unfounded zoning allegation that was given to her by **Defendant Cassel,** who, she stated under oath at a Suppression Hearing, also told her the reason Plaintiff has so many dogs is because she was raped by two State Troopers. The Plaintiff has never in her life been raped. (Emphasis added)

244. Defendant **Johannesson** ingratiated herself to be a powerful person. It is impossible to

exaggerate the damage that followed that was done by this false and reckless action.

245. Although the police officers took an oath, they demonstrated no allegiance to the U.S or NYS Constitutions as they gave themselves unrestricted authority to do as they please for as long as they please.

246. Approximately six police officers returned without a search warrant accompanied by a woman dressed in plain clothes. They all went into the back to the dogs and executed another illegal search, breaking bio-security, etc. Plaintiff went downstairs and asked PO Grosso who that person was and he said it was another police officer. Plaintiff later found out he lied - it was someone from Pets Alive, a radical animal rights extremist group – facilities down the road from Plaintiff, who have on previous occasions unsuccessfully attempted to get the Plaintiff convicted by filing fabricated charges of animal cruelty.

247. At some point, four to six police officers arrived with the assistant building inspector (BI) without a search warrant. The police officers and BI searched the front of the house. They broke bio-security. (Emphasis added)

248. The building inspector demanded to come in the house to look around. The Plaintiff refused his entry. The BI told the Plaintiff she has more dogs than the limit allows; her dogs aren't licensed; her dogs have no rabies vaccinations. (Emphasis added)

249. The Plaintiff told him the town knows she's grandfathered for an unlimited amount of dogs, that the dogs are vaccinated and she submits her license information every year. He claimed the town has no record of anything. He asked when she sent it in. Plaintiff told him November (2011). He asked who she sent it to. Plaintiff told him the TOW Clerk.

250. Plaintiff informed him this was the first year the NYS Department of Agriculture, Albany, was not issuing dog licenses. That duty was now delegated to the town clerks in all the

counties of New York State.

251. The **BI** never asked the Plaintiff to see her copy of the paperwork she sent to the TOW Clerk in November 2011.

252. The BI never asked to see her copy of the rabies certificates for the dogs.

253. **PO Ashworth** continuously trespassed on the property prior to obtaining a search warrant.

254. At some point, PO Weissman illegally arrived without a search warrant. He illegally remained on the property with PO Grosso.

255. Plaintiff was on her way to the back dog runs again to take pictures of all the dogs and their environment to prove what the true conditions were.

256. **PO Weissman** got out of his vehicle and without a search warrant, without statutory authority, told Plaintiff to stop and not take one more step or he would arrest her. He ordered her back in the house, to remain in the house, and threatened to arrest her if she came out again, threatening false imprisonment. Plaintiff reminded him he was trespassing, had no search warrant; he was violating her constitutional rights, and she had a right to walk around on her property. He repeated the threat. (Emphasis added)

257. About **seven TOW police officers** plus the building inspector returned to execute a search warrant at about 6:30 PM. The Plaintiff was handed a copy of the search warrant, looked at it quickly, and advised them it was defective for multiple reasons, including it was illegal to base a search warrant on an illegal search. There was no probable cause, overbreadth, no particularity, unlawful to search the house as the house was unrelated to the allegations of two outside deformed dogs, the seize is illegal, and other legal reasons. The officer said the judge signed it, so they are executing it.

258. There originally were 13 puppies. The police killed a newborn born that day during the

March 6, 2012, raid.

259.    **PO Jason Farningham** issued materially false reports concerning condition of the dogs, their doghouses and their environment.  Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

260.    **PO Ashworth** issued false reports concerning the condition of the dogs, and their environment.  Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

261.    **PO Ashworth** contacted the Social Security Administration and lied to them so they would withhold the Plaintiff's now <u>only</u> income, her earned Social Security monthly payment to discredit, humiliate, damage, slander, libel and defame the Plaintiff's reputation, cause great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests (Emphasis added)

262.    **PO Ashworth** contacted the American Kennel Club so that they would refuse the Plaintiff's ability to register any future puppy litters or dogs and to discredit, humiliate, damage, slander, libel and defame the Plaintiff's reputation, cause great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests (Emphasis added)

263.    Search warrants were overly defective, contained overbreadth to areas of the property that were unrelated to the allegations and authorized seizure of property not related to the probable cause.

264. There were many other reasons the search warrant was defective, however, the Plaintiff had no attorney to declare the search warrant unlawful.

265. Some went into the back to seize dogs. They broke bio-security. The balance, including the BI, came into the house.

266. The two deformed dogs were illegally seized.

267. They ransacked the entire large two-story house, garage and basement, even going through underwear drawers.

268. The illegal search warrant unlawfully allowed them to search areas of the property and domicile that were unrelated to the allegations and authorized seizure of property not related to the two deformed dogs that resided outside.

269. On **March 6, 2012**, the police illegally seized the current licensing file and about ten years of the previous licensing files, that included the dogs' names, AKC registration numbers, rabies certificates and copy of check for payment of the licenses, plus additional personal and business files that had no relation to the two deformed dogs, including birth certificates of Plaintiff and her children, passports, sales tax submission files, breeding contracts, etc.

270. The application, which was unlawfully granted for the search warrant, requested to search everywhere because PO **Farningham** 'knew' that they would find other violations. He was requesting an illegal witch hunt, a fishing expedition that **Judge Patrick Owen** granted.

271. It was negligent and purposeful omission of particularity describing the place to be searched and the persons or things to be seized.

272. There was no probable cause, just gibberish and falsehoods consisting of a smear campaign orchestrated to make the Plaintiff appear guilty of a crime.

273. A dog had just finished giving birth and was nursing her puppies. PO **Ashworth, Snellinger, Farningham, Spano and BI** entered the "puppy room" against Plaintiff's direction. Plaintiff told them not to go near the mother and newborn puppies.

274. Contrary to Plaintiff's direction during this illegal search, they all stood up close against and over the whelping crate, totally ignoring the mother's natural instinct of protecting her litter by barking at and lunging towards the front of the crate.

275. They stood over the mother and her puppies, despite emphatic objections from the Plaintiff.

276. Due to their negligence and refusal to stay away from the mother and pups, one of the newborn puppies was killed by the irresponsible police action – the mother dog trampled the puppy as she was protecting them by frantically barking and jumping at all the people that invaded her room and stood there nonchalantly and curiously overlooking her pen and puppies. They purposely and intentionally stood there while the mother continued to take an active, protective stance. The officers wouldn't move away. They refused. They broke bio-security and are responsible for the death of the newborn puppy, born just hours before.

277. The Plaintiff was in the house when the police seized the two deformed dogs that were outside with the alleged and fabricated "broken legs". When they took the female, she was SCREAMING-SCREAMING-SCREAMING! The screaming was such a shrill outburst of continual high-pitched response to being dragged by a catch-pole, it literally sent chills down the Plaintiff's spine. The Plaintiff found blood on the dog's dish the following day. They broke bio-security and injured the dog.

278. **PO Grosso** was assigned to follow Plaintiff around the house. As she sat at the computer, he stood in the doorway and showed her papers he was holding. One was a brown envelope (contained a copy of the 2009-2010 license papers sent to the Department of Agriculture,

Albany, that includes the list of dogs, rabies certificates and a photocopy of the check for payment of those licenses), and a transparent loose-leaf sleeve with a 1995 breeding contract.

279. Plaintiff went to the bathroom. As she was closing the door, **PO Grosso** put his hand up to stop the door and started to enter the bathroom. Plaintiff asked what he thought he was doing and he replied that he had to watch her. She responded, "You're going to watch me urinate? Get out of here." She closed the door on him. Plaintiff was horrified at the sick perversion exhibited by the officer.

280. **PO Grosso** ingratiated himself to a powerful person. It is impossible to exaggerate the damage done by this false and reckless action.

281. **PO Ashworth** and a group of officers went down to the basement. They went through all the Styrofoam insulated boxes (from vaccine shipments) Plaintiff had stored on shelves. **PO Ashworth** yelled out, "Quick – get the kit!" A 55-gallon perfume manufacturer's drum had a small amount of perfume fluid on the bottom. The other female officer came back with "the kit". They were disappointed when they learned the liquid wasn't blood.

282. Before they left, the **BI** handed the Plaintiff an Order to Remedy Violation – citing her for damages from Hurricane Irene, and for the outside dogs. The Plaintiff explained she was still working with FEMA on the repairs. He said he didn't care. He, also, had damages and they have been repaired already.

The **BI knew that Joe Cassel**, who initiated the action against the Plaintiff, was there to give an estimate for FEMA. The **BI**'s actions were just to further maliciously harass, embarrass, intimidate, discredit, damage, humiliate, slander, and defame the Plaintiff's reputation and character, cause great personal injury, including severe mental anguish, emotional distress that later lead to physical injuries, loss of property and business interests.

283. Before they left, **PO Farningham** handed the Plaintiff a small piece of paper he ripped off a small spiral pad. Written on it: "Rabies Vacs 22 yellow colored pages, List of dogs 4 pages, 2 Rotweillers" (sic).

284. The Plaintiff asked him what this was. He said it was a list of what he's taking. She then asked him where the official inventory form is that he's mandated by law to fill out before he leaves, the one he immediately takes back to the court and hands the judge. Plaintiff asked him where that was. He said he doesn't have it. The Plaintiff told him what he gave her was a worthless piece of paper with words on it --- that it wasn't even signed! He ripped it out of her hands, signed it, handed it back to her and said, "There – now it's signed." (He didn't date it.) (Emphasis added)

285. Altogether, he gave the Plaintiff the list, a Notice to Comply, the 1995 breeding contract, a check, and a photocopy of a check.

286. The photocopy of the check is from the 2010-2011 large brown envelope for dog licenses. When the Plaintiff went to the file cabinet to return it to the proper brown envelope, she discovered the brown envelopes with the current year (2011-2012), the previous year (2010-2011 – where this photocopy belonged), and at least nine previous years were gone. In total, he took 11 years and only acknowledged taking one year. The theft included the current envelope that proved I had sent the application to the town clerk, the first year they were doing this instead of the NYS Department of Agriculture. Many other dog files and personal files were also seized and not acknowledged.

287. **On March 6, 2012,** the police illegally seized the current licensing file and about ten years of the previous licensing files, that included the dogs' names, AKC registration numbers, rabies certificates and copies of checks for payment of the licenses, plus additional personal

and business files.

288. They seized kennel files and personal files that had nothing to do with the two seven year-old deformed dogs they illegally seized.

289. Plaintiff experienced the illusory authority of the unlawful, unwelcome invasion of Plaintiff's private property.

290. The two deformed dogs that were (illegally) seized on **March 6, 2012** were taken directly to a veterinarian to be examined, who did nothing with them.

291. **March 7, 2012**, the two deformed dogs went to Pets Alive.

292. **March 8, 2012**, the two deformed dogs went to Dr. Furman, the veterinarian Pets Alive uses.

293. **March 9, 2012**, without the Plaintiff's knowledge or permission, without a court order, with no charges against the Plaintiff for the two dogs, **Dr. Furman** did two senseless and unnecessary amputation surgeries that mutilated the Plaintiff's dogs. This reflects how misconduct extended and there's no regard for the law "around, under and through," throughout every particle and iota of the prosecutor's case.

294. **Dr. Furman** claimed to the Albany, New York agency that oversees veterinary licensing that he had every right to do it because once the dogs are seized, Plaintiff no longer owns them. That is a complete untruth. (43)

295. **Dr. Furman,** veterinarian, conducted an illegal and warrantless search of the dog(s) by extracting and testing its blood or feces—acts that constituted an illegal physical invasion of defendant's property to look for (fishing expedition) any possible violations and otherwise concealed information about the dogs, that served to search for evidence in order to allege a crime, to plot against the Plaintiff. (Emphasis added)

296. **Dr. Furman** did not at any time take X-rays of the dogs. He did not palpate either dog to see if they were in pain. He said he was afraid of the male dog because he tried to bite him.

297. **On March 9, 2012,** the town attorney, **Richard Guertin,** called a lawyer he thought was representing the Plaintiff and told him many civil and criminal charges will be brought against Plaintiff shortly.

298. **Mr. Guertin** told the attorney they were going to take all of Plaintiff's dogs. It was already planned, without any investigation or charges. The lawyer told the town attorney Plaintiff has been caring for dogs for many years, would never allow one to be poorly cared for, would always bring one to a vet if necessary, that Plaintiff was grandfathered in, and that Plaintiff had damage from Hurricane Irene.

299. **Richard Guertin** knew or should have known pursuing the charges was an action of malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed. He knew the charges were false.

300. **Judge Patrick Owen** knew or should have known pursuing the charges was an action of malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed. He knew the charges were false.

301. **Judge Joseph Owen** knew or should have known pursuing the charges was an action of malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed. He knew the charges were false.

302. **Judge Brockett** knew or should have known pursuing the charges was an action of

malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed. He knew the charges were false.

303. **ADA Kass** knew or should have known pursuing the charges was an action of malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed. He knew the charges were false.

304. **ADA Purcell** knew or should have known pursuing the charges was an action of malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed. He knew the charges were false.

305. **DA Hoovler** knew or should have known pursuing the charges was an action of malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed. He knew the charges were false.

306. **Each and every animal rights "volunteer"** knew or should have known pursuing the charges was an action of malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed. They knew the charges were false.

307. **The police** knew or should have known pursuing the charges was an action of malicious prosecution and that all that was being done against Plaintiff was to cover up for the initial illegal search and all illegal searches that followed.

308. Within a week of the raid, TOW Supervisor **Dan Depew,** personally went to several of the Plaintiff's neighbors to seek people who would speak against the Plaintiff and her dogs. None were found. One neighbor asked him why he was doing this to the Plaintiff and he replied, "Because of the amount of dogs."

309. **May 9, 2012, PO Ashworth and Supervisor Depew** trespassed onto Plaintiff' property. Plaintiff shouted out the window that they are trespassing and to leave. **PO Ashworth** looked up at the window and without saying anything, the two kept walking to the back to the dog runs. They broke bio-security. Plaintiff went outside and took a picture of them.

310. **May 9, 2012,** when **Depew and PO Ashworth** trespassed, Plaintiff spoke with TOW **PO DiNapoli** about pressing trespassing charges. He wouldn't pursue charges – said he would get back to Plaintiff and never did. Complaint was ignored to protect **Depew and PO Ashworth.**

311. **On March 16, 2012,** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

312. **On March 16, 2012,** Plaintiff left a message on **Lt. Spano's** voice mail at 11:08 AM asking when the two dogs are being returned. Plaintiff called back again and spoke with **Dispatcher Miller to see if Lt. Spano** was there. **Lt. Spano** was not there. **PO Farningham** was not there, and **Chief Hertman** was not there.

313. A few hours later, about 2:30 PM, **six TOW police** officers unlawfully, without probable cause, without a search warrant, entered the Plaintiff's padlocked property posted with two No Trespassing signs at the road and another about 100 feet down the 1,000-foot driveway, and without even letting her know they were there, walked past the house towards the back in the woods to where the dogs were, breaking bio-security. The dogs' barking alerted the Plaintiff someone was there. Plaintiff yelled out the window that she would be right down. When Plaintiff got outside, they were gone --- not even sight of them walking up the 1,000 foot driveway to leave. To date, Plaintiff was not charged with anything.

314. On another occasion, **PO Spano** and five TOW police officers again, unlawfully, without probable cause, without a search warrant, entered the Plaintiff's padlocked property posted with two No Trespassing signs, one at the road and one about 100 feet down the 1,000-foot driveway and came to the house. They went to the back and broke bio-security.

315. **PO Spano** had papers he wanted the Plaintiff to sign to forfeit all the dogs. Plaintiff requested several times they leave but was ignored.

316. **On April 13, 2012,** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

317. **On April 13th, 2012,** about 2:30 PM, six TOW police officers (one in plain clothes), again unlawfully entered the Plaintiff's padlocked property posted with two No Trespassing signs, one at the road and another about 100 feet down the 1,000-foot driveway, without a search warrant, and went into the back, in the woods, and did another illegal search (breaking bio-security again) without letting Plaintiff know they were there.

318. Gil, 82 year-old companion that lives with the Plaintiff, was sitting outside and was shocked and terrified. He's hard of hearing and didn't know they were there (unlawfully again), until they walked past him. When Plaintiff got downstairs, they were leaving. Plaintiff went outside with a pad and pen and asked for their names repeatedly. They ignored Plaintiff and kept walking. A female officer, later to be known as **PO Ashworth**, said Plaintiff has their names and if Plaintiff had questions, to have her lawyer call. Even though Plaintiff told her twice she has no lawyer, **PO Ashworth** insisted she does and they wouldn't give their names. Plaintiff finally said, "So you're refusing to give me your names?" A male officer stepped forward and said, "I'm Farningham. That's all you

need." Plaintiff took their photograph.

319. **On April 13, 2012,** Plaintiff sent, via certified mail, a FOIL for the paperwork they did not give Plaintiff (Application for Search Warrant, supporting depositions, etc.). Plaintiff also sent, via certified mail, a letter, demanding the return of the two dogs unlawfully seized March 6, 2012. The TOW clerk never responded.

320. **April, 2012** Plaintiff's 85 year-old companion, Gilbert Brandt, was admitted to Orange Regional Medical Center through his doctor and the emergency room in critical condition. The stress of the TOW and the TOW PD was accelerating his condition. His doctor told him afterwards he didn't think he was going to make it.

321. **PO Ashworth and PO Steuber** went to Gil's room during this critical time via a HIPPA violation. **PO Ashworth** began harassing him and making threatening statements, upsetting and confusing him. She told him that Plaintiff was keeping secrets from him, that the police were going into the house the next day (no one there, Plaintiff was in jail), and will condemn the house; she claimed there is no electric or water in the house, and other untruths. He had no idea what this sudden assault was about and was upset thinking he would be discharged from the hospital and have no place to go, etc.

322. **PO Ashworth** contacted Social Security and told them to withhold Plaintiff's payment because Plaintiff was in jail.

323. **PO Ashworth** contacted the American Kennel Club, the dog registry with whom the Plaintiff registered her dogs, her imported dogs and her puppy litters for 43 years telling them that Plaintiff was charged with 150 animal cruelty charges and should take action against the Plaintiff.

324. **On April 20, 2012,** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

325. **On April 20, 2012,** about 3 PM, four TOW police officers and two social workers from Orange County Social Services, Adult Protective Services (APS) once again, unlawfully entered the Plaintiff's padlocked property posted with two No Trespassing signs, one at the road and another about 100 feet down the 1,000-foot driveway, without a search warrant. The police were using APS as a form of intimidation and harassment, <u>people who have no authority or jurisdiction</u> to enter Plaintiff's property <u>without a formal and legitimate complaint</u>. There was no complaint. Gil was sitting outside. He was again shocked, frightened and terrified by the invasion of these people unauthorized to be on the wooded, secluded large property. Before Plaintiff could get downstairs, they questioned Gil if he was married to the Plaintiff, if he's on oxygen 24/7, and if Plaintiff takes him to the doctor. He told them Plaintiff is the best "nurse" anyone could have. (Emphasis added)

326. When Plaintiff got downstairs, they said they were here to "help" her. Plaintiff replied, "No, you're here to harass me. So please leave." They wouldn't leave. APS said the four police officers have accompanied them because Plaintiff has over 80 dogs here and they are there to protect them from the dogs.

327. APS said she had a piece of paper she wanted Plaintiff to sign - Plaintiff should sign all the dogs over! She continued and said it would be best to do so because the police told her that otherwise Plaintiff would go to jail and pay heavy fines.

328. Plaintiff continued asking them to leave and they wouldn't go. **Adult Protective Services** kept threatening and repeating that if Plaintiff didn't sign the dogs over, Plaintiff will be charged with a crime and will then have to pay a lot of money in fines. They, social workers from **Adult Protective Services**, have no usurpation to get involved with Plaintiff's dogs, an alleged zoning question. They were called in as a form of intimidation, threat and

harassment, resulting from the smear campaign orchestrated by slandering and libeling the Plaintiff. Plaintiff repeatedly asked them to leave and they wouldn't leave. APS kept repeating that she wants Plaintiff to sign the dogs over. Plaintiff took a picture of them and the four police officers. They all finally left. To date, Plaintiff wasn't charged with anything.

329. **On April 29, 2012,** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

330. **April 29, 2012 Judge Patrick Owen** unlawfully authorized a search warrant. A search warrant is issued based on probable cause described in an Application for that search warrant. The application for that search warrant <u>didn't even exist</u> at that time. An application wasn't signed and sworn to by **PO Farningham** until the following day, April 30, 2012. (Emphasis added)

331. Search warrant contained overbreadth to areas of the property that were unrelated to the allegations, and authorized seizure of property not related to the probable cause.

332. Contrary to law, **Judge Patrick Owen** authorized people, other than police officers, to execute the warrant, such as the ambulance corps. **Adult Protective Services**, the TOW **building inspector**, and various other **animal rights extremists civilians**.

333. **April 30, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

334. **April 30, 2012** An army of people descended onto Plaintiff's property and Plaintiff was arrested.

335. **Judge Patrick Owen** declared the appearance was for all purposes an arraignment of the charges. He stated the Plaintiff had a right to an adjournment to obtain counsel. He read the Plaintiff her rights. He nevertheless continued even though the Plaintiff had no attorney.

336. **Supervisor Depew, PO Hertman, PO's Donaldson, Spano, Farningham, Grosso, Boss, Monahan, Weissman, Ashworth, Solano, DiNapoli, Snellinger, Kenney, Joseph Steuber, Jessica Steuber, David Ayers,** are responsible for all that followed because they all saw the dogs were in good shape, dog houses were excellent and their environment was what it should be (clean and over-sized dog runs), contrary to what they were portraying to the media and court.

337. **April 30, 2012**, TOW Supervisor **Dan Depew** and **Chief of Police Robert Hertman** had sent out press releases to local, and as far-away places as New York City, newspaper media, radio and TV news stations and held a press conference outside the TOW police department, orchestrating a smear campaign to discredit the Plaintiff and destroy her credibility. **Supervisor Depew, Chief Hertman, J. Youngman, Downey** and others attended the press conference that was conducted and recorded.

338. **April 30, 2012**, TOW Supervisor **Dan Depew** and Chief of Police **Robert Hertman,** Downey, J. Youngman and others conducted and participated in a press conference to defame, humiliate, embarrass, damage, slander, and libel the Plaintiff. Plaintiff's reputation and character were discredited, and caused great personal injury, including severe mental anguish, and later caused physical injuries, emotional distress and loss of property and business interests.

339. People believe the first story they hear or read, whether or not the information therein is

true and/or accurate. This was done for the purpose of defaming the Plaintiff and removing any possibility of her having any credibility.

340. All persons who took part in this fabricated case are responsible because they all saw either through direct witnessing or through their own photographs, that the dogs were in good shape, conditions were excellent, contrary to what was being portrayed to the media and court.

341. No one said anything – including **Nathan Brown,** journalist from the **THR**, who was writing articles based on lies, the information fed to him by the police and animal rights extremists.

342. **Nathan Brown** was invited by the Plaintiff to view the Property to see things for himself. Although he stated after the premise visit that "this is not what the police are trying to portray" and was going to write an article describing the truth and real and honest conditions, the article that followed was another like all those that preceded with the fabricated details.

343. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

344. **PO Farningham** issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

345. **PO Ashworth** issued false reports concerning the condition of the dogs and their environment.

346. **Sgt. Spano** came with group to try to get Plaintiff to sign all her dogs over to them.

347. Other multiple times, **PO Ashworth** and others trespassed on the property whenever they felt like it. They had no authority to do so. They refused to leave when repeatedly told.

348. They continuously violated bio-security.

349. The peace and tranquility the Plaintiff, her companion, and dogs enjoyed were now suddenly, viciously, intentionally and forcefully interrupted by the illegal invasion of police officers who had no veterinary experience, followed by animal rights extremists who had no idea or experience in the management of a breeding kennel, let alone a large facility.

350. The peace and tranquility the Plaintiff enjoyed for 27 years were now suddenly, viciously, intentionally and forcefully interrupted by the illegal invasion of police officers who had no veterinary experience, followed by animal rights extremists who had no idea or experience in the management of a breeding kennel, let alone a large facility.

351. This was done for the purpose of defaming the Plaintiff and removing any possibility of her having any credibility, since people believe the first thing they hear or read. This was done so they would have the first opportunity to offer their untruths to the public, the first version the public would automatically accept.

352. **April 30, 2012**, simultaneously to the press conference, the illegal search warrant was executed. The Plaintiff was taken to the TOW jail (false imprisonment) and then brought to court before Judge Patrick Owen.

353. **April 30, 2012**, more than 30 people - police officers, veterinarians and civilians - descended upon Plaintiff's property and Plaintiff was victim to a multiple-defective search warrant with no probable cause, based on the first search warrant. Without mandated probable cause, it was authorized to search everywhere because **PO Farningham**, as stated

in his sworn-to application for the search warrant, 'was sure they would find <u>new</u> violations'. An orchestrated witch hunt. (Emphasis added)

354. Veterinarians present April 30, 2012, and veterinarians that examined the dogs at their premises, all had some tie to all the animal rights extremist "volunteers".

355. **Paul Johnson**, veterinarian, conducted an illegal and warrantless search of the dog(s) by extracting and testing its blood or feces, or taking X-rays—acts that constituted an illegal physical invasion of defendant's property to <u>look for</u> (fishing expedition) any possible violations and otherwise concealed information about the dogs, that served <u>to search for</u> evidence in order <u>to allege</u> a crime, to plot against the Plaintiff. (Emphasis added)

356. **Catherine Etherington**, veterinarian, conducted an illegal and warrantless search of the dog(s) by extracting and testing its blood or feces, or taking X-rays—acts that constituted an illegal physical invasion of defendant's property to <u>look for</u> (fishing expedition) any possible violations and otherwise concealed information about the dogs, that served <u>to search for</u> evidence in order <u>to allege</u> a crime, to plot against the Plaintiff. (Emphasis added)

357. **Emanouil Petkov**, veterinarian, conducted an illegal and warrantless search of the dog(s) by extracting and testing its blood or feces, or taking X-rays—acts that constituted an illegal physical invasion of defendant's property to <u>look for</u> (fishing expedition) any possible violations and otherwise concealed information about the dogs, that served <u>to search for</u> evidence in order <u>to allege</u> a crime, to plot against the Plaintiff. (Emphasis added)

358. **Elizabeth Susen**, veterinarian, conducted an illegal and warrantless search of the dog(s) by extracting and testing its blood or feces, or taking X-rays—acts that constituted an illegal physical invasion of defendant's property to <u>look for</u> (fishing expedition) any possible violations and otherwise concealed information about the dogs, that served <u>to</u>

search for evidence in order to allege a crime, to plot against the Plaintiff. (Emphasis added)

359. These rescues and individuals were all motivated and highly benefitted financially by all the dogs they took possession of.

360. All of the prosecutors' photos and the Plaintiff's photos were observations that were inconsistent with the allegations. All the photographs refuted the charges.

361. There originally were 13 puppies. The police killed one during the March 6, 2012 raid.

362. The police seized 12 very young puppies, and nine dogs (teenage and adult). One of the dogs went to a volunteer who chose a dog for himself and the police let him take it.

363. They took females they thought were pregnant. They weren't pregnant. They were just in good weight.

364. All dogs refused the entire time from April 30, 2012 through June 1, 2012, to go with the animal rights extremists. The dogs were literally choked and dragged along the ground like sleds four hundred feet from their dog runs to vehicles that would store them in the heat until they were taken away. Plaintiff took photographs. (Emphasis added)

365. One dog thought to be pregnant was so traumatized being choked and dragged that she lost control of her bowels as she was being dragged. Plaintiff took photographs.

366. Other dogs vomited as they were being dragged because they were being choked and inhumanely treated. Plaintiff took photographs.

367. **April 30, 2012**, a New York City television news helicopter was hovering over Plaintiff's house and property as though she were a threat to national security.

368. Additionally, all other statements/actions against the Plaintiff on that search warrant were either misapplication of law, contrary to law, or a fictitious statute number and law text that didn't exist. In brief and in plain layman terms, the search warrant that lacked the

mandated probable cause, authorized a massive witch hunt without particularity to be executed by not police only as mandated by law, but by a volunteer ambulance corps, Adult Protective Services, the TOW Code Enforcer, and civilians. (Emphasis added)

369. NYS Criminal Procedure Law §690.25 clearly states it is only a police officer who executes a search warrant.

370. The search warrant was authorized and signed April 29 2012 by Judge Patrick Owen. The application to that search warrant that is supposed to describe the probable cause didn't exist. The application for that search warrant wasn't sign and sworn to until the following day, April 30, 2012. ((Emphasis added)

371. The search warrant also suffered from extreme overbreadth, to wit, to search areas of the property that were unrelated to the allegations, and authorized seizure of property not related to what they incorrectly thought was probable cause.

372. Plaintiff was arrested April 30, 2012 and placed in the TOW jail on a defective search warrant. No application existed for that defective search warrant. There was no probable cause.

373. While Plaintiff was in the Town of Wallkill jail and then the TOW court, **Tina Lacatena** from **Adult Protective Services** was again present and did an illegal search of the house.

374. Her subsequent report refuted the allegations made by **PO Farningham name other PO's** in written and oral testimony. This showed the officers perjured themselves. (Emphasis added)

375. **Tina Lacatena's** written report, although favorable for the Plaintiff, Sylvia Panetta, was never shown or given to the Plaintiff. This presented as another Brady violation.

376. While Plaintiff was in the TOW jail cell, **PO Ashworth** called **Kerry Clair** at **Pets Alive.**

PO **Ashworth** then spoke to **ADA Kass** and said **Kerry Clair** didn't want to get involved unless Plaintiff signed the dogs over or the judge ordered them forfeited. **PO Ashworth** then talked **Clair** into getting involved because she said she was now told some of the dogs were vicious.

377. Plaintiff was taken to the TOW court and appeared in front of **Judge Patrick Owen.**

378. **Judge Patrick Owen** declared the appearance was for all purposes an arraignment of the charges He stated the Plaintiff had a right to an adjournment to obtain counsel. He read Plaintiff her rights. He nevertheless continued even though the Plaintiff had no attorney.

379. Plaintiff was released on her own recognizance.

380. Any reasonable and knowledgeable judge knew or should have known that the conduct/allegations complained of did not violated well-established law at the time of the incident.

381. Any reasonable and knowledgeable **District Attorney** knew or should have known that the conduct/allegations complained of did not violate well-established law at the time of the incident.

382. Any reasonable and knowledgeable Assistant District Attorney knew or should have known that the conduct/allegations complained of did not violate well-established law at the time of the incident.

383. Any reasonable police officer knew or should have known that the conduct/allegations complained of did not violate well-established law at the time of the incident.

384. Any reasonable and knowledgeable person familiar with Rottweilers, their care, their anatomy, pregnancy and whelping of litters, and environment knew or should have known that the conduct/allegations complained of did not violate well-established law at the time

of the incident. In fact, the dogs were in such great shape that they were mistaken for being pregnant.

385. The police and possibly others authorized on the defective search warrant ransacked the house again. (Emphasis added)

386. They unlawfully took many kennel files, including, but not limited to, individual dog and litter files not related to allegations, sales tax information, dog sales contracts, etc..

387. They illegally took Plaintiff's passport, her children's birth certificates and social security cards, two sets of divorce papers, kennel sales tax submission files. The police did not provide Plaintiff with the required form or any other documentation that lists all property seized.

388. Plaintiff found out on this day that the two deformed dogs who were healthy, active, in no pain and not suffering from anything, that were unlawfully seized March 6, 2012, were subjected to amputation surgery March 9, 2012, by **Dr. Joshua Furman**, DVM, without the Plaintiff's knowledge or permission or court order. Plaintiff wasn't even charged with anything at that time. These dogs were disgustingly, immorally and outrageously mutilated the third day after they were seized. There was absolutely no reason for the amputation surgery. (Emphasis added)

389. In addition to the unauthorized and unnecessary surgeries, **Dr. Furman**, without Plaintiff's knowledge or permission or court order, gave the dogs unnecessary rabies vaccinations (dogs were already vaccinated by Plaintiff's veterinarian), and drew blood for tests (considered an illegal via citation) – not involving exigent, life threatening circumstances.

390. **Kerry Clair** stated the male deformed dog almost died because he had retained fluid under the incision and was in critical condition.

391. **On April 30, 2012**, TOW **Judge Patrick Owen** declared the appearance was for all purposes an arraignment of the charges. He stated the Plaintiff had a right to an adjournment to obtain counsel for all stages of the case, including the arraignment. He read Plaintiff her rights. He nevertheless continued with the arraignment even though the Plaintiff had no attorney. (3)

392. **Judge P. Owen** read the two charges of Agriculture & Markets (A&M) §353 and incorrectly stated it included medical. Section 353 does not include management practices.

393. **Judge P. Owen** read description including dog #1 (Jack). He read PO Farningham's <u>visual description</u> of Jack including claim of intestinal parasites (inside the G.I. tract) which is impossible and fabricated. (Emphasis Added)

394. **On April 30, 2012**, after Plaintiff was brought home from jail and court by **Detective Donaldson** and female officer, Plaintiff discovered two giant VariKennel 700 crates ($200 each) and three VariKennel 500 crates ($100 each) were missing. The detective said they borrowed them – needed a way to transport dogs off of property but they will bring them back. The valuable crates were never returned.

395. **On April 30, 2012, April Wood**, Director of the **Middletown Humane Society**, asked Gil if she could have Plaintiff's cat named "What". She was told "no" and proceeded to steal the cat and sent it over state lines to Pennsylvania.

396. **On April 30, 2012, Detective Donaldson**, who was in charge of the raid, refused to do anything about the theft of the expensive dog crates and the stolen cat.

397. **On April 30, 2012**, April Wood, Director of the Middletown Humane Society, in an attempt to taunt, defame and embarrass Gil, asked him if the 55-gallon drum is where he burns puppies and dogs.

398. **April Wood,** director of the **Middletown Human Society,** took possession of 12 puppies and an adult female with a hanging tumor, knowing the facility was infected with the parvo virus.

399. **April Wood,** director of the **Middletown Human Society,** took possession of 12 young puppies and an adult female with a hanging tumor, knowing that these dogs were in excellent shape and were not in the condition the police, DA and "volunteers" portrayed.

400. A helicopter film crew from a New York City television news station filmed an overhead video of the dogs, the large runs and their environment that refute the allegations. Yet they went forward with the case, and did not notify the defendant of the material that was shown in her favor. This was a Brady violation.

401. Animal rights extremists were illegally given permission to come to Plaintiff's property daily from 7 AM to 7 PM and to take over the care (including medical) and feeding of Plaintiff's dogs. This was contrary to law.

402. The police were ordered to accompany them each and every time they came and remain until they leave.

403. None of the 76 dogs were charged. The two dogs that were charged had already been seized March 6, 2012. The taking of the Plaintiff's remaining dogs was theft, a civil asset forfeiture, planned in advance by TOW Attorney **Guertin's** release of the information March 9, 2012, three days after the seize. (Emphasis added)

404. The Plaintiff was threatened if she took care of her dogs, she would be arrested.

405. Each and every civilian animal rights extremists, "volunteers", that came with the groups, took over Plaintiff's property without her permission. When she asked them not to do particular things that would destroy property, cause damage or create an undesirable,

unhealthy environment and be detrimental for the dogs, they refused to follow Plaintiff's direction.

406. An example of this was to not put hay in the multiple Dogloo and other houses and not to place it on the ground. Plaintiff explained the use of hay will create mud swamps. They told the Plaintiff they can do whatever they want. They did, in fact, create mud swamps.

407. Another example of this was to not hang tarps over the fencing. Plaintiff explained the use of tarps will create mud swamps. They told the Plaintiff they can do whatever they want. They did, in fact, create mud swamps.

408. They then used this as an opportunity to defame, slander and libel the Plaintiff with the media and social media by saying that these were the conditions that existed when they first arrived April 30, 2012.

409. This was reinforced by the police. The police confirmed they could do what they wanted because they were the "experts".

410. Plaintiff experienced the illusory authority of the unlawful, unwelcome invasion of Plaintiff's private property.

411. It was later revealed that none of the volunteers had any experience in the management of a kennel, let alone a large breeding kennel. **Judge Patrick Owen** was negligent, without statutory authority, to order civilians with no experience or knowledge to be responsible for the care of 78 dogs.

412. The court still had not appointed an attorney for the Plaintiff, so she remained undefended.

413. **On April 30, 2012**, without the Plaintiff's permission, the volunteers took the wood already in front of the runs and threw them into a bonfire-type pile at the end of the dog runs. They took broken and solid, intact pallets from inside the runs and threw them onto

the pile. Lazy volunteers took pallets and threw them over the back of the runs, thinking no one would see them doing it. They took Dogloo houses and threw them onto the pile. They took water pails and threw them onto the pile. They took wooden dog houses that were repairable and threw them onto the pile (and left non-repairable ones IN the runs).

414. When Plaintiff told them to stop manipulating her property, they refused to stop.

415. Plaintiff told police officers to stop them and police refused.

416. There were three empty dog runs with houses. Instead of putting Cookie, (the mother of some of the puppies they removed from the house), in one of those runs, Pets Alive constructed a 10' x 10' run with their panels off the driveway, several hundred feet before reaching the house, opposite the barn in an isolated area in the pristine woods with the ticks. Instead of taking a spare doghouse from the runs near the front of the house (there were three extra ones there) or from the back, they took one of Plaintiff's expensive VariKennel 700 crates from the house and put it in the run. Cookie had no protection from the elements. The crate was always flooded as the sides and front are open. They put hay in the crate. The hay immediately got saturated and it was not removed, even though the crate was full of water. Cookie lived outside in the elements, regardless of the temperature or weather (including thunderstorms), because she had no place to go to get protection and shelter. The Plaintiff was unable to take her into the house during a severe thunderstorm because she had been threatened repeatedly that if she did anything with the dogs or their runs she would go to jail.

417. Cookie was cruelly left outdoors in the elements, including a powerful thunderstorm, while the Plaintiff stood in her house by the window and cried.

418. **Tina Hudson** (A Rottweiler Empire Rescue, Inc.) told Plaintiff and others that she can't

believe they leave Cookie in these inhumane conditions. But yet, she did not say anything to **Krissie Downey (MRR)** who was responsible for the maintenance of the dogs, or the **District Attorney or the police or the court**, because nothing was ever done about it.

419. Kennel management is a lot of work wrapped around self-taught education from years of experience. The TOW court ordered **Mountain Rottie Rescue** to provide care of the dogs. They gave minimal, inferior care and refused to follow instructions from the Plaintiff.

420. **Krissie Downey, MRR**, who was put in charge by **Judge Patrick Owen** for the maintenance of the dogs, admitted <u>at trial</u> that she had never done anything like this before. Yet she crowed all along that she was an expert. (Emphasis added)

421. **Krissie Downey, MRR** who was in charge, only showed up a handful of days. She did not show up every day to fulfill her responsibilities contrary to what she later stated.

422. When Legal Aid was deciding if Plaintiff was eligible for their services, Plaintiff told Legal Aid lawyer, **Mike Davis, Esq.**, about it. Nothing was done by anyone to help Plaintiff's dogs, even though the environment and living conditions were seen by the police and the volunteers on a daily basis. That is animal cruelty by the people purported to protect animals and were court-ordered responsible for the care and maintenance of Plaintiff's dogs.

423. **On April 30, 2012,** two veterinarians examined all the dogs. Plaintiff was told they were taking dogs that were sick or pregnant. All the dogs were in good shape and condition.

424. Janie, who had a hanging growth, was maintained by Plaintiff in the manner discussed between the Plaintiff and her veterinarian, Dr. Paul Johnson. She was one of the dogs removed by the police and "volunteers".

425. They took Plaintiff's 12 very young puppies (that already had their standard vaccinations

and wormings for their age bracket), and nine adults.

426. None of these dogs were charged. None of the remaining dogs were charged.

427. One of the volunteers admired a young male and told the vet he liked that one and hopes he can have it. That young male was one of the nine dogs that were taken.

428. Dogs removed thought to be pregnant, were in fact, not pregnant. They were just in good weight for their age. Anyone, including the veterinarians and volunteers who proclaimed to be "experts", knew or should have known they were not pregnant.

429. One of the females that was thought to be pregnant was being dragged along the ground about 400 feet like a sled or toboggan by **Eric Bellows** and **Stephanie Palmer** from **Karma K-9 Rescue, Inc.,** Albany, NY. Plaintiff yelled at him to stop dragging and choking the dog.

430. The dog was so traumatized that she lost control of her bowels as she was being dragged. The male yelled back that it was the Plaintiff's fault because the dog would not walk with him. The female was not pregnant. She was just in good weight.

431. **On April 30, 2012, Stephanie Palmer** from Karma K-9 Rescue, Inc., Albany, NY assaulted Plaintiff. She was unhappy that Plaintiff was taking notes and pictures of the people and activities on Plaintiff's property. The woman was carrying a 50-pound bale of wood shavings. As they were walking, the woman, suddenly turned around 180 degrees, lunged forward towards the Plaintiff with the bale, and with full force, rammed the bale forward into Plaintiff's right side. Plaintiff sustained injuries from the assault. Plaintiff feared further physical assaults or worse.

432. The assault was done in front of where Gil was sitting.

433. **PO Solano,** TOW police department, refused to take a witness statement from Gil or

Plaintiff and refused to allow Plaintiff to file a complaint and press charges against **Palmer**.

434. Plaintiff asked J. Youngman that wood shavings not be used in the dog runs and doghouses. They serve no purpose only to get saturated with water and urine, turn moldy and dogs will get sick. It also attracts rats and other vermin to come out from the woods. The wood dust can also create abscesses. She littered the houses and ground with the wood shavings.

435. Plaintiff asked **Downey, J. Youngman, R. Youngman, LaRocca, Herring** and others that hay not be used in the dog runs and houses. The hay merely gets soaking wet, ground underneath can't get dry, hay stops the flow of water runoff from leaving the runs as well as preventing water from being absorbed in the ground, causes houses to be flooded, causes deep mud, etc. The hay gets very moldy and the dogs will get sick. It also attracts rats and other vermin. These people took additional uncovered, stored, baled, moldy hay and put it on top of the saturated hay on the ground and in the houses.

436. Against Plaintiff's demand, they used hay that was left outside unprotected from the rain that turned moldy.

437. **Lynn Herring** showed up on Plaintiff's property after everyone left and spoke to Plaintiff and Gil. She wanted to confirm Prince Jr. had his rabies shot. She claims he nipped her finger when trying to grab a dog biscuit she was offering. She went to the E.R. She asked permission to come back to volunteer to take care of the dogs. Plaintiff told her she didn't need her permission. She said it would otherwise be rude to come and intrude on Plaintiff's privacy and property. She said she will be bringing dog food her brother is getting from someone.

438. **On April 30, 2012, Lynn Herring** said she doesn't understand why they are doing this as she sees nothing wrong because the dogs' runs are big and their housing is nice Dogloo

houses. (57) She showed Gil and Plaintiff pictures of her dogs that she had recorded on her cell phone.

439. However, once started, **Herring** went along with what was being done to the Plaintiff and lied in court, **June 15, 2012**, all refuted by APS, the D.A.'s own witness.

440. Between April 30 and June 1, 2012, All the remaining dogs were seized, even <u>though there were no charge on the dogs, and even though the Plaintiff still had no appointed attorney.</u> (Emphasis added)

441. They took what they wanted, including stealing five expensive airline crates and Plaintiff's cat as well, not mentioned on the seizure order.

442. **On May 1, 2012,** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

443. **May 1, 2012,** the **Times Herald Record, editor Vanderhhof, Nathan Brown journalist,** published an article stating the Plaintiff was charged with animal cruelty.

444. **The May 1, 2012 THR's** article published <u>false</u> and <u>fabricated information,</u> fed to them by TOW police chief **Robert Hertman** and was published without the input from the Plaintiff. (Emphasis added) include all details in article in questions for deps

445. **The May 1, 2012 THR's** article published <u>false</u> and <u>fabricated information,</u> fed to them by **MRR's Jamie Gaebel** and was published without the input from the Plaintiff. (Emphasis added)

446. **The May 1, 2012 THR's** article published <u>false</u> and <u>fabricated information,</u> fed to them by Supervisor **Depew** and was published without the input from the Plaintiff. (Emphasis added)

447. Police chief **Hertman** gave false information to the **THR** regarding the search warrant.

448. **The THR and journalist Brown** knew or should have known that information given to him could not possibly be true, yet included it in his May 1, 2012 article without investigation. There was no input from the Plaintiff. (Emphasis added)

449. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

450. The libelous article was published and discredited Plaintiff's reputation and character, without any investigation or input from the Plaintiff.

451. **This May 1, 2012 THR article** was published - Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, and caused great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests.

452. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

453. Plaintiff was defamed, humiliated, damaged, slandered, and libeled on local media, social media, out-of-town media including New York City newspapers, radio and television news networks. Plaintiff's reputation and character were discredited, slandered, libeled and caused great personal injury, including severe mental anguish, emotional distress and later physical injuries, and loss of property and business interests by the **Supervisor Depew**, police chief **Hertman**, District Attorney's office **Hoovler, Kass and Purcell,** as well as individual police officers.

454. Police chief **Hertman** gives false information to the **THR** regarding the search warrant.

455. Five men plus a police officer with wheel barrows dropped off more hay and again left bales of hay out in the open unprotected. These bales of now water-soaked hay was then used to cover the already saturated, moldy hay in the runs and houses. Even when these bales got moldy, they continued to use them. Rats started making residence in the bales.

456. Plaintiff asked that tarps not be put up. The runs are 60 feet long in the woods and the dogs have shade at any given time. The tarps collapse from the weight of the water collected in them and the massive amount of additional water creates mud swamps, even more-so with the already mounds of moldy hay that were previously set down. Tarps were put up anyway and they did, in fact, create mud swamps, with the dogs being subjected to ankle deep mud.

457. Then they falsely reported to paper and social media that these were the conditions when they arrived April 30, 2012.

458. In all three cases, Plaintiff was told these people are "experts" and they can do as they please with Plaintiff's property, when in fact, to make matters worse, not one of these people appeared to have any experience maintaining a large kennel facility. Everything they did was wrong and harmful to the dogs. It was later revealed that Downey had no such previous experience. (Emphasis added)

459. Trial testimony revealed that the person in charge of the illegal take-over, **Krissie Downey, of MRR** never did a seize before and never worked with a large amount of dogs.

460. **Starting May 1, 2012, Larocca,** one of the "volunteers" from **MRR,** herself a "back-yard" Rottweiler breeder, got on the Internet, on "Pet-law" discussion group and Facebook to generally vilify the Plaintiff. On a public Internet discussion board of approximately 3,650 members, she wrote she was at Plaintiff's property and insisted seeing things such

59

as, in part, "...bad injuries, broken bones, eye's (sic) hanging out of sockets, ..." for the purpose of destroying Plaintiff's reputation and character; **Larocca** was discrediting, defaming, humiliating, damaging, slandering, libeling and caused great personal injury, including severe mental anguish, physical injuries, emotional distress and to later cause physical injuries, loss of property and business interests.

461. **Larocca** ingratiated herself to a powerful person. It is impossible to exaggerate the damage done by this false and reckless action.

462. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, and caused great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests.

463. The defendants went on social media and to the local media, (including the **THR**), as well as radio and television news media as far away as New York City by the volunteers, including **Downey, Larocca, J. Youngman, R. Youngman, McClure and Lynn Herring.**

464. Plaintiff was defamed, humiliated, damaged, slandered, and libeled on social media. Plaintiff's reputation and character was discredited, libeled and caused great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests.

465. Plaintiff was defamed, humiliated, damaged, slandered, and libeled on local media, out-of-town media including New York City newspaper, radio and television news. Plaintiff's reputation and character was discredited, slandered, libeled and caused great personal injury, including severe mental anguish, emotional distress and later physical injuries, and

loss of property and business interests by Supervisor Depew, police chief Hertman, District Attorney's office Hoovler, Kass and Purcell, as well as individual police officers.

466. **May 1, 2012,** the day after two veterinarians were at Plaintiff's Property and examined all the dogs and the police seized 12 young puppies and nine adults, **Tina Hudson** and friends (**A Rottweiler Empire Rescue, Inc.,** Clifton Park, NY), **Eric Bellows** (**Pack Ethics,** Albany area), and **Mary MacCollum** (Margrave Rottweilers – a breeder from Stillwater, NY) arrived to "take" dogs.

467. **Mary Margaret MacCollum** a Rottweiler breeder, stated she wanted "Prince", one of the Plaintiff's valuable stud dogs. She got him.

468. **Tina Hudson** and **Eric Bellow** said all the dogs look good – they don't know why this was being done to the Plaintiff.

469. **Tina Hudson** said **Eric Bellows** likes "Arab" and she likes "Willi". She said **Kerry Clair** was telling the **District Attorney** these two dogs are "medical" and will get an Order from the judge so they can have the dogs they want. Clair is telling the judge Willi has an ear infection and Arab has pussy eyes, even though neither dogs had such conditions.

470. Plaintiff went into the house and retrieved Q-tips, and showed **Tina Hudson** and **Eric Bellows** that the ears were clean and looking into the ears, there are no signs of infection.

471. Plaintiff then took them over to Arab and asked to be shown the puss in his eyes. There was none.

472. **Tina Hudson** asked the Plaintiff to sign the two dogs over to her rather than **Clair** get a court order. She went on to say she had heard very bad stories about **Clair** and **Pets Alive** as well as **Downey and MRR**. She fears for the dogs if in their care. And she added that it would be two less charges against the Plaintiff if she took the dogs.

473. **Tina Hudson** waited for the judge's Order and took Willi and Arab and others.

474. **Eric Bellows** euthanized Willi without the Plaintiff's knowledge or permission or court order.

475. **May 5, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

476. **PO Grosso** lunged forward towards Plaintiff to grab her camera away from her and stopped suddenly when she pulled away. (Emphasis added)

477. **PO Grosso** proceeded to follow Plaintiff, literally walking two feet in back of her. Plaintiff feared he was going to grab her from behind or bump into her if she stopped walking. **PO Grosso** is the officer that attempted to go in the bathroom with the Plaintiff to watch her urinate on March 6, 2012.

478. One of the dogs was happy to see the Plaintiff and was jumping on the fence. Plaintiff went over to him and touched him through the fence. **PO Grosso** yelled at Plaintiff to get away from her dog.

479. **Lynn Herring** came alone to feed and water the dogs. Two dogs were breeding in the run and she wouldn't do anything about it. The Plaintiff was prohibited from removing any of the dogs from their runs. (Emphasis added)

480. After **Lynn Herring** and **PO Grosso** left, Plaintiff noticed Prince's door was open, his water pail outside the run and dirty dog biscuits on the ground (to attract rats).

481. **May 6, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

482. Although responsible for the daily maintenance of the dogs, **Downey, MRR**, only showed up three days the entire time towards her responsibility to maintain the dogs for feeding, watering, medical, brushing, etc.

483. Although responsible for the maintenance of the dogs, **Downey** was providing inferior care. She and her group had dumped feces on the ground outside the first dog run although she said she was dumping it in the woods.

484. Pails had yellow urine water. All the pails were green with algae because they were never scrubbed.

485. Only one Dogloo and half of a barn house in a run, inadequate amount of housing for the dogs in that run.. Plaintiff found the other half of the house outside, turned over, being used as a table stand for dishes. Plaintiff put it back in the run.

486. The ground was over-saturated in one area. Plaintiff discovered the "volunteers" broke the hose. Plaintiff had to go back to the house and turn the water off to prevent further loss of water.

487. **May 7, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

488. **Larocca, J. Youngman and R. Youngman** arrived and put up tarps. Plaintiff asked them not to do it – causes mud problems. They then put hay in dog houses. Plaintiff asked them not to do it – causes mud problems. They ignored the Plaintiff. As a result of their inexperience and lack of knowledge, they created mud swamps, with dogs walking in ankle high mud. They destroyed the dogs' environment and forced them into an unhealthy environment.

489. **Larocca, J. Youngman and R. Youngman** left dishes with food outside in the mud, even though it was raining and a big storm was expected that night. They refused to put the dishes into the houses the entire time they came to the Property. Dishes left outside would attracts rats and other vermin in the woods.

490. Two dogs are breeding – **J. Youngman** thought they were having a disagreement. She did nothing to remove one of the dogs from the run.

491. **May 9, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

492. **PO Julia Ashworth** and **supervisor Depew** trespassed on Plaintiff's property and did an illegal search. Without letting the Plaintiff know they were there, they walked past the house. The dogs' barking alerted the Plaintiff someone was there. She yelled to them from the window that they were trespassing, had no authority to be there and they must leave. **PO Ashworth** looked up and walked to the back to the dogs with **Depew**. Plaintiff again repeated they had no authority to be there and asked them again to leave. They ignored the Plaintiff and continued to the back to the dogs. They did their search of the dogs, broke bio-security and then left when they were done.

493. Plaintiff took a picture of them as they were leaving.

494. **NYS Trooper Donohue** from the NYS Police would not take a trespassing complaint from the Plaintiff. She said she won't take a complaint against another police agency - that's their policy. She advised Plaintiff to call TOW and file a complaint with them.

495. Plaintiff called TOW police and spoke with **PO DiNapoli**. He gave the call to **Sgt. McMalore** who said, "Oh, you're …" He said he will check the court orders and will get

back to Plaintiff in a few days. Plaintiff never heard from anyone.

496. Prior to that, supervisor **Depew**, went to several of the Plaintiff's neighbors in an attempt to find people who would speak against the Plaintiff and her dogs. He found no one.

497. One neighbor asked him why he is doing this to the Plaintiff. He replied, "Because of the amount of dogs."

498. **Mike Davis** from Legal Aid (still not representing Plaintiff) said he spoke to **ADA Mike Purcell** and all that he can say is bad is chain link fencing on right side going down the hill is lop-sided.

499. **May 10, 2012**: Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

500. **May 10, 2012: The THR and journalist Brown** published another libelous article providing false and fabricated information given to him by **Eric Bellows, Pack Ethic Rescue, Inc.**

501. **May 10, 2012: The THR and journalist Brown** published another libelous article providing false and fabricated information given to him by **Krissie Downey, MRR.**

502. **May 10, 2012: The THR and journalist Brown** published another libelous article providing false and fabricated information given to him by **Tina Hudson, Rottie Empire Rescue. Rottie Empire Rescue** is not a non-profit or corporation registered with the State of New York as claimed.

503. **May 10, 2012: The THR and journalist Brown** published another libelous article providing false and fabricated information given to him by town supervisor **Depew.**

504. **May 10, 2012: The THR and journalist Brown** published another libelous article

providing false and fabricated information given to him by **April Wood**, shelter manager of the **MHS.**

505. **On May 10, 2012,** the **THR** and journalist **Brown** knew or should have known the information provided to him was false and fabricated. The THR and journalist Brown had no input from the Plaintiff.

506. The libelous article was published without any investigation or input from the Plaintiff.

507. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

508. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, and caused great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests.

509. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

510. A very young female volunteer, Amy, perhaps late teens, arrived alone and not accompanied by the **TOW police** as ordered by **Judge Patrick Owen**.

511. Judge Owen ordered police to accompany the volunteers every day. The police are in contempt of that order.

512. **Krissie Downey** (Mountain Rottie Rescue) who was supposed to be in charge but never accompanied the volunteers, came later with a leash and collar and said she was told I had a pregnant female "that was ready to drop her puppies any second." Plaintiff told her there were no dogs there with that description.

66

513. **Krissie Downey** pointed to "Ali" and Plaintiff told her the dog wasn't pregnant. **Downey** left.

514. At 7:20 PM, past the time the Order allows them to be on my property, **Krissie Downey** returned with **PO Belgiovene** and **Amy** and stated they were taking the dog. Plaintiff asked them to leave as their allotted time on the property expired.

515. Plaintiff told them dog is not pregnant, and even if she was, they can't just come on her property and remove dogs without a court order.

516. Plaintiff asked them to leave again. They refused to leave saying they had a right to be there (even though the Ordered time had expired).

517. **PO Belgiovene** confirmed with **Krissie Downey** they previously needed a court order. PO **Belgiovene** called the department and it was confirmed, although he could bring back a paper for me to sign to forfeit the dog over to him.

518. **May 11, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

519. **On May 11, 2012,** the **THR** and journalist **Brown** publish another libelous article.

520. False and fabricated information is crafted by **Eric Bellows from Pack Ethic Rescue, Krissie Downey from MRR, Tina Hudson** from **A Rottie Empire Rescue,** town supervisor **Depew,** police chief **Hertman,** and **April Wood from MHS.**

521. The libelous article was published without any input from the Plaintiff.

522. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

523. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, and caused great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests.

524. The libelous article was published without any investigation or input from the Plaintiff.

525. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, and caused great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests.

526. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

527. **Det. Hults** and **Det. Kenney** served Plaintiff with a seize order for Ali, the female they all claim "is pregnant and ready to drop her puppies any second". The seize order was illegal as there was no notice or hearing.

528. **PO Adamec, PO Belgiovene, Sgt. Moskowitz and Krissie Downey** and two other officers arrived afterwards. Plaintiff addressed the officers that Ali is not pregnant. She explained vet examined dogs April 30, 2012 and took dogs they thought were pregnant. Ali wasn't taken because she's not pregnant. Ali is a housedog. He asked when she was put outside. Plaintiff said April 30, 2012. He asked if Plaintiff knew for sure she wasn't bred. Plaintiff said she was a housedog. She hasn't been in heat, wasn't bred and isn't pregnant. Now in a run by herself, even with a male and high season, even if she bred April 30, 2012, she couldn't possibly be ready to "drop her puppies" in ten days.

529. These five PO's were here for two hours. They left and did not take Ali.

530. Social media disclosed that several litters were born to seized dogs. The puppies died (one litter was 12 puppies), either because they didn't know the dogs were pregnant, and/or they had no experience delivering and maintaining newborns and their mothers.

531. **Mountain Rottie Rescue "volunteers"** gave dogs tennis balls before they left. Dogs were fighting each other over the balls, but volunteers left. Balls punctured. Dogs were pulling fuzz layer off ball and swallowing it. Two pups chewed their balls to pieces. Plaintiff couldn't find pieces. Other dogs also chewed them into pieces. Plaintiff removed the remaining balls.

532. **May 12, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

533. **Israel Sanchez** and **Lynn Herring** worked 3:30 -- 5:30 PM but remained on the property until 6:05 PM. They were finished 5:30 PM and stayed in back talking (**Lynn Herring, Israel Sanchez and PO Belgiovene**) until 5:50 PM. They went in front, gossiped, and finally left 6:05 PM.

534. **PO Farningham**, in full uniform with weapon and sunglasses, started dumping water pails (didn't scrub them, even though they were green and brown with algae after not having been scrubbed for 12 days), and filled them again.

535. **PO Farningham** left and was replaced by **PO Belgiovene** at 4:43 PM

536. **Israel Sanchez** took a Dogloo doghouse dome top, turned it over, and put all the feces inside it. (Feces had not been removed from dog runs for 12 days.) He took the feces and dumped it in front on the right side next to the driveway. Plaintiff asked him to stop.

537. **Israel Sanchez** then started throwing the feces over the back of the fence of each run.

538. Plainitiff asked **PO Belgiovene** if he gave **Israel Sanchez** permission to dump feces in the back of the runs. He said "No." Plaintiff said this was her property and asked if he would please ask Israel to stop doing it. He refused.

539. **Israel Sanchez** then started dumping in front again by the door of the first run and then on the other side of the tree.

540. Four dogs needed medical attention. Plaintiff pointed it out to **Lynn Herring.** Nothing was done about it. Plaintiff treated the dogs after they left.

541. Volunteers were leaving garbage and cigarette butts all around. They were reminded several different times not to dump their garbage on Plaintiff's Property.

542. Plaintiff found a dog food bag in Ollie's run.

543. Cookie was still living in the elements. She still was not given a doghouse or moved to an empty run. Plaintiff could not move Cookie or Plaintiff would have been thrown in jail.

544. **May 13, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

545. **Mountain Rottie Rescue – 2 men, 1 with beard** and **PO Bodensieck** arrived. 1:35 PM **PO Gulick** came and left afterwards

546. **Larocca** put Prince Jr.'s food dish up against the fence with Robbie and dogs fighting through the fence for the food. **Larocca** does nothing to stop the fighting.

547. They were underfeeding dogs. Jessie's Dogloo overturned. Someone removed the base. They left her without a house. They claimed they gave water to Rhea, Boy and Trip. Rhea hardly had water. They only took one pail to the front. This was said in front of **PO Bodensieck.**

548. **PO Bodensieck** was swatting flies. Plaintiff showed him why there were flies. They were standing right by the pile of feces Israel dumped alongside the driveway the day before. (One of three piles plus throwing over fencing in back.)

549. **May 14, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

550. Plaintiff appeared for an Order to Show Cause (OTSC) hearing at the Town of Wallkill Court – **Judge Patrick Owen** presiding. Order issued May 16, 2012.

551. Although Plaintiff requested an appointed attorney eight times, **Judge Patrick Owen** and **ADA Kass** continued with the hearing for the Order and ignored the Constitution's sixth Amendment (Judicial overreach and prosecutorial misconduct)

552. **Assistant District Attorney Kass (Kass)** told the judge he spoke with Legal Aid and was told they are not representing the Plaintiff.

553. Plaintiff still did not have an attorney. Plaintiff requested an adjournment. Request denied by **Judge Patrick Owen**.

554. **Judge Patrick Owen** again agrees Plaintiff shouldn't be without an attorney. Although he states it on the record, Plaintiff's constitutional and due process rights continue to be violated. (18,19)

555. Plaintiff again requested an attorney. Plaintiff told the judge she had a Constitutional right to an attorney. **Judge Patrick Owen** replied, 'And I have a right to move this case forward.' And he did. There was no adjournment. No attorney was appointed.

556. Although the Plaintiff requested the appointment of an attorney eight times, **Judge Patrick Owen** and **ADA Kass** continued with the hearing and ignored the U.S. Constitution's sixth

Amendment. This lends itself to judicial overreach and prosecutorial misconduct.

557. Although the judge stated on April 30, 2012 that the Plaintiff has a right to have counsel, he changed his dialogue at this hearing. When the Plaintiff declared she had a right to have an attorney, Judge **Patrick Owen** replied that he had a right to move this case forward. No lawyer was appointed. Judge **Patrick Owen** again agrees the Plaintiff shouldn't be without an attorney. Although he states it on the record, constitutional and due process rights continue to be violated.

558. In many instances, the case went forward where the **Judge or Kass** did things that were either contrary to law or misapplication of law. Everything was rubber-stamped.

559. **Judge Patrick Owen** insisted they don't have to let the Plaintiff know exactly what property has been seized from her, contrary to CPL 690.50(4).

560. Additionally, at this appearance, the **Judge and Kass** misapplied A&M §373, a section the Plaintiff wasn't even charged.

561. **Kass** wants Order to remove all the remaining dogs to vaccinate all the dogs and enable veterinarians to fully examine them. This was totally illegal because the dogs were not charged, there was no probable cause for any of the dogs, taking blood or stool samples is an illegal search per case law, and it violated due process.

562. **Kass** claimed and admits "uninhibited breeding going on and rat infestation." The volunteers were responsible for the care of the dogs. This includes unplanned breedings.

563. These "experts" wrongly identified burdock bush root dug-up <u>holes</u> (weed bushes dug out of the ground, removed in their entirety and holes left intact) as rat <u>tunnels</u> and ran with the lies. They built their "rat" stories around these burdock holes to embarrass, discredit, humiliate, damage, slander, libel and defame the Plaintiff's reputation. (Emphasis added)

564. Plaintiff stated to the court that the volunteers have been coming to her property 15 days and there was no responsible care being given to the dogs. There is no need to remove them.

565. **Kass** requested Janie, dog #613 with the hanging growth, be euthanized. Dog was taken by the Middletown Humane Society and due to stress, went into renal failure three days after being illegally seized. <u>They waited a week before getting dog into veterinary hospitalization</u> because they needed the town's approval. (Emphasis added)

566. Dog was euthanized and cremated without the Plaintiff's permission and knowledge, preventing her from getting a second opinion, doing an autopsy, and prevented Plaintiff from burying her dog.

567. **Kass** requested all dogs to be seized. He claimed none of the dogs are licensed, even though he has the Plaintiff's files showing the application for licenses, consisting of names, AKC registration numbers, rabies certificates, and check was sent to the TOW clerk November 6, 2011. This was the first year NYS changed licensing filings be made to the town and not the NYS Department of Agriculture.

568. **Kass** failed to mention that **on March 6, 2012**: the police illegally seized the current licensing file and about ten years of the previous licensing files, that included the dogs' names, AKC registration numbers, rabies certificates and check for payment of the licenses, plus additional personal and business files.

569. **Kass** lied and said the dogs had parasites, even though that information was never stated on the veterinarians' records. The dogs were wormed regularly.

570. **Kass** lied and claimed the Plaintiff's dogs' rabies shots expired May 8, 2012 and that it was an emergency and a public health hazard. Plaintiff told the court the rabies didn't

expire until May 18, 2012, and that she has arrangements for a veterinarian to come out and give a new series of vaccinations once these expire. The **Judge** asked who gave the shots. Plaintiff told him Dr. Novick. He asked where he's located. Plaintiff told him Brooklyn. A police officer left the courtroom. Upon his return, he handed a file to **Kass**. It was never put in the record that **Kass** lied – the rabies had <u>not</u> expired and that Plaintiff did, in fact, have arrangements with Dr. Novick to give new shots to the 48 remaining dogs. The police officer called Dr. Novick, who confirmed Plaintiff told the truth and was then told not to come.

571. **Judge Patrick Owen or Kass** never stated on the record he gave the wrong information – that it wasn't the public health emergency he dramatically claimed, and there was no problem for Dr. Novick to come here as planned. Plaintiff would only be paying about $70 (cost) to vaccinate the remaining 48 dogs.

572. **Judge Patrick Owen or Kass** did not acknowledge on the record that the vaccinations had not yet not expired and the information spoken by **ADA Kass** was not the truth.

573. <u>**Kass** now finally admitted on the record the situation was somewhat unmanageable.</u> "<u>It could have been better managed but there was a change in their circumstances</u> and in order to fully accomplish and provide for health, safety and maintenance of dogs, a better approach is to seize all the remaining dogs." (Emphasis added)

574. Plaintiff explained the dogs need not be removed from the property. Veterinarians were already there once and examined all the dogs. If distributed to other places, they were being put in harm's way because places like the Middletown Humane Society and others are known to have contagious viruses in their facility and her dogs could die.

575. **Kass** did not comply and was in contempt of court. The dogs went without their shots.

576. **Judge Owen** states, "I understand that you probably need an attorney (Owen admits it) but grants seizure of the dogs on a temporary basis. Plaintiff asks under what A&M law. He replies under 373 and 117. Plaintiff states laws do not allow it. Owen replies,"It does and you can take me up on it."

577. 'Appointed attorney' is mentioned 11 times, with **Owen** refusing to do anything about it.

578. **The judge** ordered that instead, the DA's veterinarians come to the property and vaccinate the dogs.

579. No one ever came. The dogs were never vaccinated. Their previous shots expired. Judge **Patrick Owen and Kass** themselves have now created a "public health emergency issue", an allegation falsely alleged against the Plaintiff.

580. **Judge Patrick Owen and Kass** made a big deal out of nothing, just as was done claiming Ali was "pregnant and ready to drop her puppies any second". Ali was not pregnant. <u>No one</u>, except the Plaintiff, was familiar or experienced with Rottweilers, in animal husbandry, and the care of a large amount of dogs.

581. The dogs were the victims because they did not get their rabies shots as ordered.

582. **ADA Kass** did not comply and was in contempt of court. However, **Judge Patrick Owen** never declared a contempt of court. The dogs went without their shots.

583. **Kass's** OTSC indicated two statutes to seize dogs. Use of those statutes was contrary to law and misapplication of law.

584. Plaintiff still had no appointed attorney.

585. **Judge P. Owen** agrees that Plaintiff needs an attorney.

586. Plaintiff stated the court cannot legally seize the dogs under those two statutes according to law. **Kass** said he was going to get Plaintiff's dogs "any way I can".

587. Keep in mind the TOW attorney **Guertin** already proclaimed March 9, 2012, three days after the first illegal search, that they were going to take all the dogs.

588. Keep in mind that **TOW Supervisor Depew** stated to one of Plaintiff's neighbors that they were doing this because of "a large amount of dogs".

589. Plaintiff tells the court that the police illegally seized many files and documents, including, but not limited to, the brown envelopes that have all the licensing information, including the current and past ten years of submissions.

590. Contrary to law, Orders are (unlawfully) being issued by **Judge P. Owen** without having a hearing first during the entire time the Plaintiff had no lawyer.

591. **Judge P. Owen** incorrectly insists that the police don't have to tell the Plaintiff what they are seizing, contrary to Criminal Procedure Law §690. "Now, right now, they do not." Judicial overreach and prosecutorial misconduct.

592. **Judge Patrick Owen** agrees to remove all remaining dogs. <u>None of the dogs were charged.</u> He was authorizing a theft of property, a civil asset forfeiture. (Emphasis added)

593. Plaintiff mentions the request of an attorney about 11 times during the hearing.

594. Additionally, at the appearance, **Judge Patrick Owen and ADA Kass** also misapplied Agriculture & Markets Law §373, which in fact, Plaintiff was not so charged.

595. All the dogs were being removed illegally, as none of them were charged. When the Plaintiff commented that the law doesn't allow the seizure of the animals, **Judge Patrick Owen** replied, "It does. And you can take me up on it." (19)

596. **Judge Patrick Owen** rubber-stamps everything ADA **Kass** requested

597. After court, **Krissie Downey** and two women arrived. They were trying to get a dog and choked it – dog screaming. When they saw Plaintiff coming, they stopped and came out

of the dog run.

598. **May 15, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

599. Just finished pouring out. **Jean Youngman** was putting soaking wet hay in runs. Plaintiff asked her why she's putting soaking wet, water-logged hay in run. She said it's better than mud. Hay is causing the mud and stink from feces and urine.

600. **Larocca, Jean Youngman and Ron Youngman** gossiping in front by their vehicles. They are smoking, even though they have been asked several times not to smoke when they are on the property.

601. Plaintiff called the **TOW police** and spoke to **Dispatcher Handbury** and then asked for supervisor. Plaintiff still on hold. The three suddenly left. **Dispatcher Handbury** comes back and said sergeant says they can be there until 7 PM. Plaintiff told him they are authorized to care and maintain dogs between 7 AM and 7 PM. They can't hang around to socialize and gossip and smoke. They can do that elsewhere.

602. Tarps hanging down in some runs. Water from rain pulled them off. Others hanging low holding water.

603. Cookie still in VariKennel 700 crate – not doghouse – with waterlogged hay on bottom. Food dish outside.

604. **May 16, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

605. **On May 16, 2012,** the **THR** and journalist **Brown** publish another libelous article.

606. False and fabricated information is crafted by **Eric Bellows from Pack Ethic Rescue, Krissie Downey from MRR and police chief Hertman.**

607. The libelous article was published without any input from the Plaintiff.

608. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, and caused great personal injury, including severe mental anguish, emotional distress and later, physical injuries, loss of property and business interests.

609. The libelous article was published without any investigation or input from the Plaintiff.

610. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

611. **Krissey Downey, MRR,** provided false and fabricate information

612. Plaintiff came home -- **LaRocca, Jean Youngman and Ron Youngman** were here. Gil was here. Gate was not locked again. This was an ongoing problem where the defendants never locked the driveway entrance, even though **Judge Patrick Owen** told them to.

613. When they were leaving the back to go to the front, I checked. Dog bowls are all muddy – no food in them. They weren't fed enough. Plaintiff asked **Ron Youngman** if he could please give them more. He said, "No." He said he has no more food – just brings enough for two cups of food for each dog. I said it apparently is not enough because they have all eaten it already.

614. **They stood by the cars,** all three, smoking and gossiping. They put in more hay. Runs are muddier than ever.

615. Plaintiff asked if they were going to remove the hay from the houses and runs. He said they're coming to get the dogs this weekend. They'll be cleaning the runs then.

616. **May 17, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

617. Gil found "Order and "amended Order 5/16/12" inside the house on the dining room floor. Someone broke in by the back door. They illegally entered Plaintiff's house. (Emphasis added)

618. Order was issued by **Judge Patrick Owen** without prior notice or hearing.

619. Order dated May 16, 2012 permitted the euthanization of dog, Janie. Janie was seized April 30, 2012 because she had a soft, hanging mass. It did not cause her any pain or suffering. Plaintiff had previously spoken to her veterinarian (Dr. Johnson, MHS veterinarian in this case) about it, and she was already taking care of it properly. The vet didn't offer any additional treatment.

620. **April Wood, Middletown Humane Society (MHS)** had the dog three days under stress when she suddenly went into renal failure with diarrhea, vomiting and seizures. The dog was fine when they unlawfully seized her April 30, 2012. They waited another seven days before calling the vet to come and diagnose the problem. Stress caused the renal failure she was diagnosed with. (Emphasis added)

621. Order was served to Plaintiff the day after euthanization was done. (emphasis added)

622. Plaintiff called **Dr. Johnson**, MHS attending veterinarian. Upon return call, he stated dog was euthanized **May 16, 2012** and cremated **May 17, 2012**. Plaintiff did not give her permission. All this was done while Plaintiff still owned the dog while there were no charges on the dog.

623. This prevented the Plaintiff from seeing the dog before they did anything, prevented her

from getting a second opinion, prevented her from doing an autopsy, prevented her from burying her own dog.

624. **PO Snellinger and PO Farningham and PO Grosso**, all on taxpayer money, stood there while dogs were being removed.

625. Zacky and his female run partner started fighting because **Larocca, J. Youngman and R. Youngman** had dragged and choked Eddie in front of the dogs' fencing and wouldn't move him. They ignored the fight and let it continue. Plaintiff heard the fight and ran over and separated the dogs.

626. After dragging and choking the dog at least 100 feet, they took a second leash in front of his back legs, pelvic area, and were lifting him off the ground.

627. It's to be noted they took Eddie, but offered no medical care to Dixie who was limping (his run partner) or take her to a veterinarian as provided in **Judge Patrick Owen's Order**.

628. Plaintiff asked **PO Snellinger** about their issuing an inventory form. He said he doesn't know.

629. Plaintiff asked **PO Farningham** if she is getting an inventory list of all dogs being removed before they leave. No. He has no form. Plaintiff told him she is supposed to get one before he leaves. Should call station to get it. Plaintiff never received one.

630. **May 17, 2012:** Plaintiff requested that more food be given to all the dogs. They were grossly underfeeding the dogs.

631. Quinn and female were breeding. No one did anything about it. As **PO Snellinger, PO Farningham, George McClure** were passing the run as they were leaving, they all looked and saw the dogs were now "tied" and they said nothing and did nothing. They left. The dogs were left there in a tie, rather than remove one after the tie breaks.

632. Six people socializing in the front. They didn't load the dog. Plaintiff asked **PO Farningham and PO Snellinger** to ask them to load the dog and leave. (6 people – second round of people, including Chrissie, Kelley, George McClure, Ron and Jean Youngman, another female.

633. For the fourth time, Plaintiff asked **PO Farningham and PO Snellinger** to tell them to leave. Dog was loaded long time ago. They finally left, but didn't close the chain behind them again. They left food in runs where dogs were removed. Good for rats. No inventory list from them.

634. **May 18, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

635. **On May 18, 2012,** the **THR** and journalist **Brown** publish another libelous article.

636. False and fabricated information is crafted by **Jamie Gaebel, MRR, police chief Hertman, supervisor Depew, District Attorney Hoovler, ADA Kass and ADA Purcell.**

637. The libelous article was published without any investigation or input from the Plaintiff.

638. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, including severe mental anguish, emotional distress and later caused great personal injury, physical injuries, loss of property and business interests.

639. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

640. **May 19, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the

**District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

641. **On May 19, 2012,** the **THR**, editor **Vanderhoof** and journalist **Brown** publish another libelous article.

642. False and fabricated information is crafted by **Jamie Gaebel from MRR, police chief Hertman, supervisor Depew, District Attorney Hoovler, ADA Kass and ADA Purcell.**

643. The libelous article was published without any investigation or input from the Plaintiff.

644. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

645. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, including severe mental anguish, emotional distress and later caused great personal injury, physical injuries, loss of property and business interests.

646. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

647. No police officer accompanied volunteers.

648. Plaintiff called **TOW police department**. Plaintiff told **Dispatcher Calderon** that **Jean Youngman and Ron Youngman** were asked to move their truck off the driveway. They were blocking Plaintiff from leaving or emergency vehicles to get to the house. They refused.

649. Plaintiff requested that more food be given to all the dogs. They were grossly underfeeding the dogs. This request was made numerous times during the time April 03, 2012 through

May 31, 2012. They were responsible for the maintenance of the dogs. It was only one time that the request was honored. Other times, Plaintiff was told that is all the food they have.

650. **PO Grosso** arrived about an hour after Plaintiff called the TOW police department. Plaintiff told him **LaRocca-Uveges-Mann** was taking pictures -- not authorized to do so. He did nothing to stop her.

651. **Larocca-Mann-Uveges** taking Ali. They couldn't catch Ali in the run, couldn't get leash on her or muzzle her. Got muzzle on several times and she pulled it off. Several times, they pinned her up against the fence and the dogs on the other side of the fence were <u>biting her through the fence</u>. They allowed it. Plaintiff called **PO Grasso** over to have them stop it. They continued – did the same thing on the fence on the opposite side of the run with the other dog biting her through the fence. **PO Grasso** did nothing to protect Plaintiff's dog and the cruelty upon which **LaRocca** pursued upon the Plaintiff's dog. He allowed these people to abuse and cause harm to the dog.

652. They had so much trouble trying to get Ali in the crate that was in the back of the truck. Ali was in a state of panic and terrified and tried to bite them when they went near her face. **Larocca** told them she doesn't care if the dog bites her in the legs, just make sure to pull the leash so she can't bite her in the face. After **PO Farningham** told them to put the crate on the ground and then lift it into the truck, Ali went into the crate by herself. They couldn't lift the crate, so they called Pets Alive to assist.

653. They did not take the female that started limping two days ago or provide medical help.

654. Plaintiff showed **PO Grosso** bagged biscuits w/moisture.

655. Socializing in the front again. Plaintiff asked them to leave.

656. **PO Boss, Lynn Herring and Israel Sanchez** arrived.

657. They were underfeeding dogs. Many dogs were fed a second time per my request.

658. **Lynn Herring** fed Quinn. She saw Quinn urinate into his food dish. She said, "Why did you do that? Now you have to eat it that way." **PO Boss** standing there and witnessed it. **Herring** walked away and didn't replace food.

659. **PO Boss** saw Quinn trying to breed female. She was on her phone either playing a game or texting someone. No one did anything about it. The dogs tied.

660. Dead rat in run 6L. These people are inviting the rats to the dog runs with the inferior feeding practice, care, wood shavings and hay, and lack of maintenance they are giving the dogs. **Herring** told **PO Boss** about the rat and they didn't remove it. Plaintiff went in and took it out and threw it into the woods.

661. When Plaintiff first got to the back, **Boss** tried engaging her in conversation. "Do the dogs have names?" She said rat just ran out from under the stacked moldy hay and Plaintiff said, "It's no wonder with them leaving food and look at the biscuits sitting here for days. They left and still left biscuits in the driveway.

662. **May 20, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

663. Two "biker" men arrived. Plaintiff asked the "unbearded" man to give Windy and Boy more food. He did.

664. Plaintiff called **TOW PD** - no police here because they have no extras to send. It violates the court order.

665. Back area smells with feces and urine on the hay. Hay is still wet even though it's hot out.

Everything under the top layer is saturated.

666. Plaintiff was on errand. Plaintiff arrived as **Jean Youngman and Ron Youngman** were leaving. Gate was open again.

667. **May 22, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

668. **Jean Youngman and Ron Youngman** arrive. No police officer accompanied them.

669. Raining two days. Runs 1L and 2L are saturated with wet, muddy hay.

670. Feeding different food.

671. **Jean Youngman,** saying things out loud to dog to taunt Plaintiff into reacting, "Don't worry. We'll get you out of this hell hole real soon," and seeing mud in run 1L and 2L, said out loud, "Look at you. What a shame!" Talking to "Boy" 4L – "You've got it. You know who's finally feeding you."

672. Smells from the mud.

673. **Jean Youngman** kicked Houdini because he was jumping on her.

674. **Jean Youngman** gave run 1L with two dogs ONE small dish of food.

675. Trying to get me to lash back, **Jean Youngman** keeps talking out loud to the dogs about bad conditions and they will all soon be saved.

676. Dirty dishes being used to feed dogs. Four other dishes already filled.

677. Same open "bag" with dog biscuits previously photographed with moisture from sun (will turn to mold) on driveway, sitting in rain, all wet, potential mold, being fed to dogs.

678. One female with limp and infection in eye still here. She never received their medical attention. Windy also getting sick.

679. All food dishes left out in elements. More rain coming. They have <u>never once</u> put their dishes in the houses where they have normally been fed. (Emphasis added)

680. The dogs' living conditions and nothing being done about it: doghouses saturated with water and hay, runs muddy with saturated, molded hay. Ground is saturated with water/molded hay. You sink in it as you walk. Plaintiff asked **R. Youngman** to give them more food. **J. Youngman** came and asked what dogs. Plaintiff showed her. She said they already had food. No more.

681. Plaintiff asked **J. Youngman** if she was done feeding. Yes. Plaintiff told her Ollie doesn't have a dish.

682. **J. Youngman** had removed all the dishes from the runs and brought them to the front to where she had the bags of food. She put food in dishes and put them back in the runs. She took Ollie's out but didn't put one back.

683. Plaintiff tells **J. Youngman** that Ollie has no food. She proceeds to curse at the Plaintiff using the "F" word several times..

684. **J. Youngman** makes a call on her cell phone.

685. **LaRocca** shows up. The two looked for a dish in Ollie's run. No dish. She insists to **LaRocca** she fed him. They looked over the back fence to see if they could see a dish in the woods. They went into the next run and walked the 60-foot length looking for a dish. No dish was recovered. She finally fed the dog.

686. She's talking out loud asking Ollie if he wants to go back with his buddy. I told her not to put him back (with Oscar – also an un-neutered male). Although they were raised together, since now separated, will no longer be compatible if put together again, especially since Echo is in heat in the next run.

687.  **LaRocca** said to Houdini, "Little boy, you're a pocket Rottie", trying to get Plaintiff enraged because she implied an inferiorly bred dog. But Plaintiff totally ignored her. She kept it up but received no response from Plaintiff.

688.  5:15 PM Leaving back. **LaRocca** starts cursing at Plaintiff. "Fuck you. I'm getting an Order of Protection against you."

689.  Plaintiff called **Dispatcher Braveneck.**

690.  They were sitting in front by trucks talking. Plaintiff asked them if they were done feeding. Plaintiff told them since they were done feeding, to please leave. They said they were waiting for a call about moving dog (Ollie). Plaintiff told them they can't put the dog back. **Jean Youngman** asked why. **LaRocca** said, "Doesn't make a difference. She's not a trainer. Fuck her," and continued in an out-of-control cursing tirade.

691.  Plaintiff went in to call **TOW PD**. Plaintiff came out – they pulled out (about 5:23 PM)

692.  Plaintiff called to cancel police officer. 5:35 PM - Call #2 TOW PD spoke with Dispatcher **Braveneck**. She said police arrived there. Plaintiff told dispatcher if they come back down, Plaintiff wants a police officer too because **LaRocca** is out of control, saying "Fuck you", and unrelentless cursing at Plaintiff, etc.

693.  5:45 PM – **PO DiNapoli** arrives. **LaRocca and J. Youngman** told him dog (Oscar) is blind. Not eating. Putting Ollie back with him. He said according to the Order, they can do it. Plaintiff told him dog isn't blind and they are two unneutered males. Female in next run is in heat. If reunited, they will fight and kill each other. If he's not eating, it's because female in the next run is in heat. A knowledgeable dog person would know that. **PO DiNapoli** didn't know that. The animal rights extremists didn't know that.

694.  Plaintiff asked if someone was going to stay 24/7 to watch and make sure they don't fight

--- or break up a fight? No. PO **DiNapoli** said if dogs kill each other, then the blame will be on the volunteers.

695. They put Ollie back in the run with Oscar. Four or five of them went in with the dogs. **LaRocca and Jean Youngman** frustrated because Oscar and Ollie are posturing to fight. They chased Oscar into a Dogloo and he got out, continued to posture with Ollie. They realized they created a dangerous problem and tried to get Ollie out again. He's pulling back because he doesn't want to be removed again. The girl can't move or handle him.

696. **LaRocca and Jean Youngman** realized Plaintiff was correct and they were wrong.

697. The female tried to pull Ollie back out of the run before a fight started. She couldn't get him to the door. **LaRocca** couldn't get him out either. She finally <u>choked the dog and dragged him out</u> and started running, pulling him behind her.

698. The dog was on her right side in back of her, being pulled forward. She looked straight at Plaintiff, headed straight towards Plaintiff, made eye contact with Plaintiff the entire time and POW, rammed into Plaintiff's left side of body from the knee to the shoulder at full speed. She could have run anywhere on the 92 acres, in any direction, but ran directly aimed at Plaintiff. Plaintiff feared further physical assaults or worse.

699. **LaRocca** rammed into Plaintiff full force on left side of Plaintiff's body, with **PO DiNapoli** standing right next to Plaintiff and caught Plaintiff before she hit the ground. Plaintiff looked at him and in shock, asked him if he saw that. He said he saw it.

700. **PO DiNapoli** left the property.

701. Plaintiff called **TOW PD**, call #3 – **Braveneck** – asked her to tell **PO DiNapoli** to come back – Plaintiff wants to press charges for assault. He came back. He admitted he witnessed it. **Larocca** claims 90# dog pulling her (lie - she was dragging him) and it was

88

an accident. He's not going to let Plaintiff press charges.

702. Plaintiff showed him vinyl bag with dog biscuits. **LaRocca response** – "bag been there since day 1." (And they ask about rats??)

703. **PO DiNapoli** said he took Plaintiff's call when **PO Ashworth and TOW Town Supervisor Dan Depew** trespassed on her property.

704. **PO DiNapoli** said he would talk to the animal rights extremists and tell them to stop cursing at her.

705. **PO DiNapoli** said Order says they are in control and can do whatever they want. Plaintiff said they cannot do anything to harm the dogs. He said they are the "experts". If dogs get hurt, then Plaintiff can blame them. Plaintiff said she is not waiting for dogs to get hurt.

706. Dogloo houses that are overturned remain overturned.

707. **May 23, 2012**: Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

708. Plaintiff showed **PO Bodenseick** Quinn's doghouse still not put together – top still remains off the base, moldy hay, mud because of hay, mud because of tarps, saturated hay in dog house covered with more wet hay, dogs underfed, dogs continue to live in unacceptable living conditions, dirty dog dishes outside in rain and turned over with food, never put inside of the houses. To date, water pails have <u>never</u> been scrubbed. (They dump water and just re-fill.) The last time they were cleaned was 4/29/12 – the last time Plaintiff fed the dogs before they "took over". These conditions invite the vermin to come out of the woods. (Emphasis added)

709. <u>Larocca telling the volunteer to drag the dogs</u>. Volunteer dragged dog – choking her.

Plaintiff yelled at them to stop. **Larocca** kept saying, "Forget it – we have to do it this way." (Emphasis added)

710. Plaintiff told **PO Bodenseick**. He said, "Dog is resisting." Plaintiff reiterated, "They are choking the dog."

711. Plaintiff told **PO Bodenseick** dogs are underfed today again. They gobbled down their food like they hadn't eaten in days. Bowls immediately empty. None re-filled.

712. After they left, **PO Bodenseick** remained in back with Plaintiff. Plaintiff showed him overturned house they didn't put upright. Plaintiff fixed it. Discussed mud, flooding, waterlogged hay, tarps causing mud, underfeeding, showed him Windy and Boy puppy dishes they are using for large adults. He took notes.

713. **May 24, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

714. **Larocca** took Windy. She refused to hold Windy so Plaintiff could take pictures. She had her on a long leash and wouldn't rein her in so dog would stand still. Says she doesn't have to hold the dog so Plaintiff can take a picture.

715. Plaintiff called **TOW PD** and spoke with **Dispatcher Solano**. **Sgt. Moskowitz** told him **PO Farningham** told her to load dog even though Plaintiff didn't have a good picture of her. (Emphasis added)

716. **PO Belgiovene** and Amy (young [teenage] volunteer arrived).

717. Dogs underfed. **Plaintiff told PO Belgiovene . He did nothing**. She didn't give more food. She didn't close Quinn and ZZ's door. Lacey doghouse full of 2" of water and saturated hay. All dishes outside in elements with rain.

718. Pails still not scrubbed in 24 days.

719. Dogs were jumping on volunteer **Amy** (teenager). She was visibly upset. When she got to Ali and male, Plaintiff went to the run and called the dogs to the corner so she could go in and get the dishes. Runs VERY muddy (saturated with wet hay) and they're jumping on her.

720. Runs very muddy and flooded. **Amy** is doing nothing about it, although they were ordered to maintain and care for the dogs, which includes their environment.

721. **May 25, 2012** - Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

722. **PO Bodenseick, Krissie Downey, Debbie and George McClure** arrived.

723. **Debbie** topping pails, not dumping and scrubbing. Algae (brown and green) in pails. Buckets have never been scrubbed since Plaintiff scrubbed them last on April 29, 2012 – day before the second raid.

724. **Krissie Downey** feeding – pushed Rocky away with force with dish. Prince Jr – no food, then only given small puppy dish. Robbie not fed at all. Dogs need more food. **8L Lacey – pregnant, 4L Boy** food water logged, **6L mamaB male, midge and Joy, 1R young male, 2R females, 4R Prince Jr., 6R Quinn and female.**

725. Plaintiff told **PO Bodenseick Krissie Downey** taking pictures – not authorized. He did nothing.

726. **Krissie Downey** asked **George McClure** if he likes the young male 7L. Because he said "yes", they took him. They dragged and choked him with two leashes. They left him in the car the whole time with no air conditioning. Yahoo weather said temp today was 79

91

degrees.

727. **Krissie Downey, Debbie** and **George McClure** tried to take MamaB male 5L 11:35-11:45. They couldn't get a noose around his neck. Then they were choking and dragging him to the door. Dog fighting two leashes – biting leashes. Choking. They let him go. He ran into the house. They couldn't get him out to take the leashes off. They waited and waited. Plaintiff suggested they just go in and grab one of the leashes and bring him out of the house and then take the leashes off. **Krissie and Debbie and George McClure,** "I'm not going in there. Why don't YOU go in there?" They finally went in and he came out of the house himself and they took the two leashes and collars off. They didn't take him because they were afraid of him. They took Houdini instead.

728. Now two dogs in the car without air conditioning. Must be very hot in the car. Plaintiff was sweating with the outside heat.

729. **Krissie** took pictures of Robbie and Oscar. Plaintiff told PO Bodenseick. He did nothing.

730. Rocky is still coughing. No one has done anything about him.

731. MamaB male barn house overturned. They didn't fix it.

732. Runs very muddy and flooded. **Krissie Downey** doing nothing about it.

733. **May 26, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

734. Temperature is 85 degrees. Eight people arrived. No police officer as ordered by **Judge Patrick Owen.** Contempt of court. Plaintiff called **TOW PD, Dispatcher Paluzzo,** will send car here. Plaintiff asked **Larocca, J.and R. Youngman and Herring** to move three cars blocking the driveway. They refused.

735. Plaintiff called again - **Dispatcher Smith** – Plaintiff asked for officer. Plaintiff asked people 5+ times to move cars and they refused. **Lynn Herring** taking pictures. They are not authorized to take pictures.

736. **Tina Hudson, Mary McCollum** plus three persons arrived – refused to move 2 additional cars.

737. **Dispatcher Paluzzo** says cop on the way. **PO Farningham** arrived. First he said they didn't have to move their cars, then later told them to move cars. Then he left. They didn't move cars until hours later.

738. Most of the people there were not volunteers. They were private citizens picking out what dogs they wanted to take home. They were trespassing. **Farningham** wouldn't tell them to leave. **License plates were from NYS, Pennsylvania and New Jersey (4R DOGS).**

739. Bringing potential owners to Plaintiff's property to pick out dogs they wanted occurred several times. Their trespassing violated Plaintiff's rights. Plaintiff's rights were then again violated when the police refused to instruct them to leave the property.

740. Plaintiff asked who was in charge. They said no one was in charge. Two cars still blocking the driveway.

741. After 1-1/4 hours, they finally moved two cars.

742. This is one of many times, they brought cars onto Plaintiff's property and blocked the driveway, and refused to move them when requested, even though it was explained the driveway has to remain clear in case an ambulance has to enter, back up to the house and have enough room to move a stretcher around.

743. In trying to catch a <u>very pregnant</u> Ali2 and remove her from the run, she was forced to lie down in the deep, <u>saturated</u> mud many times doing crocodile suicide rolls and was <u>dripping</u>

with mud from front to back, top to bottom. Volunteers took her picture and claimed to the media and the court that that is the condition Plaintiff's dogs looked like prior to their taking over their care. (Emphasis added)

744. Topped water buckets. Didn't empty or scrub them. Since April 29, 2012, buckets never scrubbed. Pails green and brown from algae.

745. **Lynn Herring** brought three people to pick their dogs. (One New Jersey license plate 4R dogs)

746. **May 27, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

747. **Police and Lynn Herring and Israel Sanchez** (boyfriend) arrived. Police ran out with siren. Gate was not closed after they entered property. Officer drove right through. Unbearded man and new young man arrive from MRR. Then another female and **PO Grosso** arrived.

748. Plaintiff advised **Grosso** they cannot remove any dogs. The Order expired. He'll check with supervisor.

749. Run 4L not enough food.

750. Gate still isn't locked.

751. **Larocca-Mann-Uveges and R. Youngman** arrive. Said they were on feeding schedule. Total nine people here.

752. Plaintiff gave PO **Grosso** Order showing removal has expired.

753. Gate still isn't locked.

754. Screamer underfed. **Israel Sanchez** refused to give her more. **Grosso** refused to ask them

to give her more. (Later, someone fed her again.) Midge and Joy underfed. Prince Jr. Quinn underfed. **Lynn Herring** and unbearded man refused to re-feed. They had no food left over so there was nothing to give the dogs that needed more.

755. **PO Grosso** said if they said dogs got enough, they don't have to re-feed. "They are the experts."

756. Plaintiff told **PO Grosso** they're not authorized to take pictures. He said it doesn't say anywhere they can't.

757. When Plaintiff gave **PO Grosso** 5/16/12 expired Order to remove dogs – he continuously apologized to them that they couldn't take any dogs.

758. Plaintiff asked **PO Grosso** to have the six people leave. They were here to remove dogs (which they can't because Order expired) and not to feed and water. He said if nine people are here, it could be they're here to feed – one dog each. **Lynn Herring and Israel Sanchez** and young male (male did not work, just hung around) were here feeding – had fed and watered a lot of dogs already.

759. Plaintiff and **Grosso** were standing near Gil. **Larocca-Mann-Uveges** was passing. Plaintiff said **Larocca-Mann-Uveges** is not here to feed. Please ask her and all other civilians to leave. They are trespassing. So **Grosso** led **Larocca-Mann-Uveges** on by saying to her, "You're here to feed, right? How much longer will you be?" She paused, realized what he said and replied, "Yes – I just have to see what they're doing and when they're done, I'll leave."

760. They said there was a dead rat by Gil. It was a chipmunk cats caught.

761. No dogs were removed. The Order had expired the previous day.

762. They did not bring enough food. They gave a little to all with no food left over to re-feed

dogs that were underfed.

763. **May 28, 2012**: Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

764. **J. Youngman, R. Youngman, PO Farningham** arrived.

765. J. Youngman fed dogs and dumped pails. R.Youngman filled pails – no scrubbing. Both took 20 minutes.

766. Boy 3 – run 12L needed food. Plaintiff told **Farningham** and asked him to ask her to give more food. He smiled and said sarcastically, "No. She already fed him."

767. **R. Youngman** overheard and told **J. Youngman**. She went and looked. (Note: Boy has lost about 20 pounds since this started.) She gave him more. She said she's giving dogs more than what she's fed before. Plaintiff explained they still need more.

768. Prince Jr – no food left. Plaintiff asked **J. Youngman** to give him more. She argued, with dog food bag in hand. Kept arguing – finally put food in Prince Jr. puppy dish Plaintiff was holding.

769. They left before Plaintiff could finish checking. Plaintiff had to feed Midge, Joy, Quinn, Rocky, Oscar.

770. Plaintiff went around and documented by individual notes and photos empty dishes, algae covered pails, feces near houses and food, food in muddy dish, feces with mold, feces with fly eggs, feces on hay with mold, puked food with mold, waterlogged hay in houses, water in houses, flies and fly eggs on feces, broken pallet with nails sticking up, dogs need to be brushed. Volunteers left without removing pallet. Plaintiff removed pallet.

771. **May 29, 2012**: Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and

**District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

772. **Although Judge Patrick Owen** declared the appearance on April 30, 2012 as being for the arraignment, on this day, even though the Plaintiff still had no appointed attorney, a lawyer sitting in the courtroom came forward and stated that for arraignment purposes only, he's waiving the reading of the Plaintiff's rights and charges.

773. **ADA Kass** handed Plaintiff the charges.

774. This being three days before the last of Plaintiff's uncharged dogs are removed, **ADA Kass** presented the court with an Order of Protection. Although unlawful, **Judge Patrick Owen** rubber-stamps it. (Order later deemed unlawful by another judge and thrown out.) **Mike Davis**, Legal Aid, told Plaintiff he is not representing her.

775. Unlawful arraignment. <u>Plaintiff has a right to be represented by her own attorney at all phases of a criminal case, including the arraignment.</u> Although the judge declared the appearance on April 30, 2012 as being for the arraignment, on this day, even though the Plaintiff still had no appointed attorney, **lawyer Davis from Legal Aid** came forward and stated that for arraignment purposes only, he's waiving the reading of the Plaintiff's rights and charges. **Judge P Owen acknowledges** counsel as only interfering for arraignment purposes only. The Plaintiff has a right to have her own attorney speak for her to benefit her defense, but none had still not been appointed. (Emphasis added)

776. **Mike Davis** is the Legal Aid lawyer that previously told the Plaintiff she "was guilty. How could a 64 year-old woman take care of all those dogs?"

777. And with that, in absence of an appointed attorney, **ADA Kass** handed the Plaintiff the 150 charges. (3)

778. And with the absence of an appointed attorney, **ADA Kass** hands Plaintiff unlawful Order of Protection that falsely claims Plaintiff is harassing the "volunteers". Order of Protection was dismissed in its entirety by another judge in 2013. (Emphasis added)

779. Plaintiff claims she is just taking pictures and taking notes to record the carelessness and poor care given to her dogs - to memorialize and document the activities. They were allowing dogs to breed freely; against Plaintiff's wishes, they put up tarps and laid down hay and put hay in dog houses that created the anticipated mud swamps, causing dogs to walk ankle high in mud. The dog houses were saturated with water. The "volunteers" didn't want a record of all this, so they asked **ADA Kass** to issue an Order of Protection against the Plaintiff so she has to stay away 100' so it will be too far for the Plaintiff to record what they were doing. **Judge P. Owen** rubberstamped the Order of Protection, even though he knew or should have known it was unlawful and even though the Plaintiff had no appointed attorney.

780. There are no officers there to watch the "volunteers", as ordered by **Judge P. Owen**. The police are in contempt of court. However, **Judge P. Owen** does not recognize the action of contempt of court.

781. Plaintiff claims she keeps calling the police department because of what "volunteers" are doing or not doing when the police are not there, as their presence was ordered by the **Judge P. Owen.**

782. This being three days before the last of the Plaintiff's uncharged dogs were removed, **ADA Kass** presented the court with an Order of Protection – Criminal Procedure Law section 530.13. Although **ADA Kass** is requesting action that is contrary to law, **Judge Patrick Owen** signed it. The two knew or should have known the Order was unlawful. (The Order

was later deemed unlawful by another judge and thrown out in its entirety. [Brockett, JP )

783. Since the Plaintiff still had no appointed attorney, the Order was handed to the Plaintiff.

784. The Plaintiff had been taking photographs and taking notes regarding the carelessness, neglect and poor care given to her dogs to memorialize and document the activities.

785. For example, they were allowing dogs to breed freely.

786. Against the Plaintiff's wishes, they put up tarps that created mud swamps where the dogs walked in mud up to their ankles. The doghouses were saturated in water and full of mud that was dragged in. The volunteers didn't want the Plaintiff to record all this, so they requested the Plaintiff stay 100 feet away from them. (4)

787. The defendants then took photographs of the conditions they created and reported to the news media and social media that those were the conditions when they originally arrived.

788. The Security Bond petition that **ADA Kass** illegally drafted was also handed to the Plaintiff.

789. Plaintiff was unlawfully served by **ADA Kass** with an <u>illegal and unlawful</u> Security Bond Petition, an unlawful Order of Protection signed by **Judge Patrick Owen**. (Emphasis added)

790. **ADA Kass** wants Plaintiff to surrender all of her dogs.

791. **ADA Kass and Judge P. Owen** knew or should have known that the Order of Protection was not specific as drafted and is supposed to favor only victims of a crime and witnesses to that crime.

792. Plaintiff was unlawfully served by **ADA Kass** with 150 superceding charges.

793. **Kass** tells untruths, including that Plaintiff attacked a police officer. This is a total fabrication. It never happened, a fabrication just as Johannesson from OFA claimed on

March 6, 2012 that the Plaintiff was raped by two state troopers.

794. Seizure Order expired, yet "volunteers" came to Plaintiff's property anyway with the intent of removing more dogs.

795. **PO Ashworth** lies and states that what **ADA Kass** said is true.

796. <u>All</u> of Plaintiff animals were seized, searched although only <u>seven</u> were charged with A&M § 353 for allegedly having violated A&M § 353, when in fact that for which they were alleged to have violated is not even provided for by statute. A&M 353 means you must provide food and water. It does not dictate management practices. Or housing. Or veterinary care. It does not authorize a seize (or seize in place). The legislature would have inserted language in the statute to individualize and confirm separate points. (Emphasis added)

797. **District Attorney Hoovler, ADA's Kass and Purcell and Judge P. Owen** knew or should have known the Security Bond Petition was <u>illegal and unlawful</u>. (Emphasis added)

798. **District Attorney Hoovler, ADA's Kass and Purcell and Judge P. Owen** knew or should have known the Order of Protection was unlawful.

799. **District Attorney Hoovler, ADA's Kass and Purcell and Judge P. Owen, PO's Ashworth and Farningham** knew or should have known the charges were fabricated as the dogs were in great condition and their environment was clean, and that the Plaintiff followed only excellent animal husbandry practices.

800. **On May 29, 2012,** the **THR** and journalist **Brown** publish another libelous article.

801. False and fabricated information is crafted by **Krissie Downey from MRR, police chief Hertman, ADA Kass.**

802. The libelous article was published without any investigation or input from the Plaintiff.

803. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, including severe mental anguish, emotional distress and later caused great personal injury, physical injuries, loss of property and business interests.

804. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

805. **May 29, 2012: PO Boss** and Gil and Plaintiff were talking. She said when she's been here, she never saw Plaintiff harass, curse at or do anything inappropriate. She said all Plaintiff did was take pictures.

806. **Mike Davis**, Legal Aid, told Plaintiff he is not representing her.

807. Unlawful arraignment. <u>Plaintiff has a right to be represented by her own attorney at all phases of a criminal case, including the arraignment.</u> Although the judge declared the appearance on April 30, 2012 as being for the arraignment, on this day, even though the Plaintiff still had no appointed attorney, **lawyer Davis from Legal Aid** came forward and stated that for arraignment purposes only, he's waiving the reading of the Plaintiff's rights and charges. **Judge P Owen acknowledges** counsel as only interfering for arraignment purposes only. The Plaintiff has a right to have her own attorney speak for her to benefit her defense, but none had still not been appointed. (Emphasis added)

808. **Mike Davis** is the Legal Aid lawyer that previously told the Plaintiff she "was guilty. How could a 64 year-old woman take care of all those dogs?"

809. And with that, in absence of an appointed attorney, **ADA Kass** handed the Plaintiff the 150 charges. (3)

810. And with the absence of an appointed attorney, **ADA Kass** hands Plaintiff unlawful Order

of Protection that falsely claims Plaintiff is harassing the "volunteers". <u>Order of Protection was dismissed in its entirety by another judge in 2013.</u> (Emphasis added)

811. Plaintiff claims she is just taking pictures and taking notes. There are no officers there to watch the "volunteers", as ordered by Judge Patrick Owen. The police are in contempt of court.

812. Plaintiff claims she keeps calling the police department because of what "volunteers" are doing or not doing when the police are not there, as they have been ordered by the **Judge P. Owen.**

813. This being three days before the last of the Plaintiff's uncharged dogs were removed, **ADA Kass** presented the court with an Order of Protection – Criminal Procedure Law section 530.13. Although **ADA Kass** is requesting action that is contrary to law, **Judge Patrick Owen** signed it. The two knew or should have known the Order was unlawful. (The Order was later deemed unlawful by another judge and thrown out in its entirety in 2013. [Brockett, JP )

814. Since the Plaintiff still had no appointed attorney, the Order was handed to the Plaintiff.

815. The Plaintiff had been taking photographs and taking notes regarding the carelessness, neglect and poor care given to her dogs to memorialize and document the activities.

816. For example, they were allowing dogs to breed freely.

817. Against the Plaintiff's wishes, they put up tarps that created mud swamps where the dogs walked in mud up to their ankles. The doghouses were saturated in water and full of mud that was dragged in. The volunteers didn't want the Plaintiff to record all this, so they requested the Plaintiff stay 100 feet away from them. (4)

818. The defendants then took photographs of the conditions they created and reported to the

news media and social media that those were the conditions when they originally arrived.

819. The Security Bond petition that **ADA Kass** illegally drafted was also handed to the Plaintiff.

820. Plaintiff was unlawfully served by **ADA Kass** with an <u>illegal and unlawful</u> Security Bond Petition, an unlawful Order of Protection signed by **Judge Patrick Owen**. (Emphasis added)

821. **ADA Kass** wants Plaintiff to surrender all of her dogs.

822. **ADA Kass and Judge P. Owen** knew or should have known that the Order of Protection was not specific as drafted and is supposed to favor only victims of a crime and witnesses to that crime.

823. Plaintiff was unlawfully served by **ADA Kass** with 150 superceding charges.

824. **Kass** tells untruths, including that Plaintiff attacked a police officer. This is a total fabrication. It never happened, a fabrication just as Johannesson from OFA claimed on March 6, 2012 that the Plaintiff was raped by two state troopers.

825. Seizure Order expired, yet "volunteers" came to Plaintiff's property anyway with the intent of removing more dogs.

826. **PO Ashworth** lies and states that what **ADA Kass** said is true.

827. <u>All</u> of Plaintiff animals were seized, searched although only <u>seven</u> were charged with A&M § 353 for allegedly having violated A&M § 353, when in fact that for which they were alleged to have violated is not even provided for by statute. A&M 353 means you must provide food and water. It does not dictate management practices. Or housing. Or veterinary care. It does not authorize a seize (or seize in place). The legislature would have inserted language in the statute to individualize and confirm separate points. (Emphasis

added)

828. **District Attorney Hoovler, ADA's Kass and Purcell and Judge P. Owen** knew or should have known the Security Bond Petition was <u>illegal and unlawful</u>. (Emphasis added)

829. **District Attorney Hoovler, ADA's Kass and Purcell and Judge P. Owen** knew or should have known the Order of Protection was unlawful.

830. **District Attorney Hoovler, ADA's Kass and Purcell and Judge P. Owen, PO's Ashworth and Farningham** knew or should have known the charges were fabricated as the dogs were in great condition and their environment was clean, and that the Plaintiff followed only excellent animal husbandry practices as she had always done the 43 years she was breeding dogs..

831. **May 30, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

832. **May 30, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

833. **On May 30, 2012,** the **THR, editor Vanderoof** and journalist **Brown** publish another libelous article.

834. False, fabricated and misinformation is crafted by **Krissie Downey from MRR, police chief Hertman, ADA Kass**

835. The libelous article was published without any investigation or input from the Plaintiff.

836. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, including severe mental anguish,

emotional distress and later caused great personal injury, physical injuries, loss of property and business interests.

837. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

838. **Larocca, J. Youngman** and two other unfamiliar people arrived.

839. **May 30, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

840. No police officer accompanied the volunteers contrary to **Judge Patrick Owen's** Order.

841. The Plaintiff made several frantic calls to the **TOW police department** speaking to **PO Salerno** requesting the presence of an officer, due to the anticipated threat of a fabricated complaint on the unlawful Order of Protection. These are people that curse at and harass Plaintiff.

842. Plaintiff called again and spoke to **Dispatcher Miller** who stated **PO Snellinger** was on his way.

843. Gilbert Brandt (Plaintiff's companion) and Plaintiff (taking pictures) stood by Bruno's run which is halfway between the house and from where the volunteers were. This was a day no police office accompanied them again, contrary to the Court's Order.

844. Volunteers **J.Youngman, Larocca** and two other volunteers were dragging a dog along the ground like a sled, the choking and lifting him up in the air by the neck, causing him to vomit a number of times.

845. Photos were taken. Plaintiff yelled at them to stop dragging and choking the dog.

846. The Plaintiff walked to the house to call the police again. The volunteers were following

the Plaintiff. The Plaintiff would stop, turn around, and was taking pictures as she walked showing how they were in back of her, coming towards her, following her. They reached the area of the driveway adjacent to the house about the same time the Plaintiff went into the house. **Volunteer J. Youngman** chanted sarcastically, "Look, she's only five feet from us. I think I'll tell the police."

847. Plaintiff called **TOW PD** again, spoke to **Dispatcher Miller** and described what just happened. He said **PO Snellinger** was on his way.

848. **PO Snellinger** arrived afterwards.

849. Plaintiff asked him to tell them when they're done feeding (**J. Youngman & Larocca-Mann-Uveges**) they should please wait so Plaintiff can check food. Dogs have been underfed. **Snellinger**, without going to the back to the location of the dog runs, said they're giving dogs plenty. He claims to know about dogs because he has one and said they're getting enough food. **PO Snellinger** said they've been giving the same amount each time they're here. Plaintiff said that was the problem.

850. Plaintiff told PO Snellinger no water in pail in 1R. There was a hole in the pail and the volunteers neglected to check it.

851. Plaintiff called TOW PD and no sergeant was there – was on the road. I requested a call back. No one called.

852. As expected, **J. Youngman** filed a fabricated, perjured complaint against the Plaintiff, stating Plaintiff violated the Order of protection and was following them!

853. They again did not lock the gate on their way out.

854. **May 31, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved

the case forward without the Plaintiff having a defense attorney.

855. **PO Snellinger** came to the house. Plaintiff was told to make arrangements for Gil, Plaintiff's companion. <u>Plaintiff is to report to the TOW police department by 12 noon tomorrow. Plaintiff is being arrested and is going to jail for violating the Order of Protection.</u> The decision was made without a hearing or defense attorney. (Emphasis added)

856. Another example of where the Plaintiff's due process rights were violated, as well as prosecutorial and judicial misconduct as this was all contrary to law.

857. 4:25 PM Pets Alive arrives. **Kerry Clair** (carrying a Jack Russell Terrier), a little girl, Whitacre, 2 Mexican males, Amy, two people from **Karma K-9.**

858. Plaintiff called **Dispatcher Morstat** – he said they are supposed to wait on the road until an officer arrives.

859. 4:40 PM Called TOW PD again – **Dispatcher Morstat. Officer Joseph Steuber** will come.

860. 4:45 PM More cars arrive

861. 4:50 PM **PO Joseph Steuber** arrived

862. They took eight dogs – didn't lock gate.

863. Dog food dumped in front of Prince Jr run, dog food with mold near Prince Jr./Robbie run. Prince had no water – gave water – pail has holes in it.

864. Plaintiff call and spoke to Dispatcher **Salerno.**

865. **June 1, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen, Judge Joseph Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

866. **Judge Joseph Owen (Judge Patrick's brother)** presiding.

867. Contrary to law, <u>without a defense attorney</u>, <u>without witnesses</u>, and <u>without even a hearing</u> (CPL section 530.13 states there has to be a hearing), with <u>one deposition non-existent</u>, **Judge Joseph Owen** sent the Plaintiff to county jail with $2,000 bail. He told **PO Snellinger** to get the second person, **Larocca** to write a deposition, get it notarized, and stick it in the file... after the fact. (Emphasis added)

868. The Plaintiff's due process and constitutional rights have been violated ... again.

869. **June 1, 2012:** Plaintiff still had no appointed attorney yet **Judge Patrick Owen, Judge Joseph Owen,** and **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

870. **June 1, 2012:** Plaintiff was unlawfully sent to Orange County jail by **Judge Patrick Owen's** brother, **Judge Joseph Owen** on a perjured complaint by **J. Youngman** on an unlawful Order of Protection that was subsequently dismissed in its entirety by another judge.

871. Although disabled with 15 herniated discs, Plaintiff was forced into the back of the Sheriff's car and put in a contorted position. Although Plaintiff advised the Sheriff's deputies of her disabilities, Plaintiff was ordered into the car because "This car is all there is."

872. Plaintiff was in and out of consciousness.

873. As a result, Plaintiff sustained multiple injuries after being transported to the Orange County Jail including massive nerve damage, a traumatic brain injury and claustrophobia.

874. Plaintiff sustained these injuries because **the two nurses** refused to address the severe and powerful neurological episode Plaintiff was experiencing that lasted over two+ hours.

875. They pinned Plaintiff to the back of the wheelchair and in concert said, "Boy, for someone with 15 herniated discs, you sure are strong."

876. They also said in concert, "You can stop faking it. Seizures don't last this long."

877. They also said in concert, "I have to contact the Guinness Book of Records for the longest seizure."

878. **June 1, 2012** - They took the last three dogs – Oscar, Prince Jr. and Robbie.

879. **April 30, 2012 through June 1, 2012,** <u>not one water pail ever scrubbed</u>. Green and brown algae on the inside of all the pails. (Emphasis added)

880. **On June 4, 2012,** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

881. **On June 4, 2012,** the **THR, THR editor Vanderhoof** and journalist **Brown** publish another libelous article.

882. False, fabricated and misinformation is crafted by **police chief Hertman.**

883. The libelous article was published without any investigation or input from the Plaintiff.

884. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

885. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character were discredited, including severe mental anguish, emotional distress and later caused great personal injury, physical injuries, loss of property and business interests.

886. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate

the damage done by this false and reckless action.

887. **June 5, 2012,** Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

888. **On June 5, 2012,** the **THR, editor Vanderhoof** and journalist **Brown** published another libelous article.

889. False, fabricated and misinformation is crafted by **police chief Hertman.**

890. The libelous article was published without any investigation or input from the Plaintiff.

891. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

892. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, including severe mental anguish, emotional distress and later caused great personal injury, physical injuries, loss of property and business interests.

893. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

894. **June 12, 2012**: Plaintiff still had no appointed attorney yet **Judge Patrick Owen** and the **District Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

895. Plaintiff appeared in court without an attorney for the bond hearing.

896. She was removed from court by ambulance due to injuries sustained when she was in Orange County Jail June 1, 2012.

897. As the ambulance was removing her, the court clerk handed her a piece of paper and told

her **Gregory Hoover** is an appointed attorney. Plaintiff is to contact him and return to court June 15, 2012 for the Security Bond hearing.

898. Plaintiff received no response from the attorney and didn't see him until just before the case was called June 15, 2012.

899. **June 15, 2012 Greg Hoover** is a newly court appointed defense attorney that shows up for the Security Bond hearing.

900. The attorney told the Plaintiff the court did not give him a complete file (has no search warrant, application for search warrant, Order to Show Cause, etc.). He did not have an opportunity to speak to Plaintiff regarding the details of the case, had no idea what the case was about, has never done a case like this, is not familiar with this type of law, and will request an adjournment based on those reasons.

901. When the case was called, the attorney requested the adjournment for those reasons

902. **ADA Michael Purcell** does not agree to an adjournment, stating, "the defense had several week's knowledge of this proceeding." However, defense attorney **Hoover** stated that was not true; he was just brought into the case with basically no background or information of the allegations. **Judge Patrick Owen** rubber-stamps **ADA Kass's** decision and the hearing will move forward nonetheless. (3-9) (Emphasis added)

903. This prohibited the Plaintiff from submitting the procedural Response to the Petition that should have preceded the hearing and should have gotten the entire case dismissed. (Emphasis added)

904. **ADA Kass** represented **Krissie Downey** by drafting the Security Bond Petition and representing them during the hearing, which is illegal and contrary to law.

905. Being a lawyer and a judge, **Judge Patrick Owen** knew or should have known the district attorney cannot represent **Mountain Rottie Rescue**. It is illegal and misuse of tens of

thousands of dollars in taxpayer money.

906. About six (6) people from **the DA's office** attended the hearing June 15, 2012.

907. **DA Hoovler and ADA's Kass and Purcell** are precluded from participating in a civil matter. **The DA Hoovler and ADA's Kass and Purcell** cannot represent private entities in civil cases. They do criminal cases for the county. The **People** cannot engage and advocate for this petition for private entities and not-for-profit corporations. It is contrary to law. In 2003, 2005, 2006, 2008, 2010, and 2011, bills have been submitted to the NYS Legislature in an attempt to make it LEGAL for **DA's** to represent "impounding organizations" (see Ag & Mkts. Law §373.6) at the security bond hearings. Each year, the bill failed. It is illegal for the **DA** to do it, yet they are representing this corporation for this case. This information was presented to **Judge Patrick Owen** and he nonetheless continued moving forward with the case.

908. The petition was filed in the wrong court. They claim $36,000 - TOW court can only award up to $3,000.

909. The petition was not FILED with the TOW court - there is no index number, so it legally doesn't even exist. (3)

910. The Petition itself was illegal and was illegally drafted and represented by **District Attorney Hoovler's** office. Tens of thousands of citizens' tax dollars were unlawfully spent (contrary to CPLR Article 3 section 321 – corporations must retain a private counsel) by the District Attorney's office by representing the not-for-profit **Mountain Rottie Rescue** for the petition plus for two Orders to Show Cause hearings.

911. There is no statutory authority that allows the **DA's office** to move forward and represent them in any phases of this matter.

912. The petition was not filed at the arraignment and were not filed on behalf of the various individual impounding organizations as mandated by law.

913. The TOW Court was the incorrect jurisdiction to file the petition as the amount ordered paid was $111,545.00 for the first month, an amount well over what the civil court allows. (Emphasis added)

914. The seizures of March 6, 2012 and April 30 through June 1, 2012, were unlawful. The Plaintiff was charged with section 353, which is a non-seize section. It is a charge and convict section. The animals remain where they are until the case is adjudicated. If there is a conviction, the judge can forfeit animals that are the basis of the conviction under section 374(8)(a)  (3,4)

915. The **April 29, 2012** search warrant is defective. It was authorized and issued April 29, 2012. However, the mandated application for that warrant that describes probable cause did not exist. The application wasn't signed and sworn to until April 30, 2012, the following day. (Emphasis added)

916. The application is based on searches done prior to that date – March 6, 2012. PO Farningham testified he did an illegal search - he walked the entire premises, counted dogs and inspected the premises, an illegal search prior to the issuance of the **March 6, 2012 search warrant**. That information was put into the **March 6, 2012 search warrant**. Whatever was found in the searches and subsequently pursuant to April 29 should have been suppressed because the warrant was issued illegally. (4-6)

917. Impounding organizations, not-for-profit corporations must be represented by private counsel. (See CPLR Article 3 section 321) There is nothing in the 2012 section 373 statute that authorizes the DA to prosecute these matters. (6,8)

918. The Plaintiff was not charged with §373, so the Security Bond hearing, aside from being illegal in its form, was unlawful in its application.

919. All this was told to the court and Judge Patrick Owen continued with the case ignoring the legal points brought to the court's attention.

920. Defendant witness **Dr. Johnson** describes care that should be given for Janie's hanging tumor which is same care Plaintiff was giving all along. Dr. Johnson claims tumor causes no complications. (P21) Dr. Johnson fails to reveal to the court that he had previously spoken with the Plaintiff about this dog.

921. **April Wood, Middletown Humane Society** stated on the third day, "Janie" was sick with vomiting, diarrhea and a seizure. She was in good condition when seized. Johnson previously drew blood, high white count, high kidney score. Prescribed antibiotics. April Wood waited <u>seven days</u> to call Dr. Johnson while dog was in renal failure. Dog couldn't walk, drank water and vomited. She called Thursday, **May 10, 2012** to examine dog that was seized **April 30, 2012**. Real treatment started at vet's office when she was admitted ten days later. (Emphasis added)

922. Plaintiff was never advised of the dog's condition or permission to treat and seize blood, etc..

923. Dog was euthanized without Plaintiff's permission.

924. Dog was cremated without Plaintiff's permission. This prevented Plaintiff from getting second opinion and from burying her dog, Janie.

925. **April Wood** claimed she waited so long because they had to get permission from the TOW to send Janie to Johnson's animal hospital.(P24)

926. Plaintiff still has no appointed attorney, yet **Judge Patrick Owen** and the **District**

**Attorney Hoovler** and his **Assistant District Attorneys Kass and Purcell** moved the case forward without the Plaintiff having a defense attorney.

927. The court calls PO Farningham to the witness stand and <u>Mr. Hoover states he hasn't received the applications for the search warrants.</u> <u>He needs them to question the witness.</u> **Judge Patrick Owen** replies, "I'm gonna have my staff work on that Mr. Hover (sic). Raise your right hand". (to PO Farningham) (128) (Emphasis added)

928. PO Farningham was asked how many such cases he worked before. In this instance he said one prior to this. In other documents, he gives various numbers. And at the trial, he said, 'one – this one'. (129)

929. Throughout the case, there is contradictory testimony given, for example, by PO Farningham. There are several written documents (two hodge-podge written Applications for Search Warrants, and papers written in a hodge-podge manner to be known as two (defective) Search Warrants, a deposition, testimony at a Security Bond hearing, again at a Motion to Dismiss hearing and then the trial. <u>None of the statements are consistent</u> throughout. (Emphasis added)

930. PO **Farningham** admits the grass is tall and he can't see the dogs from the house. So he is telling untruths when he testifies a few questions later that he saw dog #2 (Paula) from the house, and again elsewhere he cannot see the dog from the house. (130, 131, 132)

931. Several questions later, PO **Farningham** tells an untruth when he now says he can see dog #2 (Paula) from the front of the house. (132)

932. When questioned why he was dispatched to Plaintiff's property: to check on a report of approximately 100 Rottweilers on the property and a house in dilapidated condition

933. Plaintiff not mentioned and he wasn't sent for a welfare check. There was no mention that

115

there was anything wrong with the dogs – just a large amount of dogs. (130)

934. Phone call recording of March 6, 2012 and Call Summary Sheet and Ms. Johannesson's testimony at the Motion to Dismiss hearing. clearly states the complaint was an unfounded zoning complaint, information that was withheld from the Plaintiff, a Brady violation.

935. The Appellate Term Court deemed the break-in to Plaintiff's property and search was illegal February 6, 2020.

936. Another situation that was contrary to law was that the two deformed dogs that were illegally seized March 6, 2012, were taken to a veterinarian who did nothing with them. On the second day, March 7, 2012, they went to Pets Alive. On the third day, March 8, 2012, and on the fourth day, March 9, 2012, they went to Joshua Furman, veterinarian for Pets Alive. Without the Plaintiff's knowledge or permission or court order, and without any charges against the Plaintiff, Dr. Furman amputated one dog's leg to the shoulder and amputated the paw of the second dog, both cruel and unnecessary mutilation surgery.

937. When PO Farningham was called to the witness stand, Mr. Hoover states that he hasn't been given the applications for the search warrant. He needs them to question the witness. Judge Patrick Owen replies, "I'm gonna have my staff work on that, Mr. Hover (sic). Raise your right hand." (to PO Farningham)

938. When asked how many cruelty cases he has done, Farningham said that he did one prior to this one. In subsequent testimony at the trial, he said that he never did one before this current case.

939. PO **Farningham** describes his initial encounter with the Plaintiff giving varying descriptions and scenarios on how that meeting occurred, most of them being untruths. He states at this hearing he met the Plaintiff first prior to checking on the dogs (an untruth).

116

(131)

940. **PO Farningham** continued with the untruths. He claimed dog #1 would fall on its chest every time he would take a step. (132, 133) Prosecutor's own video of the dog refutes the allegations. The video was not given to the defense. A Brady violation.

941. **PO Farningham** submitted several documents (two hodge-podge written applications for search warrants, and papers written in a hodge-podge manner to be known as two (defective) search warrants, a deposition, testimony at a security Bond hearing and again at a Motion to Dismiss hearing and then at trial. None of the statements are consistent throughout.

942. **PO Farningham** describes initial encounter with the Plaintiff giving varying scenarios. Most of them untruths. At this hearing, he states he spoke to the Plaintiff first, which is an untruth.

943. **PO Farniingham** admits the grass is tall and he can't see the dogs from the house. They are at least 150 feet away. So he tells untruths when he states he saw dog #2 from the house.

944. When questioned why he was called to the Plaintiff's property, he stated it was to check on a report of approximately 100 Rottweilers on the property, and a house in dilapidated condition. Plaintifff not mentioned and he wasn't sent for a welfare check. There's no mention that there's anything wrong with the dogs – just a large amount of dogs.

945. **PO Farningham** claimed dog #1 would fall on his chest every time he would take a step. The DA's own video refutes that statement. That video was withheld from the Plaintiff. A Brady violation.

946. **PO Farningham** describes the inside of Plaintiff's home as being in unsanitary condition, unkept, very dirty, hadn't been dusted in years, feces and urine all over the house. (137,

947. His fabricated description is refuted by the premise visit and report and testimony from Adult Protective Services, their own witness. The report was withheld from the Plaintiff — a Brady violation.

948. **Det. Jessica Kenney** describes the inside of the house: "Extremely filthy, dust from probably several years, urine and feces odor, odor of rotten food. (154) It is refuted by their own photographs.

949. Her fabricated description is also refuted by the premise visit and report from Adult Protective Services, their own witness. The report was withheld from the Plaintiff -- a Brady violation.

950. **ADA Kass** illegally represented the Petitioners in drafting the Petition and representing them at the hearing. He also illegally represented them for two Orders to Show Cause. It was misuse of tens of thousands of taxpayer dollars.

951. The Plaintiff's attorney, not being familiar with the hearing, did not cross-examine any of the eleven witnesses, except for a handful of questions the Plaintiff passed over to him.

952. At the **June 15, 2012** security bond hearing, the veterinarian, **Dr. Joshua Furman** who illegally and unethically performed the unnecessary amputation surgeries on the Plaintiff's two deformed dogs March 9, 2012, illegally seized March 6, 2012, claiming it was an emergency, was asked if it is possible the <u>dogs were born deformed</u> as Plaintiff stated and were not injured as had been claimed by him and other defendants. <u>He said, "Yes."</u> (Emphasis added)

953. **Dr. Furman** decided that dog #2 had a strangulation injury by wire or rope. That never happened.

954. He removed dog #1's (Jack) complete leg to the shoulder, and dog #2's (Paula) paw.

955. Upon seizure March 6, 2012, both deformed dogs were taken to a veterinary hospital and nothing was done with them. Three days later, and after five years prior to this, the dogs were fine, just looked different.

956. **Dr. Joshua Furman** <u>admits</u> he never palpated the dog's (Jack's) leg to see if he was in any pain prior to deciding to amputate. (Emphasis added)

957. **Dr. Joshua Furman** never X-rayed the dogs' deformities.

958. **Dr. Joshua Furman** mutilated the two dogs, incorrectly claiming he could do so because

Plaintiff no longer owned the dogs once they were seized. He did so without Plaintiff's knowledge or permission, no court order and no charges against the Plaintiff.

959. **Judge Patrick Owen** looked at it, looked shocked with eyebrows raised, shrugged his shoulders and continued with the hearing.

960. **June 15, 2012,** Even though **PO Farningham** fabricated the entire scenario of when he first did the illegal search, he admits an application that the grass was very tall and he couldn't see the dogs from the house when he was talking to Plaintiff (in his fabricated version). He is admitting perjury, yet **Judge P. Owen** doesn't dismiss the case.

961. **June 15, 2012, PO Farningham** states he was dispatched to the Plaintiff's property because of a report of approximately 100 Rottweilers on the property. Plaintiff is not mentioned. More perjury and the case is **not dismissed.**

962. **June 15, 2012, PO Farningham** lied about the deck dog being covered with feces.

963. **June 15, 2012, PO Farningham** admits in the Motion to Dismiss hearing and the trial that he executed a search prior to seeing and speaking to the Plaintiff.

964. **June 15, 2012,** Detective **Jessica Kenney** fabricates the conditions inside the Plaintiff's home. This is later refuted by their own witness from Adult Protection Services.

965. **June 15, 2012, PO Farningham** fabricates the amount of times he has conducted animal cruelty cases. He reveals at trial that this case is his first case.

966. **June 15, 2012, Joshua Furman**, DVM, states he did not palpate the dog's leg prior to amputation to see if the dog was in any pain.

967. **June 28, 2012:** They returned for the Plaintiff's testimony.

968. Although it would take weeks to go through the files, invoices and Ag & Markets and additional laws connected with a bond hearing, the lawyer Mr. Hoover only met with the Plaintiff for one hour prior to the hearing.

969. The Plaintiff gave the attorney a list of reasons why the Petition had to be thrown out as a matter of law. The attorney was to mention them all so that they would be on the record.

970. The Security Bond hearing was unlawful and should have been thrown out because it falls under A&M §373, but the Plaintiff wasn't charged with § 373.

971. The Petition was not filed at the arraignment as mandated by law.

972. The Middletown City Court was the wrong jurisdiction to file the Petition as the amount was above the maximum the court allows.

973. The Petition had not docket number, so for all intents and purposes, the Petition didn't legally exist.

974. The multiple seizures were illegal because the statute that was charged is not a seize section.

975. The April 29, 2012 search warrant was highly defective because there was no application or information. They did not exist, They weren't signed and sworn to until the following day, April 30, 2012.

976. The application is based on information that was illegally obtained prior to applying for the search warrant. **PO Farningham** stated he walked the entire premises, counted and inspected the dogs and inspected the premises, prior to the issuance of the March 6, 2012 search warrant.

977. Impounding organizations, not-for-profit organizations must be represented by private counsel. There is nothing in the 2012 § 373 statute that authorized the DA to prosecute these matters.

978. The appointed attorney did not recite all of them in court, as Judge Patrick Owen intimidated him and the lawyer backed off.

979. The appointed attorney did confront the judge that the **District Attorney's office** was illegally representing the Petitioner, a non-profit corporation (who was illegally submitting bills). **Judge Patrick Owen** still went forward with the case, because **Kass** boldly said they were representing the non-profit corporation because they can't afford a lawyer – even though this was illegal and misuse of taxpayer money and contrary to law. He bragged he's done it before and there were no problems.

980. The appointed attorney specifically did tell the judge that the search warrant was defective and the case had to be thrown out. He explained the search warrant was authorized April 29, 2012 while the application for that warrant (that purportedly describes the probable cause needed to obtain a warrant) didn't exist. The application wasn't signed and sworn-to by **PO Farningham** until the following day, April 30, 2012.

981. Although totally illegal and unlawful, the judge awarded the Petitioner **Mountain Rottie Rescue** the sum of $111,545.00 per month to care for the dogs. (Emphasis added)

982. The Plaintiff was unable to pay that amount so all the dogs were illegally forfeited.

983. As a result of **Judge Patrick Owen's** decisions contrary to law, the Plaintiff lost all her

dogs to an unlawful forfeiture, including all the dogs that weren't charged.

984. **On June 25, 2012,** the **THR** and journalist **Brown** publish another libelous article.

985. False, fabricated and misinformation is crafted by a culmination of the defendants in the past articles.

986. The libelous article was published without any investigation or input from the Plaintiff.

987. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

988. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, including severe mental anguish, emotional distress and later caused great personal injury, physical injuries, loss of property and business interests.

989. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

990. **June 26, 2012, after THR journalist Brown** got permission from his editor to write the Plaintiff's version of what happened, Plaintiff and **Brown** met so he could see photographs and other proof Plaintiff had. Brown stated unequivocally that "this was not what the police are trying to portray."

991. **On July 25, 2012, Brown and THR photographer** came out to Plaintiff's property to take a picture of the Plaintiff which was to accompany the article detailing what really happened and what was done to her and the dogs that was to be published the following day.

992. **July 26, 2012** – Plaintiff still has no defense attorney. Finish w/copy/paste paragraph.

993. **On July 26, 2012,** the **THR, editor Vanderhoff** and journalist **Brown** publish another

libelous article. It was not the article Brown said he was going to write. Instead another libelous article was published.

994. False, fabricated and misinformation is crafted by **Krissie Downey from MRR, police chief Hertman, ADA Kass**

995. The libelous article was published without any investigation or input from the Plaintiff.

996. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

997. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, including severe mental anguish, emotional distress and later caused great personal injury, physical injuries, loss of property and business interests.

998. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

999. **June 28, 2012:** Plaintiff's attorney read a list to the judge on all the reasons why the Security Bond hearing and case must be dismissed:

1000. First and foremost, the search warrant dated April 29, 2012 was defective because there was no Application for that warrant. The Application wasn't signed and sworn to until the next day, April 30, 2012.

1001. The Security Bond hearing (that comes under A&M §373.6) was unlawful and should have been thrown out because the Plaintiff was not charged with section 373 or section 375 as mandated in Agriculture and Markets Law section 373.6. The Plaintiff was charged with section 353 (a non-seize section). The law pertaining to section 373.6 has changed since

then.

1002. The Petition was unlawful and was illegally drafted and represented by ADA Kass. Tens of thousands of citizens' tax dollars were unlawfully spent (contrary to CPLR Article 3 section 321 – corporations must retain a private counsel) by the **District Attorney's office** by representing the not-for-profit **Mountain Rottie Rescue** for the petition and hearing for two Orders to Show Cause hearings. There is no statutory authority that allows the DA's office to move forward and represent them in any phases of this matter.

1003. The petitions were not filed at the arraignment and were not filed on behalf of the various individual impounding organizations as mandated by law.

1004. The **Middletown City Court** was the incorrect jurisdiction to file the petition as the amount ordered paid was $111,545.00 for the first month, an amount well over what the civil court allows.

1005. The Petition was never filed with the court clerk and therefore a no docket number and therefore doesn't exist as a Petition to be heard.

1006. Hoover objects to 1" x 1" photos, Can't tell them from another. What purpose do they serve, other than someone telling him what they depict when he can't see it. Judge P. Owen still accepts them.

1007. ADA Kass and DA's office illegally represented the volunteers at two Order to Show Cause hearings.

1008. **Kelly Ambrose** (79) told untruths about the dogs, all refuted by photographs.

1009. **July 16, 2012, Judge Patrick Owen** recused himself.

1010. On or about August 8, 2012, Judge Patrick Owen's brother, **Judge Joseph Owen,** recused himself.

1011. Gregory Hoover, Esq., appointed attorney for the Plaintiff, sent a letter to the Middletown City Court dated October 10, 2012 submitting a withdrawal from the case. He states, in part, "This case requires a specialized knowledge of the law involved which I do not possess."

1012. Assistant District Attorneys **Andrew Kass** and **Michael Purcell** issued an Order of Protection that they knew or should have known was unlawful as the Complainants/Defendants were outside the scope of being "victims" as described in New York State law and Criminal Procedure Law §530.13

1013. Defendant **Jean Youngman** and Christine **LaRocca-Mann-Uveges** engaged in, instigated and directed a course of false charges, of extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing to discredit, humiliate, damage, slander, libel and defame the Plaintiff's reputation, great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests.

1014. **None of the animal rights volunteers,** all named as a **defendant, or police, or District Attorney's office,** provided an account of the puppies born to approximately 10 pregnant dogs seized between April 30, 2012 and June 1, 2012, including some of which were indiscriminately bred due to the animal rights volunteers' negligence during the time they were responsible for the care of all the dogs. There also was no accounting for the puppies born at Plaintiff's home prior to the raid.

1015. In the Prosecutors and individual Defendants committing the above-mentioned intentional acts against the Plaintiff and having her arrested and prosecuted, knowing she has medical problems, with the ulterior motive of obtaining valuable dogs for sale or personal use as

breeders or pets, damaging her reputation and her business, cessation of an irreplaceable genetic pool that had been developed over 43 years, defendants exhibited conduct that was extreme and outrageous, and utterly intolerable in a civilized community.

1016. In a "back room" conference (off the record), **Judge Brockett**, with Legal Aid attorney **McCormick, ADA Purcell**, and Plaintiff, **Brockett** said he looked through the Agriculture & Markets laws and couldn't find any law that allowed TOW **Judge Patrick Owen** to authorize people to come to Plaintiff's property daily and maintain the dogs. He sounded a bit annoyed. He continued," "These people are coming in and out of her property for a month." Plaintiff confirmed that there isn't any law that allows it.

1017. **On July 26, 2012,** the **THR** and journalist **Brown** publish another libelous article.

1018. False, fabricated and misinformation is crafted by defendant **April Wood, MHS,** (and Suzanne Taurone, Lisa Carder-had Chula? Bloated from bread diet and trouble walking. training facility in New Windsor subpoena for trial)

1019. Plaintiff is quoted as saying she did nothing wrong and is fighting the charges. Plaintiff describes several items of corruption and nothing was done about them.

1020. Depew's statements connect him to his involvement of the case.

1021. The libelous article was published without any investigation or input from the Plaintiff.

1022. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

1023. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled. Plaintiff's reputation and character was discredited, including severe mental anguish, emotional distress and later caused great personal injury, physical injuries, loss of property

and business interests.

1024. This defendant ingratiated herself to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

1025. **On** Judge Brockett held the unlawful Restitution hearing. It was unlawful for several reasons, and although he was advised why it is contrary to law, he went forward with it, resulting in the Plaintiff being ordered to pay various people who were not otherwise legally eligible to request the funds.

1026. **February 25, 2013** Judicial Prejudice

1027. Plaintiff did not have an attorney for the entire time damage was done to her. From the time of her arraignment to the seizure of all her animals, to the security bond hearing, she had no counsel at all. (2)

1028. The Order of Protection was thrown out as being unlawful. Judge Brockett wouldn't return the entire amount of $2,000 of bail money that was posted. Instead, he withheld and transferred $250 from the debunked Order of Protection file to the cruelty file (3)

1029. **April 22, 2013**: Plaintiff submitted several requests in writing and articulated at appearances since the commencement of the appointed lawyer's representing the Plaintiff, requesting a new appointed attorney because this Legal Aid lawyer was ineffective and incompetent. **Judge Brockett** refused saying he was "a good lawyer". It was the Plaintiff's opinion that the Motion to Dismiss that he submitted was inadequate. She asked if they could file an amended motion and Judge Brockett refused, again saying he was "a good lawyer". As it turned out, the motion failed to do its job. Judge Brocket threw it out. (4,5) Judge Brockett deployed judicial prejudice on the Plaintiff.

1030. Plaintiff, continuously being denied a competent attorney after being without any attorney

for many months, during which time all the damage was already done and the dogs were illegally and unlawfully removed.

1031. An attorney briefly had the case and withdrew after Judge Patrick Owen and Joseph Owen recused themselves, stating he was not familiar with the laws the Plaintiff was alleged to have violated. (6)

1032. The Plaintiff is entitled to an attorney familiar with the law. (6,7,8) (emphasis added)

1033. **Judge Brockett** refused to allow the Plaintiff to submit an amended Motion to Dismiss (8)

1034. **May 14, 2013** Motion to Dismiss hearing

1035. More untruths. First PO **Farningham** states he did not approach the deck because a dog was there. (13)

1036. Despite not approaching the deck and the tall vegetation surrounding the deck, **PO Farningham** states the deck was covered with feces ... an untruth. It would be impossible to see what is on the deck unless you approached the deck and looked over the railing of the deck. (14)

1037. **PO Farningham** claimed he could see the dogs in the back in the woods from the house. He never mentions anything about a limping dog. (16)

1038. In the two Applications for Search Warrants and a deposition, **PO Farningham** states he saw a dog limping and went back to see her after he spoke to Plaintiff. **PO Farningham** claims Plaintiff asked him if he had a search warrant. Why would he need a search warrant if he was there for a welfare check? He claims to have seen the dog from the front of the house and not from the back – where it's closer to the dogs. (17) Then he states when he was trying to make contact with the homeowner, he observed the dog in the back limping. (43)

1039. When questioned by the defense attorney at the Motion to Dismiss hearing, **PO Farningham** described the scenario as it really happened. He did the (illegal) search first and made contact with the Plaintiff afterwards. (36, 37, 38, 39, 40)

1040. To point out more untruths, **PO Farningham** says he left the property to get a search warrant. (27)

1041. In his two Applications for Search Warrant (3/6/12 and 4/29/12) and Deposition (5/28/12), he claimed to have remained on the property.

1042. **Joe Cassel** contributes to the untruths. (45,46) Listen to the recording of the telephone call from **Office of the Aging** to the Town of Wallkill police department. It was for an unfounded zoning complaint about a large amount of dogs. The Plaintiff isn't mentioned. It was all about the dogs.

1043. Multiple illegal searches were executed prior to obtaining a search warrant. (74,75)

1044. During cross-examination, **PO Farningham** testified that he did the search first BEFORE he spoke with the Plaintiff – the truthful way of how the scenario occurred. (38)

1045. The recording of the telephone call from the OFA to the TOW PD was <u>Brady material that was withheld</u> by the **District Attorney's office.** (emphasis added)

1046. **May 31, 2013**: **Judge Brockett** heard the recorded telephone conversation between **Ms. Johannesson (OFA)** and the **Town of Wallkill police dispatcher** that conflicted with the testimony and sworn-to statements submitted, so he knew that **PO Farningham** was telling untruths throughout his testimony. But he did nothing to halt the proceeding, charge **PO Farningham** with perjury and dismiss the case.

1047. The telephone call on March 6, 2012, **from Office for the Aging** to the **Town of Wallkill police** department was not included in the Plaintiff's Motion to Dismiss because the Brady

material was withheld and its existence not known until the Prosecutors presented it at the hearing, post-motion submission. The call was reporting an unfounded zoning allegation about a large amount of dogs. <u>All heard the recording</u> yet they continued to articulate untruths about the need for a welfare check of the Plaintiff. (24) (Emphasis added)

1048. Note: At the Motion to Dismiss hearing, **PO Farningham** admits he did a search of the dogs first prior to speaking with the Plaintiff. (May 14, 2013  pg. 34)   At trial, during cross examination, he admits he couldn't see the dog from the house. He admits he went to look at dog #2 even though he had no search warrant and the Plaintiff told him to leave. (June 9, 2015.  pgs. 88,89)

1049. August 12, 2013. Motion to Dismiss decision. Judge – overreach

1050. Claims findings of facts – **"Mr. Cassel** expressed concerns that he had regarding well-being of Mrs. Panetta and a large number of dogs then living on her property. This is an untruth. **Judge Brockett** heard the telephone conversation of the call made to the Town of Wallkill police department and the Plaintiff was never mentioned. The call was for a large amount of dogs, an unfounded zoning allegation. (2,3)

1051. **"Ms. Johannesson** requested that the police go to the residence to check on the condition of the dogs and she asked to be advised of the result of this check." **Judge Brockett** himself writes the call was about the dogs, yet he did not stop proceedings and dismiss the case. **Judge Brockett** allowed untruths to be unchallenged and these untruths continued repeatedly throughout the case by the court. (3)

1052. Although pictures were submitted, **Judge Brockett** claims the driveway was not gated. (4)

1053. **August 12, 2013** Motion to Dismiss decision

1054. <u>**Judge Brockett** describes the illegal search.</u> He states, "Police officers subsequently <u>made</u>

observations regarding conditions of the premises, property and dogs found thereon. The police also spoke to Mrs. Panetta. **Police Officer Farningham** then left the property to obtain a search warrant." (4) Judge Brockett did not stop the hearing and dismiss the charges. (Emphasis added)

1055. To satisfy the Emergency Doctrine, police need grounds to believe an emergency is at hand. The call was about a large amount of dogs. No emergency or problem was stated. (5)

1056. The police are motivated by intent to seize evidence. There has to be some reasonable basis approximating probable cause to associate emergency with the area or property to be searched. No emergency (or problem) was stated. It was an unfounded zoning allegation — a civil, not criminal matter. (6)

1057. The Plaintiff was not mentioned in the phone call to the police department — just dogs. No emergency existed or expressed about the dogs — just the amount of dogs. No one said anything was wrong with the dogs. (7)

1058. The judge describes a witch hunt. Dogs not in danger contradicts prong number 1 and 2 of the Emergency Doctrine. The police cannot come looking for violations. (8) (emphasis added)

1059. Everything said is an untruth. The judge heard the recording of the phone call and knows no emergency existed. The Plaintiff wasn't mentioned at all — just an unfounded zoning complaint about a large amount of dogs. (8, 9, 10)

1060. **September 30, 2013**, Judicial overreach. **Judge Brockett** gives the defense attorney instructions that he can't use "intent" as a defense for A&M section 353, when in fact, that is exactly what the statute implies. (4)

1061. Plaintiff makes requests.

1062. Conflict of interest with Legal Aid. Without even knowing details of the case, **Mike Davis, Esq.** claimed Plaintiff was guilty.

1063. Plaintiff requested change in venue — conflict of interest with Middletown Court because of **Richard Guertin (Ex-Middletown judge, Middletown counsel and TOW counsel, and currently Middletown judge again)** who is named as a defendant in a Notice of Claim.

1064. Plaintiff requests new appointed attorney –**Dennnis McCormick** incompetent, ineffective; Plaintiff only met with **McCormick** for one hour in one year. He refused to meet with Plaintiff to discuss all that happened prior to his being appointed. He refused to talk to Plaintiff's witnesses. He refused to discuss and prepare Plaintiff for trial because he said he knows how he's going to defend the case.

1065. **On September 25, 2013, McCormick** said he didn't need to talk to Plaintiff – he knows how he's going to defend the case. Plaintiff has four boxes of files, 1,500 photographs, over 320 WORD documents, over 1,000 emails with notes – all has to be researched and subpoenas generated. He cannot defend Plaintiff if he's not familiar with the case or participate in the trial.

1066. Plaintiff sustained a traumatic brain injury – June 1, 2012, while being transported by Sheriff Department and injury continuing in jail. Plaintiff not confident to participate in defense.

1067. Plaintiff very sick. **Mr. McCormick** said Plaintiff didn't have to appear. Plaintiff didn't appear and then got yelled at by **Judge Brockett**. (5-11)

1068. **Judge Brockett** denied all requests and replied sarcastically: "Do you have anything new that you haven't raised with me multiple times in the past, both orally on the record and in the voluminous correspondences that you sent to me and other people?" (8)

1069. **Judge Brockett** told Plaintiff to take it up with the appellate court if there's a conviction. (11) **Brockett** repeated that many times the defense called an objection ... "Take it up on appeal."

1070. While Plaintiff was in jail, **PO Ashworth**, accompanied by a hospital employee/Plaintiff neighbor, and **Det. Joseph Steuber** illegally went to Orange Regional Medical Center to the Plaintiff's companion's room when he was very ill, harassing him and telling him that they were going to the Plaintiff's house the next day to search and look around inside with the intention of condemning the house. They said they would be back the next day. They returned and reported they went through the house. They tried, through intimidation, to get Plaintiff's companion say things against the Plaintiff.

1071. **December 6, 2014, TOW police** came to house in response to her 911 call and the officer never mentioned anything about a **bench warrant.**

1072. **April 17, 2015** – no transcript exists for that date.

1073. Plaintiff was arrested and submitted her Marsden Motion.

1074. Plaintiff was arrested on a bench warrant that she didn't know existed – The "good lawyer", McCormick, never contacted her in 15 months. Plaintiff tried to contact the lawyer during that time but never heard back from him.

1075. Marsden Motion was served to **Judge Brockett** and he sent Plaintiff to jail - again.

1076. **April 27, 2015** Dennis **McCormick** relieved sas defense attorney with no hearing on the Marsden Motion by Brockett. For 2-1/2 years, **Judge Brockett** wouldn't appoint another lawyer despite Plaintiff's numerous written and oral requests. There was no hearing to Plaintiff's Marsden Motion - the negative information on his friend is not put on the record. **Judge Brockett** worked at Legal Aid for 20 years before becoming a judge. He knew **Mr. McCormick** prior to appointing him to represent Plaintiff. (3)

1077. **Judge Brockett** says Marsden Motion hearing moot by substitution of lawyer. (4)

1078. **May 15, 2015 Judge Brockett overreach, prejudice**

1079. Legal Aid agrees to new lawyer. **Judge Brockett** states the Marsden Motion is a delay tactic. (2)

1080. **Judge Brockett** states if Plaintiff has appeals issue, file appeal. (12)

1081. **Judge Brockett** said "We can disagree and you can appeal that." (13)

1082. "You have a right to appeal that decision." (13)

1083. **Judge Brockett** ridicules Plaintiff's 1,500 photos. "My daughter has 1500 pictures in her cell phone, but I don't know their relevance to your trial." (14)

1084. **Judge Brockett** said he doesn't care if Plaintiff is happy with the new attorney. He said Plaintiff and Rutherford Institute may not be satisfied with representation. But he's going to be satisfied and that's all that counts. (19) (Emphasis added)

1085. If Plaintiff disagrees, Plaintiff can appeal. (21)

1086. Judge Brockett gets personal. He was surprised Plaintiff was out on bail. He wanted to know how Plaintiff paid $50,000 bail. He kept badgering Plaintiff until Plaintiff provided a name. (22, 23)

1087. **June 3, 2015** Judge

1088. Plaintiff never mentioned on telephone call from **Office for the Aging** to the **TOW PD.** (3)

1089. New lawyer, **Cathy Lee**, states she was at Plaintiff's property -- same spot where **PO**

132

Farningham claims he saw dogs. **PO Farningham** is not telling truth. (3)

1090. Plaintiff can appeal decision -- not going to re-open Mapp hearing because **Lawyer McCormick** (who was deemed incompetent and ineffective via Marsden Motion) failed to do things, etc. (8)

1091. Judge denies re-opening of Mapp hearing. (11)

1092. Judge said all issues regarding the hearing can be raised on appeal. (14)

1093. **June 3, 2015 Lawyer Cathy Lee** spoke to court clerk regarding amount of time to prepare for trial. She also wants to discuss re-opening of Mapp Hearing (Motion to Dismiss) and whether or not evidence seized should have been suppressed.

1094. She questions credibility of **PO Farningham. PO Farningham never** questioned about audio tape of call from **Office for the Aging** to the **TOW PD** regarding fact that the call never mentions Plainitiff -- only about dogs on the property. Previous lawyer never questions **PO Farningham** about what he puts in his affidavits leading up to the seizure of the dogs -- totally conflicting where he says he's there for a welfare check and the call is really solely about the dogs.

1095. Having been to the property herself. **Cathy Lee** stood in places where **PO Farningham** claims he was (and she did an aerial view), **PO Farningham's** claims are not possible. (2,3)

1096. **PO Farningham** goes through chain where call is only about animals and guises it to say it's a welfare check on Plaintiff. Nothing in the call talks about Plaintiff or her welfare or safety.

1097. **Previous lawyer (McCormick)** never calls dispatcher to ask her what she relayed to **PO Farningham** -- whether or not Plaintiff is mentioned. He wouldn't have been allowed on property, it was not a welfare check.

1098. **Defense attorney (McCormick)** may or may not have had access to DA's photographs. The photos should have been used during the Motion to Dismiss hearing and **PO Farningham** should have been cross-examined. Cathy has seen the photographs and stood in the spot and there is no way **PO Farningham** saw what he claims he saw. He claims he could see things 100 yards away that are behind knee-high grass. **Cathy Lee** is using the photos taken March 6, 2012 and April 30, 2012 to show high the grass was at the time of the seizures. (4,5)

1099. **Defense attorney Cathy Lee** requests before starting a trial that the Mapp Hearing be reopened and ask the court to suppress the evidence that was seized in that it was illegally seized. **ADA Purcell** refuses. **Judge Brockett** claims the proof in that hearing closed two years ago. **Cathy** references the distances on the date of the incident – none of it was presented to the court. **McCormick** didn't attempt to attack the credibility of the officer. Plaintiff claims there's a tremendous amount of material to be reviewed. **Judge Brockett** denied application to reopen the Mapp Hearing. (6-11)

1100. Newly appointed defense attorney Cathy Lee was appointed and given only 2-1/2 weeks to prepare for trial in a case that would normally take months to learn and research the entire contents and prepare. This was a totally unreasonable amount of time, even if the attorney had no other clients.

1101. She requested an extension so she could review the case and prepare for trial and **Judge Brockett** refused. **Cathy Lee** was only able to learn about 5% of what existed with the case. The Plaintiff was purposely put in this disadvantage as **Judge Brockett** did everything to hurt the Plaintiff.

1102. Throughout the appearances, **Judge Brockett** continually says the Plaintiff can take issues regarding the hearing and file an appeal – "that's all I will say about it."

1103. **TRIAL - June 8. 2015 ADA Purcell** untruths opening statement – none included "alleged"

1104. " ... was dispatched to that property for a welfare check on a woman who lived at that property ..."

1105. **ADA Purcell** has the CD recording on the call made from the **Office for the Aging** to the **TOW PD** and knows Plaintiff wasn't mentioned and it wasn't a welfare check. Other statements are a lie to mislead the jury. (12,13,15,16,17) (Emphasis added)

1106. **ADA Kass** who is also familiar with the call made from the **OFA** to the **TOW PD** also knows the Plaintiff isn't mentioned and it wasn't a call for a welfare check. His continuing fraud upon the court is not challenged by **Judge Brockett.**

1107. Appellate Term Court rightfully deemed the search as being illegal in their December 13, 2018 partial Decision. Final Decision and Order dated February 6, 2020.

1108. **June 9, 2015 Purcells's** Opening Statement never uses the word "alleged" in order to influence the court and jury to think the Plaintiff is guilty. (10-35)

1109. **PO Farningham** claims he received a call 3/6/12 @ 10 AM to check the welfare of an

elderly lady and large amount of dogs. (42)

1110. He doesn't mention dog on deck. Went straight to the back door, heard front door. And went back. Spoke to Plaintiff (45)

1111. **PO Farningham** says he spoke to Plaintiff and then went to the back to look at limping dog. (47) Note: he admits in cross he couldn't see the dog in the back from the house, the grass was too high, and the Plaintiff told him to leave because he didn't have a search warrant. Instead of leaving, he went to look at the dogs even though he was told to leave and didn't have a search warrant. In Motion to Dismiss, **PO Farningham** describes looking at dogs first and THEN making contact with the Plaintiff. Despite the obvious untruths, **Judge Brockett** makes no mention of the perjury.

1112. **PO Farningham** testifies he observed an animal limping severely, looked like it's paw was swollen. (How can he see it from far away, tall grass?) He got closer and saw scar on paw, claims something wrapped around it for a long time (47)

1113. After Paula, he went to Jack. (48)

1114. **PO Farningham** tells an untruth and states he spoke to Plaintiff a second time. (52)

1115. Search warrant March 6, 2012 defective – authorized them to go into the house and do a search – even though the probable cause was the two deformed dogs living outside. (53)

1116. **PO Farningham** claims overpowering smell of urine and feces from the residence and dog crates (Untruth – refuted by their APS witness (53)

1117. Applications - Search warrants #1 and #2 never mentioned dog on deck. (73)

1118. <u>Cross Examination -Picture shows Paula on all fours and putting pressure on all fours. (87- 88)</u>

1119. **PO Farningham** admits illegal search in his untruth statement. (89) Claims Plaintiff asked him to leave because he has no search warrant but goes to the back to Paula and the other dogs instead. (88, 89)

1120. **PO Ashworth** can't remember if she came to the property before or after the search warrant. (112)

1121. **PO Ashworth** said inside of house "Again filthy, filthy living conditions, animals inside the house also. Puppies. There were animals living in specific dog kennels, the plastic type kennels. It was just very filthy unsuitable living conditions." Police pictures prove she is not telling the truth.. **APS** also refutes the description. Seventeen charges were

dismissed as a result of the APS testimony, yet Judge Brockett still does not dismiss the case based on the perjury throughout the case. (120)

1122. Pictures refute "It appears to be the kitchen area of the house with animals in the plastic type kennels and filthy living conditions like I explained," (122, 123)

1123. **PO Ashworth** doesn't answer question. (different answer). Kathy moves to strike as non-responsive. **Brockett**: "Move on. Ask another question." (123)

1124. **PO Ashworth** admits re police photos – table clear, articles on crates are organized, nothing on counter top, no dust, no mess, no garbage on the floor, no feces or urine or food on the floor.

1125. **June 10, 2015** (trial) **Judge Brockett** prejudice, misconduct and overreach

1126. Prosecutorial misconduct Application to court to Motion to Suppress – re-open Mapp hearing. **PO Farningham** claims he could see around the side of the house and could see dog #2 over at least calf high grass around the side of the house for a minimum of 57 feet. The map indicates over 80 feet – **PO Farmingham** claimed he could see the dog around the side of the house. He claims (1) to see dog – (2) then Plaintiff comes out –and asks what he's doing there. She said she's fine. (3) Officer says he wants the two dogs which proves he had already done a search because the dogs are not visible from the location and distance he was standing at. (4) **PO Farningham** who has no search warrant is told to leave the property and come back with a search warrant. (5) Plaintiff goes back inside. (6) **PO Farningham** proceeds to go through property, look at remainder of dogs even though Plaintiff told him not to come back until you had a search warrant, (7) **PO Farningham** went through the property without a search warrant, gathered the evidence and his response was yes. (8) Plaintiff told him to come back with a warrant. (9) Instead, **PO Farningham** gathered information and put it into his application for a search warrant when he knew he wasn't supposed to be there and he was told to leave the property.

1127. **PO Farningham**, testified under oath, that he was told to leave the property. He proceeded after that to gather all of – or most of - the info he used in the application for that warrant. His scenario is an untruth.

1128. **Judge Brockett** then ADMITS, "I would agree that he acknowledged that he sought some additional information. I believe he went to view another dog is the way I recollect it. And he also made observations prior to that." Judge Brockett still doesn't dismiss the case.

1129. With all the admission and agreements that **PO Farningham** did an illegal search, **Judge Brockett** denied Ms. Lee's application to re-open the Mapp hearing. (2 – 8)

1130. **PO Monahan**– police photographer Photos and <u>their own witness,</u> Adult Protective Services, refute all the untruths told by this witness: (Emphasis added)

1131. **PO Monaham** stated, "Property itself was pretty much in disarray." She claims pens dilapidated, makeshift dog houses, feces and urine in each pen, dogs filthy and looked malnourished. Inside house, very dirty. Dogs in small cages. Puppies inside residence. Pretty dirty overall. April 30, 2012 returned to property. (12-13)

1132. **PO Monahan's** photos refute allegations.

1133. PO Monahan claimed makeshift kennels, some igloo dog houses were broken. (24)

1134. Did not see any dog food March 6, 2012 or April 30, 2012

1135. Photos and APS refute untruths

1136. **PO Monahan** claimed house was in disarray – several dozen empty dog food bags. Admits neatly stacked on top of crates. Walls aren't freshly painted – smudges on the walls.

1137. **PO Monahan** admits there is no garbage or food on the floor. She admits crates are side-by-side pushed up against the wall in a neat organized fashion. She is shown three full dog food bags in her photo of the kitchen.

1138. Although search warrant authorized areas of search were limitless, **PO Monahan** didn't look through the barn and therefore didn't see dog food.

1139. **PO Monahan** didn't look through the van and didn't see bags of food. She didn't look at the large garbage cans in the kitchen to see dog food in there. **PO Monahan** was unable to identify feces and urine in her police photos. Asked why feces and urine not documented in her photos. She was responsible for documenting all the allegations. (42-46)

1140. **Officer Monahan** couldn't I.D any feces in her pictures. (48)

1141. **Officer Monahan** couldn't I.D any malnourished dogs. (49)

1142. **Officer Monahan** couldn't I.D. any dirty, mud-feces-urine covered dogs. (50) They look shiny! Admits some are shiny. (51)

1143. In Direct, **PO Monahan** claimed bread was in and around houses. Denies seeing bread in about 50 photos given to her. In Redirect,, the **ADA** shows two pictures with bread in them.

1144. In re-cross, **PO Monahan** admits 31 dog runs with 50-60 houses and two have bread in them.

1145. Retired Inv. **David Ayers** Photos refute untruths

1146. **Ayers** states cruelty training by NYS Humane Association who <u>he admits is a radical animal rights organization.</u> (emphasis added) (59)

1147. In direct, claimed green, slimy water bowls. Plaintiff didn't use water bowls. How come no photos of these green, slimy water bowls? (Because they didn't exist.) (63)

1148. In Cross, complained dogs had no shade, despite the fact that they were completely surrounded by the woods. Shown **DA photos** that shows shade in the back of the runs in the picture. (in AM hours – sun moves throughout the day. (67-70)

1149. **Ayers** admits he is not aware Rottweilers grow an undercoat for the winter. He admits he was never taught that dogs acclimate to their environment. He is not aware Igloo dog houses are designed for the cold and extreme heat. (71)

1150. Photos shown to him refute his testimony.

1151. **Det. Joseph Steuber** photographed right side of dog runs.

1152. Describes driveway beyond wooden entrance gate to Plaintiff's property.

1153. **Judge Brockett** said he didn't believe Plaintiff had a gate, despite photos showing gate.

1154. **Det. Steuber** exaggerates when he claims Plaintiff had over 70 dogs in the back in the woods. He also offers untruths and exaggeration about the condition of the fencing. Damage to the very top of one chain link door used to supplement the existing closure, complemented the dogs' containment ability. (91)

1155. During search warrant execution, he didn't look in sheds for dog food. He didn't look in vehicle for dog food. He didn't look in the various 32 gallon garbage cans in the house. (83-84)

1156. Broken pallet pieces are placed outside of the runs by Plaintiff – already started Spring cleaning of broken pallets two weeks before the raid March 6, 2012. (85-86)

1157. **June 15, 2015,** Dr. Furman testifies another veterinarian came to the property to assess the two dogs. (4, line 13-15)

1158. **Dr. Furman** admits dog #1 could have been born deformed. (31)

1159. **Dr. Furman** admits dog #2 could have been born deformed. (37)

1160. **Dr Furman** admits he never palpated the dog to see <u>if</u> it was in pain. He could *see* the dog was in pain. (Emphasis added)

1161. **Dr. Furman** admits Paula is standing on all fours in photograph taken by the Plaintiff prior

to her seizure and the amputation surgery, contradicting the claim the dog was in so much pain she was unable to stand on that leg. (38)

1162. **Dr. Furman** amputated her paw.

1163. **Kerry Clair** claims she took Jack and Paula (dog #1 and #2) to Dr. Furman. (They first were immediately taken to a vet (AniMall) day 1 when seized. (Day 2 to Pets Alive, day 3 to Dr. Furman, day 4, March 9, 2012, Furman did amputation (mutilation) surgeries on both dogs. She tells more untruths by saying the dogs were muddy, had no shelters, green water (48). Photos refute testimony.

1164. **Kelly Ambrose (MRR)** states dogs had no housing (65) Both Plaintiff and police photos refute her testimony.

1165. She also states they did not put up brown tarps. She speaks <u>against</u> the brown tarps saying tarps are falling down. (81) Plaintiff photos refute her testimony. Brown tarps are those put up by the "volunteers'. Ambrose actually spoke in favor of the Plaintiff. (Emphasis added)

1166. Her testimony describing mud, feces, caked in dogs' fur all refuted by TOW police photos, . No mud, some grass photos (74)

1167. **Ambrose** stated there was no dog food, but was not in house (car or barn). (75)

1168. **Ambrose** was shown picture – admits only small eye gunk and not as described earlier with DA testimony, "a lot of watery gunk out of both her eyes." (62) "Summer" taken to her vet and there is no notation of any eye irritation (82) – that the eyes are normal. (83)

1169. **Susan Bossley, Goshen Humane Society** had Dexter (?) and Princess (Rhea born blind in one eye) (85)

1170. **Bossley** had them a few months – in sworn testimony <u>testified there was no reason to take them to the vet during that entire time (93) indicating there was nothing wrong with them when seized</u>. (Emphasis added)

1171. Bossley ended up having to take them to the veterinarian because the two dogs fought and Rhea bit off part of "Dexter's" ear. (93) This occurred because of the lack of animal husbandry and breeding knowledge.

1172. Goshen HS veterinarian examined Rhea's eye. He said nothing could be done about it. (94) Note; Same thing Plaintiff said about the dog yet was charged and convicted for it. **Judge Brockett** did not remove the charge against her.

1173. **June 15, 2015** Judge Brockett – prejudice regarding Brady material not turned over to the Plaintiff produced by their own DA witness at Adult Protective Services (APS). The report refutes the officers' claims that the house was in disarray, dirty, not dusted in months, and there was feces and urine all over the house. (3)  During the trial, the PD's own photos of the interior of the house refute allegations by sworn testimony of the PD photographer. The APS social worker refuted the allegations in her report and later, the trial.

1174. **Judge Brockett's** reply?  "What is the harm?'  (4)

1175. **Judge Brockett** allowed the prosecution to use photographs of the exterior of the house (damage from Hurricane Irene) which has nothing to do with te case but has everything to do with influencing the jury.

1176. **Judge Brockett** allowed all the veterinarians to testify as expert witnesses. His reasoning is that they have "knowledge that might be beyond the knowledge of a typical person".

1177. **April Wood** from the **Middletown Humane Society** told untruths as shown by the refuting of the police photographs as well as from the testimony from their witness from **Adult Protective Services**.

1178. **Judge Brockett** <u>refused to give an extension of a few days</u> so that the Plaintiff can bring in two expert witnesses from Cornell University as one was currently out of the country.

1179. **Lynn Herring stated** people, other than animal rights volunteers, who wanted to adopt a dog, were brought to the property so they could pick out the dog they wanted.  Plaintiff advised them they were trespassing and asked the civilians to leave. They would not leave and police officer wouldn't assist with the removal of their illegal presence on Plaintiff's land or accept a trespassing complaint against the trespassers. (22)

1180. **Lynn Herring** falsely describes the inside of the Plaintiff's house.

1181. **Dina Lacatena from APS,** their witness, states rooms are spacious and orderly; there is no clutter and there is no feces or urine anywhere.

1182. **Dina Lacatena from APS** refutes everyone's testimony (perjury on behalf of all the DA's witnesses) and as a result, **Judge Brockett** dismisses 17 charges. He does not inform the jury that they have been removed. It is not to be mentioned to the jury.

1183. **Krissie Downey,** who was supposed to be in charge of the care of the dogs, untruthfully claimed she was at the property every day. (68)

1184. **Krissie Downey** claimed untruthfully that she was at the Plaintiff's property every day,

140

instead of admitting she was only there less than a handful of times.

1185. **Krissie Downey,** although responsible for the care and well-being of the Plaintiff's large amount of dogs, admitted that she had never done anything like this before. She admitted her lack of experience in maintaining a large amount of dogs.

1186. Judge Brockett is unreasonable and displays numerous times his abuse of discretion.

1187. Being a lawyer and a judge, **Judge Patrick Owen** knew or should have known the **DA's office** fabricated the entire case.

1188. **Shari Bach of Paws Unlimited** took Bruno, the Plaintiff's stud dog imported from Yugoslavia, and claimed the dog was about five years old. The dog was ten years-old. Bruno was in fact in great condition for his age, especially since it is predicted Rottweilers live to the age of only eight years old. The Plaintiff was charged with cruelty, but since the police had no photos at all of Bruno, the one charge was dropped.

1189. **June 16, 2016**

1190. **September 3, 2015**: THR's article published <u>false</u> and <u>fabricated information</u>, fed to them by TOW police chief **Robert Hertman, Supervisor Depew, District Attorney Hoovler, Assistant district Attorneys Kass and Purcell,** and was published without the input from the Plaintiff. (Emphasis added)

1191. **The September 3, 2015 THR's** article published <u>false</u> and <u>fabricated information</u>, fed to them by TOW Supervisor Depew, DA Hoovler and Pay Eyerman and was published without the input from the Plaintiff. (Emphasis added)

1192. **The THR and journalist Brown** knew or should have known that information given to him could <u>not possibly</u> be true, yet included it in his May 1, 2012 article without investigation. (Emphasis added)

1193. **This September 3, 2015 THR article** was published and discredited Plaintiff's reputation

and character.

1194. **THR Publisher Vanderhoof** knew or should have known that publishing false and inaccurate information written by a THR journalist was against the law and violated the Plaintiff's constitutional rights.

1195. Plaintiff was defamed, humiliated, embarrassed, damaged, slandered, and libeled.

1196. Plaintiff's reputation and character was discredited, and caused great personal injury, including severe mental anguish, emotional distress and later loss of property and business interests.

1197. These defendants ingratiated themselves to powerful persons. It is impossible to exaggerate the damage done by this false and reckless action.

1198. This case demonstrates essentially an open defiance of state and federal law.

1199. **June 16, 2015** Although **Judge Brockett** has the judicial authority to accept people as expert witnesses, he extended a bit of overreach when he accepted Drs. **Etherington, Susen, and Petkov** as such, with the explanation that they know more than the average person. With that reasoning, the Plaintiff could then have also been considered an expert because of all her knowledge.

1200. **Dr. Etherington** told an untruth when she said there are no animal catalogues where Plaintiff can by medicine and vaccines for the dogs. Plaintiff presented some of the catalogues.

1201. **Dr. Petkov** when shown police photos, admitted there were bags of dog food in the kitchen.

1202. Even though dogs were not charged, **Judge Brockett** allowed the DA to include non-charged dogs in witnesses' testimony which influenced the jury. Not familiar to the jurors and accepted as fact, mis-information controlled his testimony.

1203. **Dr. Petkov** claimed dog #592 previously had puppies, implying that having puppies is against the law or breeders are cruel. However, dog #592 never even had puppies.

1204. Another dog was born with a deformed hind leg. Although **Dr. Petkov** never X-rayed the deformity, he claimed it is <u>impossible</u> the dog was born that way -- would be a first in the veterinary journals. He said, "If that's the case, that had been the only case reported in literature." Petkov had no idea of the truth and **Judge Brockett** called him an "expert".

1205. With regards to dog #613, (Janie), **Dr. Petkov** exaggerated the size of the hanging tumor to influence the jury. He testified it was the size of a tennis ball, when another vet said it was the size of a golf ball, when in fact it was the size of a marble.He exaggerates the size of the scrape on it and tells an untruth that the tumor was dragging on the ground. It hung only inches from the abdomen and was nowhere near the ground.

1206. **Dr. Petkov** told untruths when he said the young puppies had swollen bellies and were full of worms. The pups did not have swollen bellies and were wormed starting at the age of two weeks old. Stool tests showed the puppies were free of intestinal parasites. Plaintiff photos show what he stated was untruths, to influence the jury against the Plaintiff.

1207. **Dr, Petkov** claimed these young puppies 9six weeks old) were suffering from hip dysplasia. Hip dysplasia is a condition that cannot be diagnosed and certified until the dogs are a minimum of two years old.

1208. **June 19, 2015 Adult Protective Services** social worker, Dina Lacatena gave testimony that refuted <u>all the allegations</u> pertaining to the inside of the Plaintiff's house. Although **Judge Brockett** dismissed the charges pertaining to the inside of the house, he did not dismiss the case for perjury. <u>Seven </u>TOW police officers told untruths about the condition of the home. The entire case is peppered with untruths and **Judge Brockett** didn't dismiss

the case at any point. (emphasis added)

1209. **June 22, 2015** – Judicial prejudice, misconduct and overreach

1210. **ADA Purcell** submits whatever photographs he wants without question from the judge. The defense attorney had to first show photographs to **Judge Brockett** and he had to decide what the Plaintiff could submit. His permission preceded what was to be submitted.

1211. **Brockett** said, "Don't the other pictures show the tarps are brown, for whatever that's worth, really that the tarps are brown instead of blue." One of **ADA Purcell's** witnesses claimed the brown tarps were already there when they came and were in bad condition. The Plaintiff was showing the witness told an untruth and the tarps were theirs. **Judge Brockett** tried to block the Plaintiff from exposing the truth. He said, "You don't need the ones in the packages." He continued, " I can't see how possibly all of these photos are necessary to prove that very limited point.

1212. **Judge Brockett** makes all kinds of excuses so that pictures Plaintiff wants in as evidence are not acceptable. "You have plenty of other pictures of the tarps." He would not allow pictures of the packaged tarps before they were put up by the volunteers (to prove the brown tarps causing the mud swamps were those put up by the volunteers) to be shown. (Emphasis added)

1213. **June 22, 2015 ADA Purcell** represented the Dogloo dog house as some flimsy plastic dog house, Plaintiff testified further. Aside from this house being the best she has ever used in 43 years of breeding, APHIS, the Federal government, recommends these houses in their U.S.Code federal Animal Welfare Act law. A copy of the law was shown to the court. The plastic material with insulaton is also used in the auto and aerodynamics industry. Plaintiff had over 40 Dogloo houses.

# CAUSES OF ACTION - CLAIMS

## COUNT I

### VIOLATION OF U.S.C. TITLE 42, SECTION 1983

#### (All Defendants)

1213. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1212 as if fully incorporated herein.

1216. Plaintiff is a "citizen" under authority of 42 U.S.C. Section 1983.

1217. Defendants are "persons" within the meaning of this section and its jurisdictional counterparts.

1218. On March 6, 2012, Defendants all acted in concert and/or conspired together and committed

1219. acts designed to accomplish unreasonable searches and seizures at the property of Plaintiff

1220. in violation of Plaintiff's right to be free from unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution.

1221. Defendants acted in concert and/or conspired together and committed acts designed to deprive Plaintiff of her property which was held and stored under the authority of the Orange County District Attorney's office and the TOW police department as evidence in an ongoing criminal investigation and prosecution after it was unlawfully seized on March 6, 2012 and April 30, 2012 through and including June 1, 2012, insomuch as her dogs were removed from her property without her consent for an unreasonable amount of time and improperly cared for, causing them to be permanently altered or destroyed, or die from neglect, thereby, depriving her of her right to Procedural and Substantive Due Process in

145

violation of the Fifth and Fourteenth Amendment to the United States Constitution.

1222. During the commission of the above unlawful acts, these Defendants were each operating under color of New York State law. The actions described above constitute a violation of 42 U.S.C. Section 1983.

1223. As a direct and proximate result of these violations of Plaintiffs' 42 U.S.C. Section 1983 Civil Rights, Plaintiffs are entitled to reasonable attorney fees under U.S.C. Title 42 Section 1988 and suffered great personal injury, including severe mental anguish, emotional distress and loss of property and business interests.

1224. Defendants filed the false and baseless criminal charges "to provide cover for defendants'" untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff.

They built their "rat" stories around these burdock holes to discredit, humiliate, damage, slander, libel and defame the Plaintiff's reputation.

1225. Any reasonable and knowledgeable building contractor and ex-humane society worker knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1226. Any reasonable and knowledgeable Town Supervisor knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1227. Any reasonable and knowledgeable Town Attorney knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1228. Any reasonable and knowledgeable Town or City Judge knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1229. Any reasonable and knowledgeable County District Attorney knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1230. Any reasonable and knowledgeable Assistant District Attorneys knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1231. Any reasonable and knowledgeable Town Building Inspector knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1232. Any reasonable and knowledgeable Town Code Enforcer knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1233. Any reasonable and knowledgeable Chief of police knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1234. Any reasonable and knowledgeable police officer would have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1235. Any knowledgeable person familiar with Rottweilers would have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1236. Any reasonable and knowledgeable Rottweiler fancier knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1237. All responsible because they all saw the dogs were in good shape, contrary to what they were portraying in the media and court.

1238. Any reasonable and knowledgeable Office for the Aging employee knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1239. Any reasonable and knowledgeable veterinarian knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1240. Any reasonable and knowledgeable newspaper publisher knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1241. Any reasonable and knowledgeable journalist knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1242. Defendants filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff.

1243. On March 6, 2012, Defendants all acted in concert and/or conspired together and committed acts designed to accomplish illegal and unreasonable searches and seizures at the property of Plaintiff Sylvia Panetta in violation of Plaintiff's rights to be free from unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution.

1244. On April 30, 2012 through June 1, 2012, Defendants all acted in concert and/or conspired together and committed acts designed to accomplish illegal and unreasonable searches and seizures at the property of Plaintiff Sylvia Panetta in violation of Plaintiff's rights to be free from unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution.

1245. Defendants acted in concert and/or conspired together and committed acts designed to deprive Plaintiff of her property which was seized by the Town of Wallkill Police Department as evidence in an ongoing criminal investigation and prosecution after it was unlawfully seized March 6, 2012, insomuch as the dogs and other property were removed illegally from her property without her consent for an unreasonable amount of time, causing them to be permanently altered or destroyed, thereby depriving her of her right to Procedural and Substantive Due Process in violation of the Fifth and Fourteenth Amendment to the United States Constitution.

1246. Defendants acted in concert and/or conspired together and committed acts designed to deprive Plaintiff Panetta of her property which was held and stored under the authority of the Orange County District Attorney's Office and TOW Police Department as evidence in an ongoing criminal investigation and prosecution after it was unlawfully seized on March 6, 2012 and April 30, 2012 through and including June 1, 2012, insomuch as her dogs were removed from her property without her consent, never returned and improperly cared for while still on Plaintiff's property, causing them to be permanently altered or destroyed, never returned, thereby depriving her of her right to Procedural and Substantive Due Process in violation of the Fifth and Fourteenth Amendment to the United States Constitution.

1247. During the commission of the above unlawful acts, these defendants were each operating under the color of New York State law. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident. The actions described above constitute a violation of 42 U.S.C. Section 1983.

1248. As a direct and proximate result of these violations of Plaintiff's 42 U.S.C. Section 1983

Civil Rights, Plaintiff is entitled to reasonable attorney fees under U.S.C. Title 42, Section 1988 if attorney joins the case, and suffered physical injury, great personal injury including severe mental anguish, emotional distress, loss of enjoyment of property, and loss of property and business interests.

1249. As a direct and proximate result of these violations of Plaintiff's 42 U.S.C. 1983 Civil Rights, and suffered great personal mental and physical injury, including severe mental anguish, emotional distress and loss of property and business interests, Plaintiff is entitled to reasonable attorney fees under U.S.C. Title 42 Section 1988 should an attorney join the case.

1250. Because the government perceives animals as property, the rights associated with fourth amendment searches and seizures also apply to animals. The Case of Fuller v Vines, 36 F. 3d @68, citing Soldal v Cook County 506 US 56, --- 113 S. Ct 538, 546, 1992; and see United States v Jacobson, 466 US 109, 113, 104 S. Ct. 1652, 1656, (1942); Bonds v Cox, 20 F.3d 697, 701-02, (6th Circuit 1994); Lesher v Reed, 12 F.3d 148, 150 (8th Cir.1994); The case noted that a "seizure" of property occurs, within the meaning of the Fourth Amendment, when 'there is some meaningful interference with an individual's possessory interests in that property'". Therefore the court reasoned, the destruction of property is a "meaningful interference" constituting a seizure under the Fourth Amendment. Therefore, the euthanasia of dogs Willi and Janie additionally constitutes a Fourth Amendment seizure.

# COUNT II

## VIOLATION OF U.S.C. TITLE 42, § 1983

(Against Defendants Daniel Depew in his individual and official capacity as TOW supervisor, Edward Diana in his individual and official capacity as TOW Supervisor, Richard Guertin in his individual and official capacity as TOW attorney, David Hoovler in his individual and official capacity as Orange County District Attorney, Andrew Kass in his individual and official capacity as Assistant District Attorney, Michael Purcell in his individual and official capacity as Assistant District Attorney, Joseph Cassel in his individual and official capacity as owner and operator of J. Cassel Construction, Patrick Owen in his individual and official capacity as TOW judge, Joseph Owen in his individual and official capacity as TOW judge, Steven Brockett in his individual and official capacity as Middletown City judge, Robert Hertman in his individual and official capacity as TOW Chief of Police, M. Donaldson in his individual and official capacity as TOW police detective, Antonino Spano-Jason Farningham-Anthony Grosso-Kelly Ann Boss-Kate Monahan-Barry Weissman-Julia Ashworth-A. Solano-Christopher DiNapoli-John Snellinger-Jessica Kenney-Joseph Steubber-Jessica Steuber-C. Orengo-J. DeAngelis in their individual and official capacity as TOW police officers, David Ayers in his individual and official capacity as Orange County Sheriff Department Investigator, Alison Johannesson in her individual and official capacity as employee of Orange County's Office for the Aging, Joshua Furman-Paul Johnson-Catherine Etherington-Emanouil Petkov-Elizabeth Susen in their individual and official capacities as veterinarians in their respective veterinary practices, Krissie Downey in her individual and official capacity as director of Mountain Rottie Rescue of New York, Inc. (MRR), Janie Gaebel in her individual and official capacity as volunteer/member of MRR, Pay Eyerman in her individual capacity as owner of a Karousel Kennel dog, Suzanne Taurone in her individual and official capacity as owner Suzanne's Dog Training, Lisa Carder in her individual and official capacity at Suzanne's Dog Training, Christine Larocca-Mann-Uveges in her individual and official capacity as volunteer at MRR and later Hudson Valley Rottie Rescue, Inc., George McClure-Kelly Lambert Ambrose-Jean Youngman-Ronald Youngman-Lynn Herring- in their individual and official capacities as volunters at MRR, Kerry Clair in her individual and official capacity as Director of Pets Alive, Inc., Tina Hudson in her individual and official capacity as Director of A Rottweiler Empire Rescue, Eric Bellows in his individual and official capacity as Director of Karma K-9 Rescue, Inc., Stephanie Palmer as member and board of Director of Karma K-9 Rescue, Inc., Shari Bach in her individual and official capacity as Director of Paws Unlimited, Susan Bossley in her individual and official capacity as director of Goshen Humane Society Inc., April Wood in her individual and official capacity as director of Middletown Humane Society, Susan Barron in her individual and official capacity as director Warwick Humane Society, Joseph Vanderhoof in his individual and official capacity as Publisher of the Times Herald-Record, Nathan Brown in his individual and official capacity of journalist at the Times Herald-Record.)

1251. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1248 as if fully incorporated herein.

1252. Plaintiff is a "citizen" under authority of 42 U.S.C. Section 1983.

1253. Defendants acted in concert and/or conspired together and committed acts designed to accomplish the unreasonable searches and seizures executed at the property of the Plaintiff on March 6, 2012 and continued through and including June 1, 2012, in violation of Plaintiff's right to be free of unreasonable searches and seizure based upon the Fourth Amendment to the United States Constitution.

1254. During the commission of the above unconstitutional acts, these defendants were each operating under color of New York State law. The actions described above constitute a violation of 42 U.S.C. Section 1983.

1255. As a direct and proximate result of these violations of Plaintiff's 42 U.S.C. Section 1983 Civil Rights, Plaintiff is entitled to reasonable attorney fees under U.S.C. Title 42, Section 1988 and suffered great discreditation, damage, humiliation, embarrassment, was slandered, libeled, defamed the Plaintiff's reputation and character, personal injury, including severe mental anguish, severe and later causing physical injuries, emotional distress, loss of property and business interests.

1256. Defendants filed the false and baseless criminal charges "to provide cover for defendants' untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff.

1257. They built their "rat" stories around these burdock holes to discredit, humiliate damage, slander, libel and defame the Plaintiff's reputation.

1258. Although the town supervisor, police officers, attorneys, district attorney, took an oath, they demonstrated no allegiance to the U.S or NYS Constitutions as they gave themselves unrestricted authority to do as they pleased for as long as they pleased.

1259. Any reasonable and knowledgeable ex-humane society president knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1260. Any reasonable and knowledgeable Town Supervisor knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1261. Any reasonable and knowledgeable Town Attorney knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1262. Any reasonable and knowledgeable Town or City Judge knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1263. Any reasonable and knowledgeable County District Attorney knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1264. Any reasonable and knowledgeable Assistant District Attorneys knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1265. Any reasonable and knowledgeable Town Building Inspector knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1266. Any reasonable and knowledgeable Town Code Enforcer knew or should have known that

the conduct/allegations complained of violated well-established law at the time of the incident.

1267. Any reasonable and knowledgeable Town Code Enforcer knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1268. Any reasonable and knowledgeable Chief of police knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1269. Any reasonable and knowledgeable police officer would have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1270. Any knowledgeable person familiar with Rottweilers would have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1271. Any reasonable and knowledgeable Rottweiler fancier knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident. All responsible because they all saw the dogs were in good shape, contrary to what they were portraying in the media and court.

1272. Any reasonable and knowledgeable Office for the Aging employee knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1273. Any reasonable and knowledgeable veterinarian knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1274. Any reasonable and knowledgeable newspaper publisher knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1275. Any reasonable and knowledgeable journalist knew or should have known that the conduct/allegations complained of violated well-established law at the time of the incident.

1276. During the commission of the above unconstitutional acts, these Defendants were each operating under color of New York State law. The actions described above constitute a violation of 42 U.S.C. Section 1983.

1277. As a direct and proximate result of these violations of Plaintiffs' 42 U.S.C. Section 1983 Civil Rights, Plaintiffs are entitled to reasonable attorney fees under U.S.C. Title 42, Section 1988 and suffered great personal injury, including severe mental anguish, physical injuries, emotional distress and loss of property and business interests

## COUNT III

### VIOLATION U.S. C. 18 §242
### Deprivation of Rights Under the Color of Law

(In their individual and official capacities, against Judge Patrick Owen, Judge Joseph Owen, Judge Steven Brockett, TOW Attorney Guertin, Orange County District Attorney Hoovler, Orange County Assistant District Attorney Kass and Orange County Assistant District Assistant Attorney Purcell, TOW Supervisor Dan Depew, Orange County Sheriff Dept. Ayers, TOW Police Chief Robert Hertman, TOW PO's Donaldson, Spano, Covey, Farningham, Grosso, Boss, Monahan, Weissman, Ashworth, Solano, DiNapoli, Snellinger, Kenney, Jess Steuber, Joseph Steuber, Orengo, DeAngelis, OFA Johannesson, DVM's Furman, Johnson, Etherington, Petkov, Susen, volunteers Downey, McClure, Ambrose, Larocca, J. Youngman, Herring, Clair, Hudson, Bellows, Palmer, Bach, , Bossley, Wood, Barron, THR Brown, Vanderhoof,

1278. Plaintiff incorporates each and every allegation set forth in paragraphs 67- 1275 as if fully incorporated herein.

1279. Judge Patrick Owen violated the Plaintiff under the color of law by willfully subjecting the Plaintiff to the deprivation of her rights and privileges secured and protected by the New York State and U.S. Constitutions or laws of the United States, New York State, County and Town laws and to different punishments, pains or penalties, with bodily injuries resulting from the acts committed in violation of the above section.

155

1280. Judge Joseph Owen violated the Plaintiff under the color of law by willfully subjecting the Plaintiff to the deprivation of her rights and privileges secured and protected by the New York State and U.S. Constitutions or laws of the United States, New York State, County and Town laws and to different punishments, pains or penalties, with bodily injuries resulting from the acts committed in violation of the above section.

1281. Judge Steven Brockett violated the Plaintiff under the color of law by willfully subjecting the Plaintiff to the deprivation of her rights and privileges secured and protected by the New York State and U.S. Constitutions or laws of the United States, New York State, County and Town laws and to different punishments, pains or penalties, with bodily injuries resulting from the acts committed in violation of the above section.

1282. Orange County District Attorney Hoovler violated the Plaintiff under the color of law by willfully subjecting the Plaintiff to the deprivation of her rights and privileges secured and protected by the New York State and U.S. Constitutions or laws of the United States, New York State, County and Town laws and to different punishments, pains or penalties, with bodily injuries resulting from the acts committed in violation of the above section.

1283. Orange County Assistant District Attorney **Kass** violated the Plaintiff under the color of law by willfully subjecting the Plaintiff to the deprivation of her rights and privileges secured and protected by the New York State and U.S. Constitutions or laws of the United States, New York State, County and Town laws and to different punishments, pains or penalties, with bodily injuries resulting from the acts committed in violation of the above section.

1284. Orange County Assistant District **Attorney Purcell** violated the Plaintiff under the color of law by willfully subjecting the Plaintiff to the deprivation of her rights and privileges

secured and protected by the New York State and U.S. Constitutions or laws of the United States, New York State, County and Town laws and to different punishments, pains or penalties, with bodily injuries resulting from the acts committed in violation of the above section.

## COUNT IV

### MALICIOUS PROSECUTION
### (Against All Defendants)

1285. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1282 as if fully incorporated herein.

1286. On March 6, 2012 two TOW police officers, PO **Farningham** and PO **Grosso** broke into Plaintiff's Property and without probable cause or a search warrant, executed an illegal search.

1287. **PO Farningham and PO Grosso** nevertheless made a conscious decision to offer this illegally obtained evidence to be presented to the Orange County District Attorney **Hoovler** in order to obtain 150 charges against the Plaintiff.

1288. **PO Farningham, PO Grosso, PO Chief Hertman, DA Hoovler, ADA's Kass and Purcell** knew this evidence was fraudulently obtained and that they didn't have a search warrant when the alleged observations were made which finally convinced the issuing TOW court, **Judge Patrick Owen** to grant the search warrant.

1289. And again, TOW Judge **Patrick Owen** issued a second warrant on April 29, 2012 with the application for that warrant being non-existent. The application for that warrant wasn't signed and sworn to until the following day, April 30, 2012.

1290. Six other illegal searches took place March 6, 2012 subsequent to the first one, and continued until April 30, 2012.

1291. On April 30, 2012, Plaintiff was charged with two charges for the two deformed dogs that were seized March 6, 2012.

1292. On May 31, 2012, the Plaintiff was charged with 150 superceding charges. On December 18, 2018, and again on February 6, 2020, the Appellate Term Court deem the initial search that was executed March 6, 2012, prior to obtaining a search warrant, was illegal.

1293. The Defendants, with malice toward the Plaintiff, acted in concert with and/or conspired together and committed acts designed to cause the criminal proceeding against Plaintiff.

1294. Probable cause did not exist for the criminal charges against the Plaintiff.

1295. **Orange County District Attorney David Hoovler, ADA's Kass and Purcell** withheld evidence – the telephone recording and Call Summary made on March 6, 2012, from **Alison Johannesson** from the **Office for the Aging** to the **TOW police department**, a Brady violation. This same evidence was exculpatory to the extent that had the issuing Court heard the evidence, the case would have been dismissed, suppressing all evidence obtained during the execution of the search warrants.

1296. OC D.A. **David Hoovler**, ADA's **Kass and Purcell** withheld evidence, a second Brady violation – the written report from their witness **Dina Lacatena** at **Adult Protective Services** that refuted all the allegations regarding the inside of the Plaintiff's home. The proof of the perjury of the multiple police officers and animal rights "volunteers" would

have dismissed all the charges by suppressing evidence obtained during the execution of the search warrants. Without the illegal search, there would have been no fabricated probable cause to pursue a "case".

1297. Third Brady violation – DA and ADA's **Kass and Purcell** did not provide the video of dog #1 that showed him when he was mobile and was NOT falling down or all over himself as alleged by various prosecution witnesses.

1298. Fourth Brady violation – Video recorded by NYC television news program that refuted the claims that the dog runs were muddy, did not have adequate housing, and in horrible condition was withheld from the defense.

1299. **Guertin, Depew, Hoovler, Kass and Purcell** knew this evidence was fraudulently withheld from the Court and that **Farmingham and Grosso** told an untruth about the illegal search when they made observations on March 6, 2012, which was finally deemed illegal by the Appellate Term Court on or about December 18, 2018 and February 6, 2020.

1300. **Guertin, Depew, Hoovler, Kass and Purcell** nevertheless made a conscious decision to offer the fabricated evidence as the basis for two search warrants and the voluminous 150 charges against the Plaintiff.

1301. **Guertin, Depew, Hoovler, Kass and Purcell** knew this evidence was fraudulently held from the court.

1302. All defendants maliciously filed or provided false and baseless information that would lead to criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to discredit, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff.

1303. Probable cause did not exist for the criminal and violation charges against the Plaintiff and should have rendered the applications for the search warrants null and void. The Appellate Term made their Decision and Order December 18, 2018 and February 6, 2020.

1304. Defendants had no probable cause to seek criminal prosecution or to make the allegations underlying the criminal prosecution, in that they did not honestly, reasonably, and in good faith believe the allegations to be true.

1305. Defendants, by and though their agents, acted with malice in that they had Plaintiff prosecuted and seized all her dogs, including all those not charged, with the improper motive of causing the Plaintiff financial and reputational harm, and disrupting her breeding operation.

1306. Defendants acted with actual malice in that despite knowing that Plaintiff was innocent of the accused conduct, Defendants publicized and continued to publicize the false allegations underlying the criminal charges, knowing the allegations were of such serious nature that they would inevitably damage Plaintiff's personal and professional reputation, and Defendants acted solely on that improper purpose with conscious disregard for Plaintiff's rights.

1307. The voluntary dismissal of 17 charges amounted to favorable termination for the Plaintiff, reversing the malicious prosecution, defamation, in that by pursuing the action only until their own witness testified that the allegations were false, producing sworn testimony not supporting the allegations, Defendants' witness demonstrated that they had no evidence supporting the allegations and that the action not only had no merit, but the entire allegations were false and perjured by the Town of Wallkill, the District Attorney's office,

the County, multiple police officers and impounding organizations' volunteers and agents, and never had any merit.

1308.    As a direct and proximate result of the Defendants' action described hereinabove, Plaintiff suffered damages to her business and her reputation as described herein below.

1309.    On April 30, 2012, a two count criminal Information was brought by Criminal Complainant PO Julia **Ashworth** alleging violation of Agriculture & Markets Law §353.

1310.    Although a participant with the illegal searches that were executed prior to obtaining the search warrant, **PO Ashworth** became "lead" officer on the case.

1311.    The Defendants, with malice towards the Plaintiff, acted in concert with and/or conspired together and committed acts designed to cause the criminal proceeding against Plaintiff Sylvia Panetta.

1312.    PO Jason **Farningham** issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1313.    PO **Anthony Grosso** issued materially false reports/testimony concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1314.    PO **Julia Ashworth** issued materially false reports/testimony concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1315. Town Supervisor **Daniel Depew** contributed materially false information concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1316. Town Supervisor **Daniel Depew** issued materially false reports to Plaintiff's neighbors concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1317. Town Supervisor **Daniel Depew** circulated himself to Plaintiff's neighbors, days shortly after the first seize March 6, 2012, inquiring if they ever had problems with the Plaintiff or her dogs. He was looking for witnesses to inflate the case against the Plaintiff.

1318. Town Supervisor **Daniel Depew** issued materially false reports on April 30, 2012, to mass media located locally and as far away as New York City, to newspapers and radio and TV news stations, invited to a press conference concerning conditions of the dogs, their doghouses and their environment. The press release was distributed across the state including New York City. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1319. From March 4, 2012 through June 1, 2012, Defendants acted in concert and/or conspired together and committed acts designed to accomplish illegal trespass and illegal searches and seizures at the property of Plaintiff in violation of Plaintiff's rights to be free from

trespass and unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution.

1320. Plaintiff's photos show lack of expertise and experience on behalf of the animal rights "volunteers".

**1321.** Defendants acted in concert and/or conspired together and committed acts designed to deprive Plaintiff of her property which was illegally seized by the Town of Wallkill Police Department as evidence in an ongoing criminal investigation and prosecution after it was unlawfully seized March 6, 2012 and April 30, 2012 through June 1, 2012, insomuch as the dogs and other property were removed illegally from her property without her consent or being charged, for an unreasonable amount of time, causing them to be permanently altered, mutilated or destroyed, thereby depriving her of her right to Procedural and Substantive Due Process in violation of the Fifth and Fourteenth Amendment to the United States Constitution.

1322. **Richard Guertin, Town of Wallkill Attorney**, was given information from another attorney that Plaintiff was grandfathered 27 years, and that there were no restrictions on her breeding and selling dogs. This information could easily have been researched. Any attorney knew or would have known that the conduct complained of violated well-established law at the time of the incident and thereafter.

1323. District Attorney **David Hoovler, ADA Kass, ADA Purcell** had possession of, as well as created much of the Plaintiff's file. Any attorney / prosecutor would have known that the conduct complained of violated well-established law at the time of the incident and thereafter.

1324. **Richard Guertin,** Town of Wallkill Attorney, was given information by another attorney March 9, 2012, that Plaintiff was legally grandfathered 27 years. This information could easily have been researched. Any attorney would have known that the conduct complained of violated well-established law at the time of the incident and thereafter

1325. On May 9, 2012, **Daniel Depew,** Town of Wallkill Supervisor, accompanied by Defendant police officer Julia **Ashworth,** trespassed on the Plaintiff's property to do an illegal search of the property, the dogs and the dogs' over-sized dog runs. Supervisor **Depew** and **Ashworth** and refused to leave when instructed to do so. They did their search of the dogs, broke bio-security and then left when they were done.

1326. **Daniel Depew** stated to a witness that they were going after the Plaintiff only because she had a large amount of dogs. He knew, or should have known the Plaintiff was legally grandfathered, being allowed to have an unlimited amount of dogs.

1327. Although town judge **Patrick Owen** took an oath, he demonstrated no allegiance to the U.S. or NYS Constitutions as he gave himself unrestricted authority to do as he pleased for as long as he pleased.

1328. Although town judge **Joseph Owen** took an oath, he demonstrated no allegiance to the U.S or NYS Constitutions as he gave himself unrestricted authority to do as he pleased for as long as he pleased.

1329. Although town **judge Patrick Owen** took an oath, he demonstrated no allegiance to the U.S or NYS Constitutions as he gave himself unrestricted authority to do as he pleased for as long as he pleased. He knew the defendants were falsely and fraudulently submitting allegations, and in refusing to appoint an attorney for the Plaintiff, continued this fraud

upon the court in the hopes that the Plaintiff would break down from intimidation and take a plea so the details of this mess would never become public.

1330. District Attorney **David Hoovler, ADA Kass, ADA Purcell** had possession of, as well as created, much of the Plaintiff's file. Any attorney / prosecutor knew or should have known that the conduct complained of violated well-established laws at the time of the incident and thereafter.

1331. PO **Farningham and PO Grosso** were asked by Plaintiff if they had a search warrant. Plaintiff then instructed them to leave the property. They eventually left, yet they came back several more times without a search warrant and searched the property, **plus PO Grosso** remained on for about seven hours and **PO Weissman** sat outside the house for a while as well.

1332. **PO Weissman** caused false imprisonment of the Plaintiff when he threatened to arrest Plaintiff and ordered her to remain in the house and not come out when Plaintiff attempted to go to the kennels to take photographs of the dogs and environment dogs lived in, prior to any application for a search warrant was even submitted to the judge, and while the Defendants were illegally on her property violating trespass laws.

1333. During the commission of the above unlawful acts, these defendants were each operating under the color of New York State law or in concert with those operating under the color of New York State law. The actions described above constitute a violation of 42 U.S.C. Section 1983.

1334. As a direct and proximate result of these violations of Plaintiff's 42 U.S.C. 1983 Civil Rights, and suffered great personal injury, including severe mental anguish, emotional

distress and loss of property and business interests, Plaintiff is entitled to reasonable attorney fees under U.S.C. Title 42 Section 1988 should an attorney join the case.

1335. Defendants

1336. Code Enforcer **Frank Werlitz** issued materially false reports to Orange & Rockland, a utility company that provided electricity to the Plaintiff's home concerning conditions of the Plaintiff's home and to abruptly disconnect the electric service, falsely stating the house was condemned. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983. It caused an enormous loss of personal chattel property.

1337. **Police Chief Robert Hertman** issued materially false reports concerning conditions of the dogs, their doghouses and their environment to the mass media across the state, including news outlets in New York City, by holding a press conference to distribute the false reports. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1338. PO **Antonino Spano** issued materially false information concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that the false information defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1339. PO **Kelly Ann Boss** issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and

maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1340. **PO K. Monahan** issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1341. PO **Barry Weissman** issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1342. PO **Weissberg** illegally remained on the property, stopped the Plaintiff from walking around outside on her property, threatened her with arrest if she "took one more step", and caused false imprisonment by ordering her to remain inside the house when no search warrant existed. He maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1343. PO A. **Solano** issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1344. PO **Christopher DiNapoli** issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed

her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1345. **PO John Snellinger** issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1346. On May 31, 2012, PO **John Snellinger** went to Plaintiff's home and ordered her to appear the following day in court for a violation of an Order of Protection hearing and to make arrangements for her companion, Gilbert Brandt, because Plaintiff is going to jail, showing the decision was made prior to even being heard in court.

1347. **PO Farningham** lied in his signed and sworn-to statements on his applications for a search warrant of the initial search March 6, 2012 he and PO Grosso executed prior to obtaining a search warrant. He also wrote false statements on his application for a search warrant dated April 30, 2012, a day AFTER the search warrant was authorized. (No application existed when the actual search warrant was signed and authorized by Judge Patrick Owen.)

1348. **PO Farningham** gives different versions and omissions of his activities on the Plaintiff's property prior to obtaining a search warrant.

1349. **PO Farningham** told untruths in his signed and sworn-to statements on his deposition of May 28, 2012 and in subsequent signed and sworn-to statements.

1350. **PO Farninghm** also confessed false statements orally in the Security Bond hearing June 15, 2012, a Suppression hearing May 2013, as well as his trial testimony.

1351. Additionally, **PO Farningham** fails to confess in writing on his applications for the search warrants of the multiple illegal searches he and other officers and a representative from Pets Alive and other civilians executed before obtaining a search warrant.

1352. Additionally, PO **Farningham** fails to confess **PO Grosso** illegally remained on the property approximately seven hours prior to obtaining a search warrant.

1353. Additionally, PO **Farningham** fails to confess PO **Weissberg** illegally remained on the property, stopped the Plaintiff from walking around outside on her property, threatened her with arrest if she "took one more step", and caused false imprisonment by ordering her to remain inside the house when no search warrant existed.

1354. **PO Farningham** and all the other police officers that were on Plaintiff's property prior to obtaining a search warrant made a conscious decision to offer the illegally obtained alleged evidence to be presented **to Judge Patrick Owen** for issuance of a search warrant and to obtain charges of two counts.

1355. **PO Farningham** and all the other police officers that were on Plaintiff's property prior to obtaining an April 29. 2012, search warrant made a conscious decision to offer illegally obtained alleged evidence to be presented to Judge Patrick Owen for issuance of a search warrant and to obtain charges of 150 counts.

1356. All the officers knew this evidence was fraudulently withheld from the court. No one stepped forward to tell the truth and allowed a criminal case to commence.

1357. To further their goal, **Dan Depew** (Town Supervisor) and Robert **Hertmann** (Chief of Police), to distract the general public from accusations Plaintiff would make against the town and police department and to destroy her credibility, sent out a press release and held an immediate press conference with media across the state, including New York City radio

and television. A TV news helicopter hovered over the Plaintiff's home and property as though she were a threat to national security. (Emphasis added)

1358. Defendants knew the conditions of the dogs and their environment were falsely and fraudulently portrayed from March 4, 2012 to June 1, 2012 and beyond, because of their first-hand knowledge.

1359. Probable cause did not exist for the criminal charges against the Plaintiff.

1360. The **District Attorney's** Office knew of the illegal searches as the situation was discussed with them prior to applying for the warrant.

1361. **Richard Guertin** knew that Plaintiff was grandfathered 27 years on the property for an unlimited amount of dogs with no restrictions to breed and sell dogs, yet he was determined to seize all the Plaintiffs dogs and go forward with criminal and civil charges against her. He told another attorney March 9, 2012, three days after the first seize, that he was doing it because of the amount of dogs.

1362. **ADA Kass** was so determined to succeed with the prosecution that he illegally represented the impounding organizations by drafting and submitting a security bond petition, representing them for the Bond hearing and two Order to Show Cause briefs and hearings. He did so knowingly that he was misusing tens of thousands of County taxpayers' dollars by illegally representing them. When challenged by the Plaintiff, he replied that he did it because the animal rights "volunteers" did not have any money to pay for a lawyer. This is contrary to County and Corporation law.

1363. Judge **Patrick Owen** stated on May 14, 2012 that he didn't feel comfortable that the Plaintiff didn't have an attorney, looked at **ADA Kass** and then proceeded with the hearing. Although the Plaintiff made several requests for an adjournment and appointed attorney,

Plaintiff finally went on the record again stating she had a Constitutional right for an attorney. The judge replied, 'And I have a right to move this case forward.' And he did.

1364. Three days later, on May 17, 2012, the Court responded to the Administrative Judge's inquiry as to why the Plaintiff didn't have an appointed attorney. **Judge Patrick Owen** told an untruth and said the Plaintiff did, in fact, have an appointed attorney and didn't understand why she said she didn't.

1365. **Judge Patrick Owen** consistently refused to appoint an attorney for the Plaintiff and the court went so far as to telling an untruth to the Administrative Judge saying she had an appointed lawyer.

1366. **Judge Patrick Owen** signed an Order giving the police and strangers permission to what boils down to trespass and emotional stress, etc. on Agriculture & Markets Law §373.7, even though the Plaintiff advised him and **ADA Kass** that they were misapplying the law and was contrary to NYS law and was never charged with that section.

1367. **Jean Youngman and LaRocca** told an untruth when they asked for an Order of Protection, and Jean **Youngman** again perjured herself when she filed a false and fabricated complaint against the Plaintiff.

1368. **Judge Patrick Owen** signed an <u>unlawful</u> Order of Protection CPL §530.13 with false allegations. **Judge Patrick Owen, Judge Joseph Owen, DA Hoovler, ADA Kass and ADA Purcell** knew or should have known that the Order of Protection was unlawful. (Emphasis added)

1369. The Plaintiff still had no appointed lawyer, and without any hearing, with a deposition non-existent, as mandated by CPL §530.13, Judge Joseph Owen sent the Plaintiff to jail, where she sustained injuries, including a traumatic brain injury.

1370. Judge Joseph Owen told PO Snellinger to make sure the complainant writes a complaint and then he should put it in the file … after the fact.

1371. The Order of Protection was later dismissed in its entirety nine months later by another judge as being unlawful.

1372. The Plaintiff had to pay bail of $2,000, part of which was never returned.

1373. Judge **Patrick Owen** recused himself July 16, 2012 after much of the damage was done.

1374. **Judge Joseph Owen,** his brother, recused himself on or about August 9, 2012, after much of the damage was done.

1375. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1376. As a direct result of Defendants' conduct, Plaintiff incurred expenses, suffered great personal injury including mental anguish, emotional distress, and later, physical injuries, and loss of property and business interests.

1377. Defendants' conduct was in reckless disregard of Plaintiff's rights, such that Plaintiff is entitled to punitive and exemplary damages.

## COUNT V

### INTENTIONAL AFFLICTION OF SEVERE EMOTIONAL DISTRESS

### (Against All Defendants)

1378. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1375 as if fully incorporated herein.

1379. Between March 6, 2012 and the present, Defendants acted in concert and/or conspired together and committed acts designed to produce a result which amounted to extreme and outrageous conduct toward Plaintiff.

1380. Defendants knowingly and intentionally filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff.

1381. Defendants knew or should have known their actions were likely to cause Plaintiff to experience severe emotional distress.

1382. Defendants' conduct was, in fact, the cause of Plaintiff's distress.

1383. The Plaintiff suffered an extreme disabling emotional response to Defendants' conduct.

1384. Defendants' conduct was in reckless disregard of Plaintiff's rights, such that she is entitled to punitive and exemplary damages.

1385. Defendants' conduct was outrageous and extreme and exceeds the bounds of decency in a civilized society.

1386. Defendants' defamatory and libelous statements caused and continue to cause Plaintiff (and her companion) to suffer severe emotional distress.

1387. Defendants knew and were acutely aware that Plaintiff (and her companion) would suffer severe emotional and physical distress and ordered ambulances to stand by on Plaintiff's property, but simply did not care about the extremely negative impact Defendants' individual and collective defamation and libel would have on, or the potential danger it would create for Plaintiff (and her companion) or how long the ill effects of the same would last. These were Defendants' multiple purposes of the stories complained of which resulted

from Defendants' individual and collective attempts to destroy Plaintiff's personal and professional life. The politics of personal and professional destruction of Plaintiff on each of these levels was the intended purpose and goal of Defendants.

1388. Defendants' specious, scurrilous and defamatory statements as published by Defendants were known, or should have been known by Defendants to be false.

1389. As a result of Defendants' intentional infliction of emotional distress, Plaintiff is entitled to monetary and punitive damages and demands judgment in the amount of eighty-four million dollars ($84,000,000.00).

1390. Defendants, by and through their agents, engaged in, instigated and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Plaintiff.

1391. District Attorney Hoovler, Assistant District Attorneys Kass and Purcell issued an Order of Protection that they knew or should have known was unlawful as the Complainants/Defendants were outside the scope of being "victims" as described in New York State law and Criminal Procedure Law §530.13

1392. Defendant Jean Youngman and Christine LaRocca Mann Uveges engaged in, instigated and directed a course of false charges, of extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Plaintiff.

1393. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1394. In the Prosecutors and individual Defendants committing the above-mentioned intentional acts against the Plaintiff and having her arrested and prosecuted, knowing she has medical

problems, with the ulterior motive of damaging her reputation and her business, Defendants exhibited conduct that was extreme and outrageous, and utterly intolerable in a civilized community.

1395. As a direct and proximate result of the acts alleged herein, Plaintiff suffered severe and extreme emotional distress, physical injuries, entitling her to damages in an amount of eighty-four million dollars ($84,000,000.00).

## COUNT VI

### VIOLATION OF ANIMAL ENTERPRISE TERRORISM ACT TITLE 18 U.S.C. SECTION 43

**(Against All Defendants)**

1396. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1393 as if fully incorporated herein.

1397. Intimidation is against the law. Section 43 (a) (2) (C) of Title 18 of the U.S. Code (Animal Enterprise Terrorism Act) expressly uses the word "INTIMIDATION!" Subsection (C) adds the phrase "or conspires or attempts to do so."

1398. Defendants filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against Plaintiff. Defendants' unlawful conduct was knowing, deliberate, malicious, willful and wonton, and demonstrated a reckless disregard for Plaintiff's rights, which has caused and continues to cause the Plaintiff, humiliation, shame and disgrace locally, nationally

and in certain instances, internationally, causing Plaintiff to suffer permanent harm to her personally and professionally causing Plaintiff and her companion to suffer severe mental anguish and emotional distress and causing Plaintiff to receive obscene, vulgar, and threatening emails, mail and "death threats"..

1399. Plaintiff's rights secured by the New York and U.S. Constitution amendments 1,3, 4,5,6,8,14 and restraining Tow and Orange County agents from all the criminal conduct its agents committed under color of law in this case of criminal trespass, theft, extortion, racketeering, fraud, extortion, false charges, and violations of their Oaths

1400. Defendants' unlawful conduct was knowing, deliberate, malicious, willful and wonton, and demonstrated a reckless disregard for Plaintiff's rights, which has caused, and restraining TOW and Orange County agents from all the criminal conduct its agents committed under color of law in this case of criminal trespass, theft, extortion, racketeering, fraud, extortion, false charges, and violations of their Oaths

1401. Defendants continued to cause the Plaintiff, humiliation, shame and disgrace locally, nationally and in certain instances, internationally, causing Plaintiff to suffer permanent harm to her personally and professionally causing Plaintiff and her companion to suffer severe mental anguish and emotional distress and causing Plaintiff to receive obscene, vulgar, and threatening emails, mail and "death threats".

1402. Between March 6, 2012 and the present, Defendants, without consent, intentionally damaged or destroyed an animal facility, an animal, or property in or on the animal facility, or obstructed any enterprise conducted at the animal facility.

1403. Between March 6, 2012 and the present, Defendants, without consent, acquired or otherwise exercised control over an animal facility or an animal or other property from an

animal facility with the intent to deprive the owner or to obstruct the enterprise conducted at the facility.

1404. Between March 6, 2012 and the present, Defendants, without consent, entered an animal facility, not then open to the public, with the intent to commit any acts prohibited by section SDCL 30-38-2.

1405. Between March 6, 2012 and the present, Defendants, without consent, entered or remained in an animal facility where entry forbidden or notice to depart was received.

1406. Defendants filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff.

1407. Plaintiff has been damaged by reason of Defendants' violation of the Animal Enterprise Protection Act under SDCL 40-38-2 and SDCL 40-38-3 and are entitled to recover an amount equal to three times the actual and consequential damages, court costs and reasonable attorney fees under SDCL 40-38-5.

1408. Defendants acted in concert and/or conspired together and committed multiple various acts, in combination, designed to use or cause to be used a facility of interstate commerce for the purpose of damaging or interfering with the operations of an animal enterprise, the Plaintiff's dog breeding kennel.

1409. And in connection with such purpose, intentionally placed a person in reasonable fear of death or serious bodily injury to that person or an immediate household member, or conspired or attempted to do so, by a course or conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment or intimidation, in violation of Title 18, United States Code, Section 43.

1410. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

## COUNT VII

### Negligence per se – Criminal Trespass in the Third Degree in Violation of NYS Penal Law Article 140, §140.10(a)

(Defendants Dan DePew, Town of Wallkill Defendant police officers, and Jane Doe 2)

1411. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1408 as if fully incorporated herein.

1412. On March 6, 2012, at Plaintiff's residence, Defendants Farningham and Grosso acted in concert and/or conspiring together and commit acts designed to gain entry upon Plaintiff's property, which they were not privileged to enter and for which they did not possess a valid search warrant, even after Plaintiff clearly communicated to them that they should leave the property.

1413. As a proximate cause of this trespass, Plaintiff suffered loss of enjoyment of her property, was subjected to an illegal and unconstitutional search of her property and also suffered mental and emotional anguish, and physical injuries.

1414. Although the Town of Wallkill police officers took an oath, they demonstrated no allegiance to the U.S. or NYS Constitutions as they gave themselves unrestricted authority to do as they please for as long as they please under the color of law.

1415. Although PO Julia Ashworth took an oath, she demonstrated no allegiance to the U.S. or NYS Constitutions as she gave herself unrestricted authority to do as she pleases for as long as she pleases under the color of law. This was demonstrated by her multiple

trespasses onto Plaintiff's property without authority or permission, and without a search warrant. PO Ashworth trespassed when she entered onto the padlocked and "No Trespassing" signed property and refused to leave after Plaintiff clearly communicated to her several times that they should leave the property.

1416. Although Dan Depew, Town of Wallkill Supervisor, took an oath, he demonstrated no allegiance to the U.S or NYS Constitutions as he gave himself unrestricted authority to do as he pleases for as long as he pleases. He trespassed onto Plaintiff's property, accompanied by PO Ashworth, and refused to leave after Plaintiff clearly communicated to them several times that they should leave the property.

1417. Some time prior to April 20, 2012, Lt. Spano and five armed TOW police officers entered the Plaintiff's padlocked property posted with two No Trespassing signs, one at the road and another about 100 feet down the 1,000' driveway and came to the house. He had papers he wanted the Plaintiff to sign to forfeit all the dogs. Plaintiff told them they had no authority to be on her property and asked them to leave. They wouldn't leave, trying to engage Plaintiff in conversation to convince her to sign the papers. They trespassed onto Plaintiff's property and refused to leave after Plaintiff clearly communicated to them several times that they should leave the property.

1418. Dina M. LaCatena, Adult Protective Services, County of Orange, trespassed with another worker and four armed TOW police officers without authority or jurisdiction, trespassed when they entered onto the padlocked and "No Trespassing" signed property and harassed, intimidated and threatened Plaintiff, and refused to leave after Plaintiff clearly communicated to them several times that they should leave the property.

1419. On May 10, 2012, Krissie Downey and PO Belgiovene trespassed when they entered onto the padlocked and doubly "No Trespassing" signed property after 7 PM for which they were not privileged to enter and for which they did not possess a search warrant, even after Plaintiff clearly communicated to them that they should leave the property. Plaintiff articulated several requests for them to leave and they refused to leave insisting they had a right to be there any time they wanted to.

1420. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1421. As a proximate cause of these trespasses, Plaintiff suffered loss of enjoyment of her property, was subjected to illegal and unconstitutional searches of her property and also suffered mental and emotional anguish.

1422. Defendants' conduct was in reckless disregard to Plaintiff's rights, such that Plaintiff is entitled to punitive and exemplary damages of eighty-four million dollars ($84,000,000.00.

## COUNT VIII

**Negligence per se – Intentional damage to private property in violation of law** name law

**(Against All Defendants)**

1423. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1420 as if fully incorporated herein.

1424. Defendants acted in concert and/or conspired together and committed acts designed to cause Plaintiff, Sylvia Panetta, to be permanently deprived of her property, namely the dogs taken from her March 6, 2012 and April 30, 2012 through June 1, 2012 as a result of the illegal warrants and unlawful searches and seizures.

180

1425. Defendants' actions caused Plaintiff's dogs to be turned over to Kerry Claire (Pets Alive), Krissie Downey (Mountain Rottie Rescue [MRR] ), John Doe 1 and Stephanie Palmer (Karma K-9 Rescue), Tina Hudson (A Rottie Empire Rescue), Eric Bellows (Pack Ethic Rescue), Christine LaRocca Mann (MRR and Hudson Valley Rottie escue), Jean Youngman (MRR), Ronald Youngman(MRR) , Lynn Herring (MRR), April Wood (Middletown Humane Society), and any other persons or entity which exercised control of dogs after they were seized.

1426. All parties were negligent because they knew or should have known their actions were harmful to the dogs and the Plaintiff.

1427. Judge Patrick Owen, Hoovler, Kass, Purcell, Joshua Furman, Kerry Claire (Pets Alive), Krissie Downey (Mountain Rottie Rescue), John Doe 1 and Stephanie Palmer (Karma K-9 Rescue), Tina Hudson (A Rottie Empire Rescue), Eric Bellows (Pack Ethic Rescue), Christine LaRocca, Jean Youngman, Ronald Youngman, Lynn Herring, April Wood (Middletown Humane Society), and any other person or entity which exercised control of dogs after they were seized acted in concert in an intentional or reckless manner to cause the Plaintiff's dogs to be subject to disease, to become injured, to be surgically mutilated, to be euthanized, to suffer neglect and to die.

1428. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1429. As a proximate cause of this intentional damage to her property, Plaintiff suffered loss of the enjoyment of her property, loss of business opportunity and mental and emotional anguish.

1430. Defendant's conduct was in reckless disregard of Plaintiff's rights, such that she is entitled to punitive and exemplary damages of sixty three million dollars ($63,000,000,00).

# COUNT IX

## DEFAMATION AND LIBEL *PER SE*
(all defendants)

1431. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1428 as if fully incorporated herein.

1432. This count is for declaratory relief, actual/compensatory damages, assumed damages and punitive damages to redress Defendants' acts of defamation, slander and libel committed by the Defendants as and against Plaintiff.

1433. People believe the first story they hear or read. This was done for the purpose of defaming the Plaintiff and removing any possibility of her having any credibility.

1214. Defendants filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, to defame and libel, and to further intimidate and retaliate against plaintiff. They built their "rat" stories around these burdock holes to discredit, humiliate damage, slander, libel and defame the Plaintiff's reputation.

1434. Defendants' unlawful conduct was knowing, deliberate, malicious, willful and wonton, and demonstrated a reckless disregard for Plaintiff's rights, which has caused and continues to cause the Plaintiff, humiliation, shame and disgrace locally, nationally and in certain instances, internationally, causing Plaintiff to suffer permanent harm to her personally and professionally causing Plaintiff and her companion to suffer severe mental anguish and

emotional distress and causing Plaintiff to receive obscene, vulgar, and threatening emails, mail and "death threats".

1435. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1436. All Defendants published or caused to be published in newsprint, and as generated by and through electronic media, websites, and social media, defamatory written statements about Plaintiff and her dogs.

1437. The defamatory statements published by defendants were untrue and defamatory in that they falsely "reported" plaintiffs character and actions while Defendants knew, or should have known, that such statements were false.

1438. Defendants published these false and defamatory statements and photograph descriptions with malice.

1439. The statements and allegations made by the Defendants to and by law enforcement, to the Prosecution regarding the Plaintiff, which were subsequently used in bringing a criminal prosecution against Plaintiff and re-published in local and New York City local media and television news outlets and various Internet websites and various social media, were false.

1440. Defendants published these false and defamatory statements with knowledge of their falsity and/or with a reckless disregard for the truth or falsity of these statements.

1441. These statements constitute defamation and/or libel *per se* as they falsely portray Plaintiff as an animal abuser, a breeder of poor quality dogs.

1442. They built their "rat" stories around these burdock holes to discredit, humiliate damage, slander, libel and defame the Plaintiff's reputation.

1443. These false statements constitute defamation and/or libel *per se* because they falsely impugn plaintiff s honesty, integrity, trustworthiness, competency, moral values, dependability, professional fitness, by defendants falsely alleging Plaintiff engaged in the most ghastly forms ocriminal conduct and/or other forms of conduct that have injured plaintiff personally and professionally.

1444. These false and defamatory statements have caused and continue to cause Plaintiff to experience embarrassment, humiliation and emotional injury.

1445. All defendants named herein are liable to plaintiff for defamation.

1446. Upon information and belief, defendants have made and continued to make after publications complained of herein, the enumerated and similarly false and defamatory statements about Plaintiff to third parties via the Internet websites and social media.

1447. As a direct result of said defamation, Plaintiff (as well as her companion) suffers and continues to suffer humiliation, loss of standing in the community. Public disgrace and extreme emotional distress.

1448. The defamatory and libelous acts committed by defendants as and against Plaintiff were deliberate, intentional, malicious, wonton, willful and oppressive motivated, in part, by local politics, animal rights extremism, and a desire to create a sensationalistic, however false, to sell newspapers without regard for the truth or for plaintiff 's well-being.

1449. More specifically, defendants' defamatory and libelous acts were premised upon a complete lack of concern and profound ill will towards plaintiff Hudson and/or a reckless disregard for Plaintiff's rights, for which plaintiff is entitled to an award of punitive damages.

1450. Plaintiff has suffered harm as a result of Defendants' overtly false and misleading statements including, but not limited to, harm to Plaintiff's personal and professional reputation, emotional distress and mental anguish as Defendants' statements were defamatory *per se*.

1451. As a result of defendants' libel *per se*, Plaintiff is entitled to monetary and punitive damages and demands judgment in the amount of Sixty Three Million Dollars ($63,000,000.00).

1452. The statements were known by Defendants and their employees and agents to be false, and Defendants, by and through their agents, acted intentionally in causing them to be published.

1453. As specified below, Plaintiff was injured by the publishing of the false statements to and by law enforcement and to the public at large.


1454. Press releases to as far away as NYC media and TV stations and held a subsequent press conference. A helicopter was hovering over Plaintiff's property as though she were a threat to national security. People believe the first story they hear or read. This was done for the purpose of defaming the Plaintiff and removing any possibility of her having any credibility.

1455. PO Jason Farningham issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1456. TOW PO Jason Farningham issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed

her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1457. TOW PO Anthony Grosso issued materially false reports/testimony concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1458. TOW PO Julia Ashworth issued materially false reports/testimony concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1459. TOW Supervisor Daniel Depew contributed materially false information concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1460. TOW Supervisor Daniel Depew issued materially false reports to Plaintiff's neighbors concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1461. TOW Supervisor Daniel Depew issued materially false reports to mass media located locally and as far away as New York City concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and

maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1462. TOW Code Enforcer Frank Werlitz issued materially false reports to Orange & Rockland, a utility company that provided electricity to the Plaintiff's home concerning conditions of the Plaintiff's home and to abruptly and immediately disconnect the electric service, falsely stating the house was condemned. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1463. TOW Police Chief Robert Hertman issued materially false reports concerning conditions of the dogs, their doghouses and their environment to the mass media, including news outlets in New York City by holding a press conference to orate the false reports. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1464. TOW PO Antonino Spano issued materially false information concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that the false information defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1465. PO Kelly Ann Boss issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1466. K. Monahan issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1467. Barry Weissman issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1468. Barry Weissman illegally ordered the Plaintiff to go back and remain in her house and was threatened not to come out or would be arrested.

1469. A. Solano issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1470. PO DiNapoli issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1471. PO Snellinger issued materially false reports concerning conditions of the dogs, their doghouses and their environment. Plaintiff alleges that these reports defamed her and maliciously deprived Plaintiff of her right to liberty and substantive due process as guaranteed by the Fourteenth Amendment and in violation of 42 U.S.C. § 1983.

1472. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1473. November 29, 2018, about 4:00 P.M. the Plaintiff experienced what she thought was a sudden power failure with her electricity.

1474. Plaintiff called Orange & Rockland to report the power failure.

1475. She was told there was no power, that they terminated the service by order of Frank Werlitz, TOW Code Enforcer. He relayed to them only verbally that the Plaintiff's house was condemned. He never sent them any documentation.

1476. The house was not condemned.

1477. Four hours later, two TOW police officers, **PO Orengo** and PO **DeAngelis** physically broke into the house. (Emphasis added)

1478. They literally threw the Plaintiff out of the house and threatened to arrest her and seize her car if she returned.

1479. They yelled and cursed at her using the word "fuck" with practically every other word in every sentence. They ridiculed her. **PO Orengo** jumped up and down and then said he'll have to stop jumping because he would fall through the floor.

1480. **PO DeAngelis** yelled, also using the word "fuck" that he has to get out of there now because he doesn't know what kind of diseases he'll bring home with him.

1481. Plaintiff called **TOW Councilman Eric Johnson** for help. He asked to speak to the Officers. They refused to speak to him. The Plaintiff held the phone for Eric Johnson to hear the way the two TOW officers were yelling, cursing and degrading the Plaintiff. Councilman Johnson said he heard them yelling and cursing at Plaintiff.

1482. Plaintiff held the phone for a while as the two officers continued their verbal, disgraceful rampage.

1483. **Councilman Johnson** stated he heard all the cursing and yelling at Plaintiff.

1484. Plaintiff advised the officers she can't leave because she can't drive because she has taken medication. **Orengo** and **DeAngelis** said they didn't care. They said she had to "get the fuck out of here now".

1485. **Orengo** and **DeAngelis** would not allow Plaintiff to gather any belongings or medications, and wasn't allowed to use the bathroom.

1486. Plaintiff was allowed to take her pocketbook, put on a jacket and then, "get the fuck out and do not come back."

1487. Plaintiff pulled over on the side of the road when she left her driveway to get her bearings and one of the officers went on the P.A. loudspeaker of the police car and ordered Plaintiff to move her car or she will be arrested.

1488. Plaintiff drove to Walmart. Walking to the store, Plaintiff passed out in the parking lot and was later found by a store employee.

1489. Plaintiff contacted TOW Supervisor Diana after the week-end, who admitted the house was not condemned. He said, "You didn't hear it from me, but you can go back to your house and finish packing."

1490. Plaintiff was unable to pack the balance of her belongings at the house because it was too cold without the electricity. The water in the toilets were frozen.

## COUNT X

## LIBEL *PER SE* – INJURY TO PERSONAL AND PROFESSIONAL REPUTATION

1491. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1488 as if fully incorporated herein.

1492. Defendants' defamatory and libelous statements concerning Plaintiff were false.

1493. Defendants' defamatory and libelous statements were widely published in newsprint, local radio and television news as well as New York City and through electronic news and social media and not privileged in any manner.

1494. Defendants' defamatory and libelous statements were made with reckless disregard for their truth or falsity and were deliberately made with malice.

1215. Defendants' statements were libelous per se because they injured Plaintiff's personal, professional and public service reputation(s). Example: They built their "rat" stories around these burdock holes to discredit, humiliate damage, slander, libel and defame the Plaintiff's reputation.

1495. Defendants' defamatory and libelous statements forever taints and permanently damages Plaintiff in the eyes of friends, associates, the business community, and the general public as a criminal. Plaintiff has devoted her life to her family, developing her business interests. Defendants' defamatory and libelous statements have caused permanent damage to Plaintiff 's reputation worldwide as Defendants' publication by electronic media have both national and international reach.

1496. Defendants' goal was to destroy Plaintiff's viability as a breeder. As a result of the multiple newspaper articles and false stories on the Internet and social media reaching international recipients complained of herein, Plaintiff is obstructed from continuing her goal as a Rottweiler breeder.

1497. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1498. As a result of Defendants' injury to Plaintiff's personal and professional reputation, Plaintiff is entitled to monetary and punitive damages and demands judgment in the amount of sixty three million dollars ($63,000,000.00).

# COUNT XI

## LIBEL *PER SE* – DEFENDANTS' ACCUSATIONS OF PLAINTIFF'S CRIMINAL AND VIOLATION CONDUCT

1499. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1496 as if fully incorporated herein.

1500. Defendants' defamatory and libelous statements concerning Plaintiff were false.

1501. They built their "rat" stories around these burdock holes to discredit, humiliate damage, slander, libel and defame the Plaintiff's reputation.

1502. Defendants' defamatory and libelous statements were widely published in newsprint and through electronic media and social media and not privileged in any manner.

1503. Defendants' defamatory and libelous statements were made with reckless disregard for their truth or falsity and were deliberately made with malice.

1504. Defendants' statements were libelous per se because they alleged Plaintiff was engaged in horrendous and ghastly acts of criminal conduct and greed.

1505. Defendants' defamatory and libelous statements forever taint and permanently damage Plaintiff in the eyes of friends, associates, the business community and the general public as a criminal.

1506. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1507. As a result of defendants unfounded and baseless accusations of Plaintiff's engagement in multiple criminal and violation acts, Plaintiff is entitled to monetary and punitive damages and demands judgment in the amount of sixty three million dollars ($63,000,000.00).

# COUNT XII

## LIBEL BY IMPLICATION

1508. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1505 as if fully incorporated herein.

1509. Defendants' defamatory and libelous statements concerned Plaintiff and alleged the existence of other "facts" which are defamatory.

1510. Defendants' defamatory and libelous statements concerning Plaintiff were false.

1511. Defendants' defamatory and libelous statements were widely published in newsprint and through electronic media and social media and Internet discussion boards, and not privileged in any manner.

1512. They built their "rat" stories around these burdock holes to discredit, humiliate damage, slander, libel and defame the Plaintiff's reputation.

1513. Defendants' defamatory and libelous statements were made with reckless disregard for their truth or falsity and were deliberately made with malice.

1514. Defendants had no reasonable grounds for believing as true the false narrative they created and concocted between themselves. Defendants deliberately "cherry picked" events, while ignoring pertinent facts in real time, photographs and information readily available on the Internet and other sources, all of which were available to defendants. Instead, defendants crafted and orchestrated their smear campaign comprised of rumor mongering, unsupported suppositions, unproven and outright false allegations and uncorroborated conclusions. Premised upon statements by named but indirectly involved individuals who, at the time the events transpired, had all rights and remedies at law available to them but either did not avail themselves of the same or did not prevail in any litigation undertaken at the time.

1515. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1516. As a result of defendants contrived and concocted implication(s), Plaintiff is entitled to monetary and punitive damages and demands judgment in the amount of sixty three million dollars ($63,000,000.00)

## COUNT XIII

### LIBEL – RECKLESS DISREGARD AND MALICE

1517. Plaintiff incorporates each and every allegation set forth in paragraphs 1- _____ as if fully incorporated herein.

1518. Defendants' defamatory and libelous statements concerned Plaintiff and alleged the existence of other "facts" which are defamatory.

1519. They built their "rat" stories around these burdock holes to discredit, humiliate damage, slander, libel and defame the Plaintiff's reputation.

1520. Defendants' defamatory and libelous statements concerning Plaintiff were false.

1521. Defendants' defamatory and libelous statements were widely published in newsprint and through electronic social media and discussion groups and not privileged in any manner.

1522. Defendants' defamatory and libelous statements were made with reckless disregard for their truth or falsity and were deliberately made with malice.

1523. Defendants' defamatory and libelous statements were knowingly made by Defendants in contravention of and without regard for preexisting public and Court records which defendants claimed to have reviewed. but instead, "cherry picked" what Defendants needed to fabricate their false narrative about Plaintiff.

1524. When compared to the preexisting public and Court records, Defendants' statements are demonstrated to be abject lies about Plaintiff.

1525. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1526. As a result of Defendants' reckless disregard and malice, Plaintiff is entitled to monetary and punitive damages and demands judgment in the amount of sixty three million dollars ($63,000,000.00).

## COUNT XIV

# ABUSE OF PROCESS

1527.   Plaintiff incorporates each and every allegation set forth in paragraphs 67-1524 as if fully incorporated herein.

1528.   Defendants misused the legal process by having Plaintiff prosecuted and removing all her dogs solely for the purpose of causing her financial and reputational harm, and to otherwise harass and harm the Plaintiff.

1529.   Defendants acted with malice and conscious disregard for the rights of the Plaintiff or the care of the dogs in that their ulterior purpose in misusing the legal process was to disrupt the Plaintiff's breeding operation by causing financial hardship and damaging her reputation.

1530.   The fact that the Defendants placed dogs with "impounding organizations" that Plaintiff proclaimed had a history of the killer canine parvovirus, and where her dogs were being euthanized without Plaintiff's knowledge or permission, and performing amputation surgery on deformed dogs that were previously not in pain or suffering from anything, and were happy and thriving dogs, resulting in unnecessary mutilation was abuse in itself against the dogs that were Plaintiff's property.

1531.   Defendants defiantly used tarps that they knew or should have known would create mud swamps in the dog runs as was expressed by the Plaintiff, that cause the dogs to be in ankle deep mud, and among other things, demonstrates the Defendants were not motivated by the safety and well-being of the dogs, but rather were acting for the ulterior motive and purpose of financially disrupting Plaintiff's business and harming her reputation. Their motivation was also the dogs and money they would receive by conspiring to create fabricated and baseless charges "to provide cover for defendants" untruthful actions,

wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against Plaintiff.

1532. Any reasonable officer knew or would have known that the conduct complained of by Plaintiff violated well-established law at the time of the incident.

1533. Any reasonable officer knew or should have known that the defendants were not experts and had no control or reasoning of doing the things they were doing.

1534. As a direct and proximate result of the Defendants' actions described hereinabove, Plaintiff suffered damages to herself and her reputation as described herein below.


## COUNT XV

### TRESPASS TO REAL PROPERTY

1535. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1532 as if fully incorporated herein.

1536. On March 6, 2012, under false pretenses under the original guise of a "welfare check" on the Plaintiff, Officers Jason Farningham and Anthony Grosso broke into Plaintiff's 92 acre private property, posted with a NO TRESPASSING sign on the gate and another 100 feet down the 1,000 foot driveway and blocked by a wooden gate and a heavy tow chain padlocked to the posts, located at 237 Derby Road, Town of Wallkill, They entered the property by cutting the chain, removing the wooden swing door from the 4x4 post cemented into the ground, and broke and knocked the 4x4 post over at ground level.

1537. Six further illegal searches were executed by PO's Ashworth, Spano, Covey, Farningham, Grosso, Boss, Monahan, Weissman, Ashworth, Solano, DiNapoli, Snellenger, Kenney, Joseph Steuber, Jessica Steuber, prior to obtaining a search warrant.

1538. Judge Patrick Owen unlawfully allowed PO'S, town civilian employees, civilians, ambulance corps to trespass on Plaintiff's real property.

1539. Without any statutory right, police allowed unauthorized civilians to trespass on Plaintiff's real property.

1540. PO Ashworth trespassed on Plaintiff's real property.

1541. Veterinarians trespassed on Plaintiff's real property.

1542. Town Supervisor Depew trespassed on Plaintiff's real property.

1543. All Defendant police officers trespassed on Plaintiff's real property.

1544. Many automobiles were driven onto and in the property recklessly, causing damage.

1545. In the course of this operation, Defendants and their agents entered into Plaintiff's business office area and personal home and then proceeded to ransack the premises March 6, 2012 and again on April 30, 2012, went through her personal effects, all the drawers in all the rooms, including Plaintiff's underwear drawer, as well as property of the business, including 31 dog runs. (Emphasis added)

1546. Business and personal files, personal documents, birth certificates of family members, passports, divorce papers, sales tax files, among the many things that were stolen.

1547. In doing so, Defendants and their agents did cause damage to real property.

1548. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1549. Said physical invasion of Plaintiff's private property, committed intentionally and purposefully for the reasons set forth above, constitutes a compensable trespass to real property.

1550. The Appellate Term Court deemed the initial search as being illegal.

## COUNT XVI

### TRESPASS TO CHATTELS

1551. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1548 as if fully incorporated herein.

1552. Defendants **Ashworth,** Spano, Covey, Farningham, Grosso, Boss, Monahan, Weissman, Ashworth, Solano, DiNapoli, Snellenger, Kenney, Joseph Steuber, Jessica Steuber in concert, illegally removed two (2) deformed dogs on March 6, 2012.

1553. Defendants illegally removed 12 puppies, nine (9) pregnant and non-pregnant dogs, on April 30, 2012, and 55 dogs between May 1 and June 1, 2012 none of which were charged, from Plaintiff's possession, never to be returned.

1554. April Wood stole Plaintiff's cat after being told she cannot have it, and then sent it to Pennsylvania.

1555. Animal rights "volunteers" stole Plaintiff's five (5) valuable dog crates whereas Det. Donaldson refused to pursue the theft.

1556. This wrongful taking of Plaintiff's property constituted interference with Plaintiff's possession, use and enjoyment of her chattels.

1557. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1558. Defendants filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff.

1559. As a direct and proximate result of the actions of the Defendants as detailed above, Plaintiff suffered emotional distress and financial loss.

## COUNT XVII

### CIVIL CONSPIRACY

1560. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1557 as if fully incorporated herein.

1561. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

1562. In committing the above described intentional acts against Plaintiff and having her sent to jail four times, having her arrested and prosecuted with the ulterior motive of intimidating her for the purpose of their desire to cover-up the illegal search, and at the same time, damaging her reputation and her business, and acquiring valuable dogs for sale or for themselves to breed, to enrich themselves, the above named Defendants in this action have joined together to accomplish a purpose that is unlawful or oppressive or alternatively, to accomplish a purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive or immoral means, to the injury of another.

1563. Defendants filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff

# COUNT XVIII

## DAMAGES

1564. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1561 as if fully incorporated herein.

1565. As a direct and proximate result of the actions of the Defendants as detailed above, Plaintiff suffered a loss of her dogs and business revenue from her breeding operation and an undetermined amount. Plaintiff has lost her home as a result of the impact of Defendants' actions.

1566. As a direct and proximate result of the actions of the Defendants as detailed above, Plaintiff was arrested and falsely prosecuted, suffering the inconvenience and emotional distress of being subjected to criminal prosecution, jail, and suffering damage to her personal and professional reputation.

1567. Defendants filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede Plaintiffs' ability to seek relief for those actions, and to further intimidate and retaliate against Plaintiff.

1568. Any reasonable officer would have known that the conduct complained of violated well-established law at the time of the incident.

# COUNT XIX

## PUNITIVE DAMAGES
### (All defendants)

1569. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1566 as if fully incorporated herein.

1570. The actions of the Defendants and their agents or employees were wanton, reckless and willful.

1571. On March 6, 2012, two TOW police officers broke into the Plaintiff's secured, secluded property under false pretenses with the goal of viewing everything in order to be a participant in the nation's epidemic of fabricated cruelty charges resulting with the intention of obtaining valuable animals and conforming to the animals rights' goals.

1572. The Defendants and their agents or employees published the false statements in question to law enforcement and subsequently to the general public with reckless disregard as to whether the allegations were false or not.

1573. Plaintiff was emotionally and physically injured June 1, 2012 in Orange County jail resulting in massive nerve damage, a traumatic brain injury and claustrophobia.

1574. Defendants filed the false and baseless criminal charges "to provide cover for defendants" untruthful actions, wrongful actions, to frustrate and impede plaintiffs' ability to seek relief for those actions, and to further intimidate and retaliate against plaintiffs.

1575. More specifically, defendants' defamatory and libelous acts were premised upon a complete lack of concern and profound ill will towards plaintiff Hudson and/or a reckless disregard for Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

1576. As specified above, the actions of the Defendants have caused injury to the Plaintiff.

1577. Plaintiff seeks punitive damages for violations of the first, third, fourth, fifth, sixth eighth and 14th Amendments, assault and battery, conspiracy, defamation, libel, abuse of process, malicious prosecution, negligence and emotional distress.

1578. Any reasonable officer, the District Attorney and employees, TOW management and employees, TOW judges. Middletown Judge knew or would have known that the conduct complained of violated well-established law at the time of the incident.

1579. Any impounding organization and its volunteers or agents knew or should have known that the conditions and conduct complained of violated well-established law at the time of the incident.

1580. For all of the above actions, Plaintiff is entitled to recover of and from all Defendants for defamation, actual expenses incurred, lost income, loss of an irreplaceable genetic pool, loss of home, Plaintiff's valuable dogs, inconvenience and emotional distress suffered by Plaintiff as well as punitive damages, attorney's fees, if applicable, and costs associated with bringing this action.

1581. Panetta seeks punitive damages for violations of the third, fourth sixth, eighth and 14th Amendments, assault and battery, conspiracy, defamation, libel, abuse of process, malicious prosecution, negligence and emotional distress.

## COUNT XX

### FALSE IMPRISONMENT

**( Patrick Owen, Joseph Owen, Steven Brockett, PO Weissman, Joseph Steuber, Spano, DA Hoovler, ADA Kass, ADA Purcell)**

1582. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1579 as if fully incorporated herein.

1583. Defendants filed the false and baseless criminal charges "to provide cover for defendants' untruthful actions, wrongful actions, to frustrate and impede Plaintiff's ability to seek relief for those actions, and to further intimidate and retaliate against plaintiff.

1584. The ongoing and continuing actions of fabricated charges and theft of property and consequences proves the corrupt actions and conduct were deliberate.

1585.  As a direct and proximate result of the actions of the Defendants as detailed above, Plaintiff was arrested and falsely prosecuted, suffering the inconvenience and emotional distress of being subjected to criminal prosecution and suffering damage to her personal and professional reputation and sustained permanent physical injuries as well as a traumatic brain injury, Post Traumatic Stress Disorder and claustrophobia.

1586.  **March 6, 2012, PO Spano**, without statutory authority, forced Plaintiff to remain in the cold in an open porch against her will refusing to let her re-enter her home.

1587.  Although being told by an attorney to leave, Plaintiff was then illegally confined to her home by PO Weissman and threatened she would be arrested if she exited again.

1588.  Six trespasses and illegal searches followed with police being accompanied by civilians.

1589.  Plaintiff was arrested April 30, 2012 on a totally defective search warrant and placed in the TOW jail, falsely imprisoned.  No probable cause, no application for a SW.

1590.  June 1, 2012, Plaintiff was unlawfully sent to Orange County jail on an unlawful Order of Protection that was subsequently dismissed in its entirety.

1591.  On May 17, 2015, Plaintiff was sent to Orange County jail on a bench warrant Plaintiff didn't know existed.  Her ineffective and incompetent attorney that was later replaced by the Middletown judge never contacted her to advise her the warrant existed and she should turn herself in.

1592.  Any judge or reasonable officer knew or should have known that the conduct complained of violated well-established law at the time of the incident.

1593.  Plaintiff was illegally imprisoned four times by order of Judge Joseph Owen and Judge Steven Brockett.

## COUNT XXI

### PERJURY

### New York State Penal Code 210

(Defendants Cassel, Farningham, Grosso, Covey, Ashworth, Spano, Boss, Monahan, Kenney, Joseph Steuber, Jessica Steuber, Ayers, Kass, Johannesson, Furman, Johnson, Etherington, Petkov,Susen, Downey, Ambrose, Larocca, J, Youngman, Herring, Hudson, Bach, Bossley, Barron,)

1594. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1593 as if fully incorporated herein.

1595. "Oath" includes an affirmation and every other mode authorized by law of attesting to the truth of which it is stated.

1596. "Swear" means to state under oath.

1597. "Testimony" means an oral statement made under oath in a proceeding before any court, body, agency, public servant or other person authorized by law to conduct such proceeding and to administer the oath or cause it to be administered.

1598. "Swear falsely" – a person swears falsely when he intentionally makes a false statement while giving testimony or under oath in a subscribed written instrument with intent that it be uttered or published as true.

1599. § 210.05 Perjury in the 3rd degree, a class A misdemeanor, when guilty of swearing falsely.

1600. § 210.10 Perjury in the 2nd degree is a class E felony, when guilty of swearing falsely and when false statement is made in a subscribed written instrument for which an oath is required by law and made with the intent to mislead a public servant in the performance of his official functions and material to the action., proceeding or action involved.

1601. § 210.15 Perjury in the 1st degree is a class D felony, is when guilty of swearing falsely, and when his false statement consists of testimony and is material to the action, proceeding or matter in which it is made.

1602. Plaintiff was harmed by false, sworn statements while Defendants gave testimony and/or in writing while under oath.

## COUNT XXII

### PERJURY

### 18 U.S.C. § 1621

(Defendants Cassel, Farningham, Grosso, Ashworth, Spano, Boss, Monahan, Kenney, Joseph Steuber, Jessica Steuber, Ayers, Kass, Johannesson, Furman, Johnson, Etherington, Petkov, Susen, Downey, Ambrose, Larocca, J, Youngman, Herring, Hudson, Bach, Bossley, Barron,)

1603. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1593 as if fully incorporated herein.

1604. Whoever having taken an oath before a competent tribunal, officer or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under 1746 of Title 28 U.S. Code, willfully subscribes as true any material matter which he does not believe to be true; is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years or both. This section is applicable whether the statement or subscription is made within or without the United States.

Plaintiff requests a trial by jury.

## INJURIES

206

1605. Plaintiff incorporates each and every allegation set forth in paragraphs 67-1604 as if fully incorporated herein.

1606. Death of newborn puppy March 6, 2012, caused by injuries occurring during the illegal search executed by the TOW police officers, Ashworth, Farningham, Spano, Joseph Steuber, Jessica Steuberand the building inspector.

1607. Emotional distress commencing March 6, 2012, with the illegal break-in, multiple illegal searches, death of newborn puppy, and unjustified seizure of two dogs, causing Post Traumatic Stress Disorder, further instigated through April 30, 2012 raid and all that followed. Post Traumatic Stress Disorder (PTSD) is as injurious as physical injuries. The permanent PTSD will never get resolved and suffering will be unlimited ... forever.

1608. April 30 2012 – assaulted by Stephanie Palmer, Karma K-9, resulting in injury.

1609. May 22, 2012 – assaulted by Christine Larocca-Mann-Uveges, resulting in injury.

1610. June 1, 2012 – multiple nerve damage injuries, traumatic brain injury and claustrophobia caused by negligence of two Sheriff Department officers, two Orange County jail nurses and Orange County Jail Correction Officers (unknown names) that refused to interfere as Plaintiff 's injury caused a neurological episode that lasted several continuous hours and reoccurred for several years.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that this Honorable Court:

(a)     accept jurisdiction over this matter;

(b)     empanel a jury to fairly hear and decide this case;

(c)    order all defendants to compensate Plaintiff for the injuries, physical and emotional, and for all damages caused by the events set forth above in the amount of sixty three million dollars $63,000,000.00;

(d)    order all Defendants to pay punitive and exemplary damages for their malicious, knowing and wrongful violation of Plaintiff's rights to due process of law, as set forth in the asserted causes of action in the amount of sixty three million dollars, $63,000,000.00;

(e)    order all Defendants to pay Plaintiff's costs and expenses in this action;

(f)    order all Defendants to pay Plaintiff for actual and compensatory damages in the amount of sixty three million dollars, $63,000,000.00;

(g)    order all Defendants to pay any attorney fees and costs pursuant to the provisions of 42 U.S.C. Section 1988, should an attorney join the case and;

(h)    enter any other relief which the interests of justice require.

Plaintiff demands trial by jury

Respectfully submitted,

Sylvia Panetta

P. O. Box 55
Howells, NY 10932
845 341-8786

Dated: March 5, 2020

EP STATES
AL SERVICE.

Retail

US POSTAGE PAID
Origin: 10940

PRESS FIRMLY TO SEAL

US POSTAGE PAID

C004

DELIVERY DAY: 03/09/20

3 Lb 2.10 Oz

1005

S TRACKING®NUMBER

5163 2717 0067 2482 26

ARROPAS ST
PLAINS NY 10601-4140

f delivery specified*
'RACKING™ included to many major
tional destinations.
l international insurance.
available.*
upplies online.*
ised internationally, a customs
tion label may be required.

stic only

To schedule free
Package Pickup,
scan the QR code.

USPS.COM/PICKUP



USMWP
SDNY

RECEIVED
MAR 09 2020
U.S.D.C.
WP

FROM: S. Panetta
Howells NY 1093

US DISTRICT COURT
TO:
300 QUARROPAS ST
WHITE PLAINS NY 10601

PRO SE OFFICE

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail
Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; October 2018;

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

0001000014